[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 07-11476, 07-11644,
08-10428, 08-10433

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 12, 2010
JOHN LEY
CLERK

D. C. Docket Nos. 05-00544-CR-LSC-TMP
05-00061-CR-2-RBP-TMP
05-00542-CR-2-RDP-PWG
05-00545-CR-LSC-PWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEWELL C. "CHRIS" MCNAIR,
JACK W. SWANN,
BOBBY J. RAST,
DANIEL B. "DANNY" RAST,
RAST CONSTRUCTION, INC.,
FLOYD W. "PAT" DOUGHERTY,
F.W. DOUGHERTY ENGINEERING & ASSOCIATES, INC.,
GRADY R. "ROLAND" PUGH, SR., and
ROLAND PUGH CONSTRUCTION, INC.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(May 12, 2010)

Before CARNES, HULL and ANDERSON, Circuit Judges.

HULL, Circuit Judge:

This consolidated appeal arises from five bribery and public corruption cases relating to the $3 billion repair and rehabilitation of a sewer and wastewater treatment system in Jefferson County, Alabama. A 127-count Second Superseding Indictment (the "Indictment") charged sixteen defendants (eleven individuals and five corporate firms) with conspiracy to commit bribery, substantive offenses of bribery, honest services mail fraud, mail fraud, and obstruction of justice. Nine defendants appeal their convictions here. Three of those nine defendants appeal their sentences.

Specifically, the nine defendant-appellants are: two former County officials, three corporate contractors, and four individuals who owned these respective contractors. The two defendant County officials were in charge of the sewer program and received hundreds of thousands of dollars worth of bribes from the defendant contractors. In many cases, the contractors disguised these payments by

2

altering invoices or hiding costs within their accounting systems. In turn, the defendant contractors obtained hundreds of millions of dollars worth of payments on construction and engineering contracts with the County. The County officials approved the contractors' pay requests, change orders, time extensions, and/or requests for field directives, all of which financially benefitted the defendant contractors.

After review and oral argument, we conclude the evidence at the trials overwhelmingly established the defendant-appellants' guilt, and they have shown no reversible error in the district courts' rulings, pre-trial or in the trials, in the cases consolidated on appeal. Thus, we affirm all of the defendant-appellants' convictions except Roland Pugh Construction, Inc.'s conviction on Count 75, which is barred by the statute of limitations. We also affirm Jewell C. "Chris" McNair's sentence in full. We affirm Jack W. Swann's sentence in part but remand for further proceedings as to the amount of the fine. As to the sentence of Roland Pugh Construction, Inc., we (1) affirm the district court's findings of fact as supported by the record; and (2) conclude there was no error in the district court's calculations under the sentencing guidelines; but (3) in light of the reversal of its Count 75 conviction, we vacate its sentence and remand for resentencing without Count 75.

## I. BACKGROUND

### A. Jefferson County Officials

The defendant County officials implicated in the bribery scandal are:

<u>Defendant McNair</u>: Jewell C. "Chris" McNair ("McNair") was a Jefferson County Commissioner.  McNair was responsible for overseeing the operation of the Jefferson County Environmental Services Division ("JCESD"), which included the sewer system.[1]

<u>Defendant Swann</u>: Jack W. Swann ("Swann") was the Director of the JCESD.

<u>Defendant Wilson</u>: Ronald K. Wilson ("Wilson") was Chief Civil Engineer for the JCESD and served on the Product Review Committee ("PRC").[2]  After leaving the JCESD in 1999, Wilson formed his own firm, Civil Engineering Design Services, Inc. ("CEDS").

---

[1]The repair and rehabilitation project, which is the subject of this appeal, was required under the terms of a consent decree between Jefferson County and the U.S. Environmental Protection Agency.  The consent decree was entered into as a settlement of claims brought by the U.S. Justice Department in 1994 against Jefferson County for violations of the Clean Water Act, and it required Jefferson County to repair and upgrade dilapidated sewer lines and wastewater treatment plants that were overflowing and leaking sewage into local watersheds.  The JCESD initially estimated the work would cost County ratepayers $1.2 to 1.5 billion over the next decade.  The actual costs were closer to $3 billion.

[2]The PRC was a technical committee that reviewed materials, specified the products that could be used on the sewer project, and qualified contractors for certain kinds of work on the project.  During the relevant time period, the PRC had between 10 and 11 members.  Among them were defendants Wilson and Barber, and co-conspirators Harry Chandler, Donald Ellis, and Larry Creel.

Defendant Barber: Clarence R. Barber ("Barber") was Chief Construction Maintenance Supervisor for the JCESD and served on the PRC.

## B.    Contractors

These defendant corporate firms and individuals had either construction or engineering contracts with the JCESD and were implicated in the bribery scandal.

Pugh defendants: Roland Pugh Construction, Inc. ("PUGH"); Grady Roland Pugh, Sr. ("Roland Pugh"), founder, board chairman, and 70% owner of PUGH; and Joseph E. "Eddie" Yessick ("Yessick"), President and 10% owner of PUGH. PUGH had $178 million in sewer construction contracts with Jefferson County between August 1999 and January 2002. PUGH was a "dig-and-replace" contractor.[3]

Rast defendants: Rast Construction, Inc. ("RAST"); Bobby J. Rast ("Bobby Rast"), President and co-owner of RAST; and his brother Daniel B. Rast ("Danny Rast"), Vice President and co-owner of RAST. RAST had about $100 million in sewer construction contracts with Jefferson County during the same period. RAST was another "dig-and-replace" contractor.

---

[3]A "dig-and-replace" contractor traditionally digs up broken sewer pipes, replaces them, and paves over the repair. Some dig-and-replace contractors have the capacity to perform "cured-in-place" work. The "cured-in-place" process involves the relining of cracked pipes with a cement product that cures inside the pipes and seals the cracks from within. None of the defendants here performed cured-in-place work. However, PUGH and Defendant Rast Construction, Inc. entered into joint ventures with contractors who could perform cured-in-place work, as discussed later.

Dougherty defendants: F. W. Dougherty Engineering & Associates, Inc. ("FWDE") and Floyd W. "Pat" Dougherty ("Dougherty"), President and owner. FWDE received $11.4 million in no-bid engineering contracts with Jefferson County during the same period.

USI defendants: US Infrastructure, Inc. ("USI"); Sohan Singh ("Singh"), President of USI; and Edward Key ("Key"), Vice President of USI. USI received about $50 million in engineering contracts with Jefferson County between 1999 and 2003.

## C. Co-conspirators

Five other individual co-conspirators pled guilty and testified for the government in one or more of the five trials:

Grady Pugh: Grady Roland Pugh, Jr. ("Grady Pugh") was CEO and 10% owner of PUGH. He is the defendant Roland Pugh's son.

Chandler: Harry T. Chandler ("Chandler") was Assistant Director of the JCESD and served on the PRC.

Ellis: Donald R. Ellis ("Ellis") was an engineer for the JCESD and Chairman of the PRC.

Creel: Larry P. Creel ("Creel") was a Maintenance Supervisor for the JCESD and served on the PRC.

Dawson: William H. Dawson ("Dawson") was the owner of Dawson Engineering, Inc. ("Dawson Engineering"), which received at least $20 million worth of no-bid engineering contracts from Jefferson County.

While the Indictment alleges certain conduct by these five individuals as co-conspirators, they are not named defendants in the Indictment at issue in this appeal.

**D.    The Indictment**

The Indictment contained 127 counts.[4]  Six of the counts charged a bribery conspiracy.  Specifically, Counts 1 (against McNair and the Pugh, Rast, and Dougherty defendants), 32 (against McNair and the USI defendants), 50 (against McNair and the USI defendants), 51 (against Swann and the Pugh, Rast, and Dougherty defendants, except for Roland Pugh), 75 (against Wilson and PUGH), and 78 (against Barber and the Pugh defendants) charged conspiracy to commit bribery under 18 U.S.C. §§ 371 and 666.

Counts 2-31, 33-49, 52-74, 76-77, and 79-89 charged one or more defendants with substantive bribery offenses (or aiding and abetting bribery) under

---

[4]The original indictment was filed on February 7, 2005, and the Superseding Indictment was filed on July 13, 2005.  After the five co-conspirators listed above pled guilty over a period of several months, the government submitted the Second Superseding Indictment on August 26, 2005, dropping the defendants who had pled guilty.  The counts referenced in this opinion are as numbered in the Second Superseding Indictment.

18 U.S.C. § 666.  For the most part, these substantive bribery offenses were the overt acts charged in the conspiracy counts.

Counts 90-101 charged honest services mail fraud under 18 U.S.C. §§ 1341 and 1346 against defendants Swann, Yessick, and PUGH.  Counts 102-121 charged honest services mail fraud under 18 U.S.C. §§ 1341 and 1346 against defendants Swann, Wilson, CEDS, FWDE, and Dougherty.  Counts 122-124 charged mail fraud under 18 U.S.C. § 1341 against the Dougherty defendants.  Counts 125-127 charged obstruction of justice against certain defendants under 18 U.S.C. § 1503.

Some of these counts were dismissed before trial, and other counts were dismissed prior to jury deliberations.  And some defendants, such as Roland Pugh, were dismissed from some of the counts that went to the jury.  This opinion addresses only the counts that were actually submitted to the jury.

E.    **Five Trials**

The 127-count Indictment was severed into five separate cases for trial: *McNair* (05-061), *Swann* (05-544), *Barber* (05-542), *Wilson* (05-545), and *USI* (05-543).[5]  The *McNair* trial involved bribes by the Pugh, Rast, and Dougherty

_____

[5]Grady Pugh, Chandler, Ellis, Dawson, and Creel testified for the government in the *McNair* trial.  Chandler, Ellis, and Wilson testified for the government in the *Swann* trial.  Grady Pugh, Chandler, and Yessick testified for the government in the *Barber* trial.  Grady Pugh and Chandler testified for the government in the *Wilson* trial.  Chandler, Ellis, and Dawson testified

defendants primarily to McNair but also to Chandler and Ellis. The *USI* trial

involved bribes to McNair by the USI defendants. The other trials involved bribes

to Swann, Barber, and Wilson, respectively.

In the *USI* trial, defendants USI, Key, and Singh were convicted of, among

other things, conspiracy to commit bribery and substantive bribery offenses for

making payments to defendant Commissioner McNair and the JCESD's Chandler

and Ellis. This Court affirmed defendants USI, Key, and Singh's convictions and

sentences in United States v. US Infrastructure, 576 F.3d 1195 (11th Cir. 2009),

cert. denied, __ S. Ct. __, 78 U.S.L.W. 3540 (U.S. Mar. 22, 2010) (No. 09-967).

Defendant McNair entered a conditional guilty plea to Count 32 (conspiracy to

accept a $140,000 bribe from the USI defendants).[6] McNair reserved the right to

appeal the district court's denial of his motion to dismiss Count 32. McNair's

appeal in the *USI* case has been consolidated with the present appeal.

**F.     Nine Parties to This Appeal**

This present consolidated appeal involves not only defendant McNair's

appeal in the *USI* case but also these defendants' appeals in the other four trials:

(1) *McNair* trial: defendants McNair, PUGH, Roland Pugh, RAST, Bobby

_____

for the government in the *USI* trial.

[6]McNair's motion to dismiss sought dismissal of Counts 32 and 50 (both counts of conspiracy to commit bribery), arguing under "Wharton's Rule" that a conspiracy cannot exist as an offense separate from the substantive offense of bribery (charged in Counts 33-37).

9

Rast, Danny Rast, FWDE, and Dougherty. Defendant Yessick (President of PUGH) was convicted at trial and does not appeal.

(2) *Swann* trial: defendants Swann, PUGH, RAST, Bobby Rast, FWDE, and Dougherty. Defendant Yessick was convicted at trial and does not appeal.

(3) *Barber* trial: defendant PUGH. Defendants Barber and Yessick pled guilty and do not appeal.

(4) *Wilson* trial: defendant PUGH. Defendant Wilson was convicted at trial and does not appeal.

Albeit from five separate cases, the defendant-appellants raise many of the same issues. We discuss (1) the evidence in the *McNair*, *Swann*, *Barber*, and *Wilson* trials, and (2) the issues commonly raised by the defendants, followed by (3) certain issues pertaining to particular defendants.

## II. THE *McNAIR* TRIAL (05-061)

The *McNair* trial, held from April 6 to 21, 2006, involved over $350,000 in bribes the Pugh, Rast, and Dougherty defendants paid to Commissioner McNair and $6,600 in bribes they paid to County employees Chandler and Ellis. The government called 36 witnesses, including Chandler, Ellis, Dawson, Creel, and Grady Pugh. The defense called 23 witnesses. No named defendant testified.

The government's witnesses described in great detail the bribes to McNair,

Chandler, and Ellis, and how those three County officials financially helped the Pugh, Rast, and Dougherty defendants in their contracts with and payments from Jefferson County. Because the defendant contractors in the *McNair* trial claimed they paid McNair only out of a long-time friendship and lacked corrupt intent, the district court admitted certain evidence, under Federal Rule of Evidence 404(b), about how these same defendants bribed Swann and other County employees in order to show the defendants' corrupt intent and common plan. Thus, our recitation of evidence in the *McNair* trial covers bribes given not only to McNair but also to Swann and other County employees.

## A.    McNair Helps Contractor-Defendants

Jefferson County was governed by five elected Commissioners, each of whom had a different area of responsibility. Defendant McNair held office as a County Commissioner from 1996 until his retirement in March 2001. McNair was responsible for overseeing the JCESD, which included the sewer systems. McNair had authority to approve pay requests from the sewer construction contractors, to approve change orders[7] increasing the contract price paid to those contractors, to approve change orders modifying the contract terms in favor of those contractors, to approve emergency payments to contractors, to select consulting engineers

---

[7]Change orders are contract modifications in the Jefferson County Commission's Agenda items.

11

through a no-bid process, and to approve the engineers' contracts and payments. Although final approval required the vote of the entire Commission, there was no evidence that the Commission questioned or disapproved of any pay request or change order approved by McNair or any selection or award of a contract recommended by McNair. McNair's nickname among the contractors was "Big Man."

McNair approved payments (in the hundreds of millions of dollars) to the Pugh, Rast, and Dougherty defendants (the "contractor-defendants"), approved change orders (in the millions of dollars) benefitting PUGH and RAST, and approved no-bid engineering contracts (in the millions of dollars) to FWDE, all while these defendants were paying for materials and labor to expand and renovate McNair's photography studio. Each item requiring Commission approval, such as contract awards or modifications, needed McNair to approve it first and then to put it on the Commission's agenda for further approval.[8] The sewer construction contracts were awarded through a sealed bid process and would go to the lowest

_____

[8]For example, the December 1999 Commission Agenda shows a modification adding $1,081,621 (about 28% of the contract value) to a PUGH contract, and a $112,600 contract award to FWDE. The January 2000 Agenda indicates a modification adding $489,133 to a PUGH contract. The February 2000 Agendas indicate a modification adding $400,724 to a RAST contract, a $721,132 contract award to FWDE, and a modification adding $1,377,267 to a PUGH contract. The March 2000 Agenda indicates a $5,289,002 contract award to PUGH. The April 2000 Agenda indicates contract awards of $994,640 and $348,103 to FWDE, a modification adding $439,722 to a RAST contract, and a modification adding $850,264 to a PUGH contract.

bidder. But the prospective contractors had to satisfy technical standards set by the PRC before they would be eligible to bid.

Once a new contract was awarded and in place, Chandler and other supervisors, such as Ellis, could approve changed or additional work as "field directives." If a requested change exceeded the original contract amount, Chandler and Ellis could recommend "change orders" (requests for additional funds), which McNair would then approve and place on the Commission's agenda, without further competitive bidding. The JCESD also could award "emergency" work to construction contractors without competitive bidding. For emergency jobs, Barber typically selected the contractor, negotiated the price, and then sent the pay requests to McNair, Swann, and Chandler for approval. Together, McNair, Swann, and Chandler approved a variety of contracts for the sewer project.[9]

The construction contractors' work was supervised by independent consulting engineers, whose jobs were to make sure the contractors performed according to specifications and to sign off on payments and requests for change orders. This supervision was provided by engineering firms such as FWDE, USI,

---

[9]For example, Chandler, Swann, and McNair approved a $1,168,788.02 payment to PUGH for work done in January 2001. Chandler, Swann, and McNair approved a $2,652,820 payment to PUGH for work done in June 2000. Chandler, Swann, and McNair approved a $1,000,000 payment to RAST in October 2000. Swann and McNair approved — in one day on an emergency basis without Chandler's or the County engineer's usual approval — a $1,152,888 payment to RAST for work done in October 2000.

and Dawson Engineering. The engineering consultant contracts were awarded without bidding. Swann and Chandler selected engineering firms, negotiated their contracts, and recommended them to McNair for final approval.

The County's PRC initially decided to qualify only three contractors to do "cured-in-place" work: W.L. Hailey ("Hailey"), Insituform, and Reynolds. Because the traditional "dig-and-replace" work was grouped with "cured-in-place" work for all the major construction contracts, this PRC decision effectively limited the "big jobs" to only three bidders: a RAST-Hailey joint venture, a PUGH-Insituform joint venture, and Reynolds, which did its own dig-and-replace work. In late 1999, the PRC changed the criteria, making it more difficult for other contractors to pre-qualify for "cured-in-place" work, and potentially delaying by two years the qualification of otherwise qualified contractors.[10]

Contractor PUGH's CEO Grady Pugh admitted to receiving a "general benefit" from giving McNair "envelopes of cash," in that "Jefferson County treated us real well. We had an opportunity to do a tremendous amount of work there. The work that we did there generated huge profits . . . [I]t took our company [PUGH] from a normal struggling contracting company in [the] mid to late '90s, to a thriving, wealthy, strong construction company."

---

[10]The PRC and its requirements are discussed more later in the *Wilson* trial section.

During the relevant period, PUGH dedicated about 70% of its work to the Jefferson County sewer rehabilitation and received tens of millions of dollars in revenue from that sewer work. In 1996 and 1997, at the sewer rehabilitation's outset, PUGH made gross profits of 10%, and as the project continued and payments were made to JCESD officials, the company's sewer rehabilitation profits increased to 50% in 1999, 40% in 2000, and 45% in 2001, making PUGH tens of millions of dollars each of these years.

RAST also received tens of millions of dollars in revenue per year from its Jefferson County sewer work. And the engineering firms, including FWDE, received revenue in millions of dollars per year from their work on the sewer rehabilitation. McNair made the decision every time FWDE or Dawson Engineering was selected as the outside consulting engineer and awarded a professional service contract. After electrical contractor Gus Henson did some work for McNair without charge, McNair had Swann arrange a County contract for him, even though the County did not normally hire electrical engineers for sewer work.

In total, from August 1999 to January 2002, Jefferson County paid $178 million to PUGH, $100 million to RAST, $11.4 million to FWDE, and $8 million to Dawson Engineering.

15

**B. Bribes of McNair**

McNair owned a small photography business called McNair Frame & Photo Art, Inc. ("McNair's studio"). Between 1999 and early 2002, McNair started a major expansion and renovation of the studio, which would more than double its size. McNair's expansion included adding extras to the studio, such as an apartment for his daughter, a second-story deck, external stairs, a "guard shack," and a security gate.

All contractor-defendants in this case generously contributed to the renovation and expansion of McNair's studio. In 1999, FWDE's President Dougherty sent Bill Bailey, an FWDE employee initially hired as an inspector for County jobs, to work as the construction superintendent for the studio's renovation. FWDE paid Bailey for the approximately 18 months he spent working at McNair's studio. During that time, FWDE paid Bailey $74,240. Although some of his time was charged to "administration," FWDE President Dougherty charged some of Bailey's studio time to a JCESD sewer project. McNair was not charged for Bailey's work. As superintendent, FWDE's Bailey oversaw construction at McNair's studio by numerous other contractors, including PUGH and RAST.[11]

_____

[11]As 404(b) evidence, the government showed that in addition to paying $74,240 to Bailey, FWDE paid the salaries of its employees, Wayne Hendon and John Stanger, while they acted as construction superintendents overseeing renovation of JCESD Director Swann's home. FWDE paid Hendon $94,090 and Stanger $28,839 for that work.

RAST excavated for the expansion's footings for McNair's studio. In July 1999, PUGH ordered concrete and for four weeks had a four-man crew pour concrete walls and do other work on the studio, paying the crew $11,709. PUGH's crew supervisor talked to McNair while the concrete work was in progress, but McNair did not question why he was there or where he was from, nor did McNair offer to pay for this work.

In late 1999, FWDE's Bailey asked Barry Mosley of Mosley Construction to do wood framing and other finish work at McNair's studio. McNair initially paid Mosley, first with a check and then with cash, but eventually McNair stopped paying. Bobby Rast then told Bailey that "McNair was running out of funds" and that RAST would begin paying Mosley directly. From July 2000 to December 2000, RAST wrote 20 checks totaling $52,990 to Mosley as his work at the studio progressed, and, at Bobby Rast's direction, coded these payments as expenses on a JCESD sewer project. Either Bailey or someone from RAST's office, such as Danny Rast, brought Mosley the checks.

In January 2002, RAST gave Mosley two more checks totaling $7,200 for work he and his crew did on the studio's "guard shack," a two-story, 12 x 12 building designed by defendant Dougherty, and built, in part, by defendants RAST and FWDE. Bobby Rast caused these payments to be coded as expenses on the

"Upper Valley Rehab" or Kilsby contract, a JCESD sewer project. For tax purposes, all payments to Mosley were deducted as business expenses on sewer projects. Mosley did no work on those projects. After a local newspaper reported RAST's construction work at JCESD Director Swann's home, RAST amended its tax returns for 1998-2000 and 2002 to eliminate these and other deductions. The deductions, which totaled over $140,000, were based on expenditures for McNair's studio and Swann's home that had been cost-coded to sewer projects and treated as business expenses.

After the publicity, Bobby Rast told his bookkeeper in "effect that we really didn't need any document invoices in the files with Jack Swann's or Chris McNair's shipping address on them." The bookkeeper then located and discarded several invoices related to work at McNair's studio and Swann's home.

RAST furnished the labor and PUGH furnished the materials to construct a second-story deck for the rear of McNair's studio. Bailey handwrote a list of materials and ordered the necessary steel. When Besco Steel Supply ("Besco") delivered the steel, its delivery tickets identified PUGH and Yessick as its customers and indicated some of the steel was for the Valley Creek Treatment Plant, a JCESD sewer job on which PUGH was the contractor and FWDE the consulting engineer. In September 2000, PUGH paid Besco and charged the

JCESD for $3,773 worth of steel with FWDE's approval, and RAST poured the concrete deck and stairs, set the handrails, and built the steps.

Around September 2000, FWDE employee Dave Bechtel ordered two sets of aluminum handrails for the studio deck and a staircase from Thompson Fabricating, which was directed to bill PUGH. The $5,500 invoice for the first set of handrails charged the work as performed on the Valley Creek Treatment Plant and falsely indicated that the handrails were shipped there. In February 2001, an $11,700 invoice for the second set of handrails referenced "CHRIS MC." as the customer, but also falsely indicated that the handrails were shipped to Valley Creek when in fact they were shipped to McNair's studio. PUGH paid both invoices and billed the County for the first set of handrails after adding a markup and charges for labor and equipment. RAST installed the handrails.

In May 2000, at McNair's request to Roland Pugh, Grady Pugh flew McNair's daughter and FWDE's Bailey on PUGH's airplane to Georgia, where they picked out carpet for McNair's studio. Before take-off, Roland Pugh told his son Grady Pugh that "McNair has called [again] and says that he's broke and he doesn't have enough money to leave for the deposit on the carpet" and "[s]o, if you would, write a check for the deposit." Grady Pugh paid the deposit with a $4,820 PUGH check made out to the Mill Store and had it treated on PUGH's books as an

19

expense on the "last rehab contract."[12]

FWDE's Bailey hired subcontractor Clint Gilley to install the carpet at McNair's studio. In October 2000, FWDE's Bailey called RAST to request checks for subcontractor Gilley. After Bobby Rast was consulted, RAST gave Gilley two checks totaling $5,301 for his work at McNair's studio.

In addition to paying for materials and providing work crews, PUGH also made other contributions to McNair's studio. When the project began in 1999, Roland Pugh told PUGH's other three owners, Grady Pugh, Andy Pugh, and Yessick, they had to give money to McNair because he was building a studio and, as 10% owners of the PUGH company, they had to "kick in" their share. Grady Pugh gave approximately $1,500 in cash to Roland Pugh's secretary that time.[13]

---

[12]The Indictment alleges as an overt act on Count 1: "On or about May 24, 2000, Defendant ROLAND PUGH instructed Grady Pugh to fly an airplane owned by Defendant PUGH, INC. to LaGrange, Georgia, to buy carpet and flooring material for the benefit of Defendant McNAIR. . . . On or about May 24, 2000, Defendant ROLAND PUGH caused Grady Pugh to pay $4,820 to The Mill Store, Inc. for carpet and tile for installation at McNair Studio for the benefit of Defendant McNAIR."

[13]The government also presented evidence of cash allegedly given to McNair. Roland Pugh collected money from the other owners to give to McNair. On July 18 and 19, 2000, Roland Pugh, Grady Pugh, and Yessick wrote checks to cash (totaling $9,000) in proportion to their ownership interests. Roland Pugh gave Grady Pugh an envelope of money and asked him to give it to McNair. Grady Pugh took the envelope to the studio where he saw Bailey and told him he was there to help McNair. Grady Pugh stated the money was "financial help" that McNair needed at that time. Grady Pugh then met with McNair for a few minutes and left the envelope with McNair.
    When the studio needed an air conditioning system, McNair again called Roland Pugh asking PUGH to pay for it. Roland Pugh told Grady Pugh that McNair needed $40,000, but that "y'all don't have to put up any money this time, I'm going to do it in a different way." Roland Pugh gave a $10,000 check dated December 22, 2000 to Grady Pugh's wife, Genae Pugh, who

20

McNair also wanted a security gate for the studio. In August 2000, Danny Rast hired subcontractor Master Access Controls ("MAC") to install an electronic gate and agreed that RAST would provide the electrical conduit, wiring, and concrete pad for the gate's motor. MAC met with FWDE's Bailey at McNair's studio site, installed the gate, and sent its invoices to the attention of Danny Rast. RAST paid the subcontractor $5,866.92. McNair paid nothing.

Also in December 2000, at Danny Rast's request, RAST gave Bailey & Sons' Bobcat Service, owned by Danny Bailey, a $5,500 check for landscaping at McNair's studio. However, RAST's records indicated Danny Bailey was working on a JCESD sewer project. Although Danny Bailey had done work for RAST before, he did not send the invoice for the studio work through regular billing, as he normally would, but instead sent it "Atten Dan Rast."[14]

_____

cashed it and gave the money to Roland Pugh. That same day, Roland Pugh wrote a $10,000 check to Angie Pugh (Andy Pugh's wife) and a $9,750 check to cash. A week earlier Roland Pugh had written a $9,000 check to cash. Around Christmas 2000, at Roland Pugh's request, Grady Pugh picked up another envelope containing cash from Roland Pugh's secretary, went to McNair's house, spoke with him for a few minutes, and put the money down on a couch with McNair watching.

It appears from the closing arguments that all of the above cash and checks relate to Counts 4, 13 and 14 (on which the defendants were acquitted).

[14]Huffman Electric was hired to do electrical work at McNair's studio by FWDE but was told to bill RAST. When Huffman sent an $11,252 invoice to RAST in November 1999 without making it to the attention of Bobby or Danny Rast, RAST's vice president, Roy Weaver, responded that they "have no job at this location." Huffman then began billing McNair directly. At first McNair paid the bills, but he eventually fell behind in his payments and owed approximately $45,000 by July 2000. Around this time, Grady Pugh allegedly made a delivery of cash to McNair, and RAST took over paying for Mosley's wood framing services.

In November 2000, McNair asked Dawson Engineering to contribute to the studio's renovation. After McNair called William Dawson, the founder of Dawson Engineering, the two met at McNair's studio. McNair handed Dawson a brochure for an audiovisual system and told Dawson that, while McNair had "never asked [Dawson] for anything before," he needed to ask Dawson to "help [him] with something." McNair opened the brochure to a specific page, showed it to Dawson, and indicated he wanted Dawson to pay for the equipment and its installation. Dawson went to Holt Audio Video ("Holt") and purchased the equipment for $16,400. Dawson testified he would not have done this for McNair if McNair had not been associated with the sewer rehabilitation process. When Dawson saw the invoice indicated the bill was for Dawson Engineering but the shipment was for McNair's studio, he became "uncomfortable with the whole situation" and asked Holt to alter the shipping information by putting a sticker over the McNair studio's address, which Holt did. Dawson later pled guilty to conspiring to commit bribery.

Work at the studio continued after Commissioner McNair retired in March 2001. FWDE's Bailey hired Buchanan Plumbing and Sewer Service ("Buchanan") to plumb the "guard shack." In November 2001, FWDE employees signed Buchanan's $1,775 in invoices and sent them to RAST, which paid them. RAST recorded the payments as "Plumbing Work at Kilsby Circle," a sewer project, even

though Buchanan never did any work there.

After McNair's retirement, Roland Pugh told Grady Pugh "that GD [sic] McNair has called again, and he wants us to do some work over in Arkansas" and "surely this is the last time we'll have to do anything for him since he's out of office." Grady Pugh flew with McNair to Arkansas to look at the site and plans. Following this visit, PUGH's Yessick hired George Word, an Arkansas building contractor, in August 2001 to build a 3,000-square-foot retirement home for McNair. Both PUGH and FWDE paid for its construction.[15] PUGH's checkbook carried the notation "Gift per Eddie [Yessick]. No job." After McNair's retirement, RAST also continued to perform work at McNair's studio and paid $8,135.78 for McNair and his wife to take a cruise to Alaska in September 2001.[16]

## C.    Bribes of Chandler and Ellis

The Pugh, Rast, and Dougherty defendants also gave, at no charge, goods,

---

[15]After McNair's retirement, PUGH paid George Word $44,192.75 in the first half of October 2001, and, at Yessick's instruction, internally charged the expense to miscellaneous jobs/construction materials. McNair told George Word that FWDE would make the next payment. On October 24, 2001, after FWDE's bookkeeper Rick Brinson saw Dougherty speaking with McNair in FWDE's parking lot, Dougherty asked the bookkeeper to write a $50,000 check to a construction company. About 20 to 30 minutes later, George Word's $50,000 invoice, dated a day earlier, arrived by fax. The bookkeeper wrote the check, gave it to Dougherty, and made an extra copy of the paperwork and kept it at home. Upon being subpoenaed for these records later, the bookkeeper searched FWDE's records, but could not find the invoice. The only copy he found was the extra one he kept at home.

[16]After McNair's retirement, on May 14 and 15, 2001, PUGH, FWDE, and Bobby Rast each gave McNair a check for $5,000 (totaling $15,000). Bobby Rast's check was for a "retirement gift" and FWDE's was for a "motor home."

services, labor, materials, and other things of value to (1) JCESD Assistant Director Chandler, and (2) JCESD Engineer and PRC Director Ellis. At a lunch, PUGH's President Yessick offered to landscape Chandler's home. Chandler at first refused, but weeks later Yessick offered again, and Chandler accepted. PUGH provided crews and paid for the materials for the extensive landscaping, including grading, drainage work, and new sod, as well as construction of a patio, walkway, and retaining walls. Chandler paid nothing for that work.

In October 2001, Yessick arranged and paid for a $610 condo rental for the Chandler family vacation at the Pelican Beach Resort in Destin, Florida.[17] Chandler asked for, and PUGH delivered, a load of sand for Chandler's house for free.

In the spring of 2002, Chandler asked Bobby Rast to help with his expenses for a trip to Europe to attend technical conferences. Ellis planned to attend too. At RAST's office, Bobby Rast gave Chandler an envelope containing $5,000 in cash and told Chandler to split the money with Ellis. Chandler had expected $250 to $500 and was "uncomfortable and thought about giving it back, but [he] didn't."

---

[17]The government also presented evidence that in April 2000, PUGH's Yessick invited Chandler on a fishing trip to Bienville Plantation in Florida, where the trip was paid for by PUGH. Grady Pugh arranged to have Yessick and Chandler fly to Florida in the PUGH company's airplane. The jury acquitted PUGH and Yessick on Count 70, which referenced this trip.

Instead, Chandler "eventually gave half" to Ellis.[18]  The Dougherty defendants also gave Chandler tickets to Disney World and a trip to San Antonio.

## D.    The Defense

For the most part, the defendants did not dispute that they provided, at no charge, these goods, services, labor, materials, and other things of value to Commissioner McNair.[19]  Instead, the defendants argued they lacked the "corrupt" intent necessary for bribery and that the government had failed to prove the required *quid pro quo* for the benefits provided to McNair.  The defendants also asserted they helped McNair based on their friendship with him or for goodwill. In support, defense witnesses testified to McNair's decades-long friendship with Roland Pugh, Dougherty, and the Rast family, and described how the contractor-defendants frequently performed work for McNair at no charge.  The contractor-defendants also contended their experience, skills, and business reputation were strong enough so that they did not need to resort to bribery to win County contracts.

The defense spent considerable time attacking the credibility of Grady Pugh,

---

[18]Other JCESD employees also received cash from the contractors.  Danny Rast gave $1,500-$2,000 in cash to JCESD Field Supervisor Larry Creel, who sometimes awarded emergency work.  PUGH gave $500 in cash to Creel for airplane tickets after Creel asked for a flight on PUGH's company airplane.

[19]Roland Pugh is the only defendant to dispute that he gave anything to McNair.

25

including inconsistencies in his testimony. The defense suggested he was lying out of hatred for his father Roland Pugh and to obtain a favorable sentence recommendation from the government.

The government countered the defendants' corrupt-intent arguments by offering 404(b) evidence of similar items of value the same contractors had provided for Swann, Wilson, and Barber (who were not defendants in the *McNair* trial). The government argued the large scale and overall pattern of these payments were inconsistent with the defendants' claims that they were favors undertaken merely out of friendship for McNair. The government also presented evidence that McNair made numerous unexplained cash deposits.[20]

## E.    Jury's Verdicts

Before sending the case to the jury, the district court dismissed several substantive counts that charged bribes to McNair after his retirement in March 2001, and struck the corresponding overt acts from the conspiracy count (Count 1), reasoning that 18 U.S.C. § 666 (the bribery statute) could not apply when McNair was no longer a public official.

In the *McNair* trial, the jury convicted defendants McNair, PUGH, Roland

---

[20]In the *McNair* trial, the government did not explain the source of the cash deposits. But in the *USI* case, the government showed these cash deposits corresponded with cash withdrawals from USI, Singh, and Key. See US Infrastructure, 576 F.3d at 1206.

Pugh, Yessick, RAST, Bobby Rast, Danny Rast, FWDE, and Dougherty on Count 1 of conspiring to bribe McNair. Count 1 alleged 54 overt acts originally. Several overt acts were dismissed pre-trial, but Count 1, as submitted to the jury, charged 39 overt acts in furtherance of the conspiracy.

As to bribes by the Pugh defendants, the jury convicted defendant McNair on these substantive bribery counts: 2 ($5,500 for hand railings) and 3 ($11,700 for hand railings). The jury convicted defendant PUGH on Count 15 (same hand railing facts as Counts 2 and 3). The jury convicted defendants PUGH and Yessick on Count 71 ($610 for Chandler condominium rental).

As to bribes by the Rast defendants, the jury convicted defendant McNair on these substantive bribery counts: 5 ($52,990 for carpentry work by Barry Mosley), 6 ($5,866 for security gate installation by Master Access Controls), 7 ($5,300 for carpet installation by Clint Gilley), 8 ($5,500 for landscaping work by Bailey & Sons), 9 (several thousand dollars for fabrication and construction of stairs), and 10 (several thousand dollars for concrete deck construction). The jury also convicted defendants RAST and Bobby Rast on Counts 19-22 (same facts as Counts 5-8, respectively), 72 ($2,500 cash to Chandler by RAST and Bobby Rast), and 87 ($1,000 cash to Ellis by RAST and Bobby Rast). RAST was also convicted on Counts 23 (same facts as Count 9) and 24 (same facts as Count 10). The jury

27

convicted defendant Danny Rast on Counts 19, 20, and 22 (same facts as Counts 5, 6, and 8).

Defendant McNair was also convicted on Counts 11 ($27,434 by the Dougherty defendants for project management and supervision by Bailey) and 12 ($16,400 by Dawson for installation of audio visual system). The jury convicted defendants FWDE and Dougherty on Count 28 (same facts as Count 11).[21]

In summary, the jury convicted defendant McNair on the bribery conspiracy count and ten substantive bribery counts. The jury convicted defendants PUGH, Roland Pugh, and Yessick on the bribery conspiracy count; defendant PUGH on two substantive bribery counts; and defendant Yessick on one substantive bribery count. The jury convicted defendants RAST, Bobby Rast, and Danny Rast on the bribery conspiracy count; defendant RAST on eight substantive bribery counts; defendant Bobby Rast on six substantive bribery counts; and defendant Danny Rast on three substantive bribery counts. The jury convicted defendants FWDE and Dougherty on the bribery conspiracy count and on one substantive bribery count

---

[21]In the *McNair* trial, the jury acquitted defendant McNair on Count 4 ($30,000 cash from the Pugh defendants), defendants PUGH and Yessick on Count 13 ($20,000 cash to McNair) and on Count 70 ($1,000 trip for Chandler to Bienville Plantation, Florida), and defendants PUGH and Roland Pugh on Count 14 ($10,000 cash to McNair). The $30,000 in Count 4 appears to consist of the cash in Counts 13 and 14.

The *McNair* jury also acquitted defendant Danny Rast on Count 21 ($5,300 bribe of McNair for carpet installation through Clint Gilley), defendants RAST and Danny Rast on Count 89 ($1,000 cash to JCESD employee Larry Creel), and defendants RAST and Bobby Rast on Count 126 (obstruction of justice in connection with withholding items from the grand jury).

each.  All defendants but Yessick appeal all conviction counts.

### III.  THE *SWANN* TRIAL (05-544)

The *Swann* trial, held from September 19 to October 2, 2006, involved more than $330,000 in bribes paid to County employee Swann by the Pugh, Rast, and Dougherty defendants.  The government called 25 witnesses, including Wilson, Chandler, and Ellis.  The defense called 20 witnesses, including Grady Pugh.  No named defendants testified except for Swann.

The government's witnesses described in great detail the bribes to Swann and how Swann financially helped the Pugh, Rast, and Dougherty defendants in their contracts with and payments from Jefferson County.  And to counter the defendants' lack-of-corrupt-intent defense, the government introduced 404(b) evidence describing bribes that the same Pugh, Rast, and Dougherty defendants gave to McNair, Barber, Wilson, and Chandler.[22]

#### A.    Swann Helps Contractor-Defendants

JCESD Director Jack Swann reported directly to Commissioner McNair.  It was Swann's responsibility to implement the EPA consent decree, which included recommending engineering firms to McNair and negotiating the scope and price of

---

[22]For example, in the *Swann* trial, the government presented evidence about how RAST bought Barber a piece of land.  This evidence is outlined later in this opinion under the *Barber* trial evidence.  Defendant Barber pled guilty to this charge.

no-bid engineering contracts, such as with FWDE. Swann supervised the sewer work and made recommendations to McNair for payment approvals and change orders. Swann also was able to grant time extensions and field directives that greatly benefitted RAST and PUGH.

For example, in May 1998, the JCESD awarded the Vestavia Trunk Sewer Replacement project to PUGH. PUGH's failure to meet the project's May 17, 2000 completion date would trigger a liquidated damages clause, obligating PUGH to pay $1,000 per day. In March 2000, PUGH was running far behind schedule on this project and requested a 120-day extension to the May 17 completion date. Swann initially denied PUGH's request.

On June 13, 2000, PUGH renewed its request, this time for a 180-day extension. On July 10 — five days after PUGH's Yessick hired Guthrie Landscaping ("Guthrie") to landscape Swann's property — Swann granted PUGH's request for a 180-day extension to the May 17 completion date. Swann's extension saved PUGH $180,000 in potential liquidated damages.

In July 2000, the JCESD awarded the Valley Creek Trunk Relief Tunnel project (designed by FWDE) to RAST and its joint venture partner W.L. Hailey. In December 2001, during the first phase of the project, RAST's tunnel-boring machine became stuck in the ground. An independent engineer concluded the

30

machine became stuck because RAST may have discounted certain information in a geotechnical survey. And the JCESD's supervising engineer faulted RAST for using "the wrong machine." Nevertheless, Swann authorized RAST to remove the machine at a cost of $2.6 million to Jefferson County.

Further, Swann declined to invoke the performance bond against RAST, which would have guaranteed the project's completion at the original contract price of $27.8 million. Instead, RAST won a re-bid for an additional contract worth $23.8 million. Consequently, the County effectively paid RAST over $50 million for work RAST was obligated to perform under the original $27.8 million contract.

Swann also approved a lucrative field directive that benefitted PUGH ($827,417) and three that benefitted RAST ($2,020,367). Although in the County's internal accounting system Swann recorded the County's payments to the RAST-Hailey joint venture for each of these field directives as payments for the Valley Creek Tunnel Relief project, none of the field directives involved work on that project. Swann also exercised great influence over the selection of engineers, like FWDE.

B.    Bribes of Swann

In 1998, Swann and his wife Nila purchased a house two doors down from

31

their own residence. The Swanns lived in their residence while they renovated their new home. Between September 1998 and June 2002, the Swanns put over $600,000 worth of additions and improvements into their new home. FWDE, RAST, and PUGH provided Swann, at no charge, more than $330,000 in goods, services, labor, and materials for that work. For certain improvements paid for by FWDE, Swann admitted he did not reimburse FWDE or Dougherty. As they had done for the McNair studio project, the contractor-defendants worked together on Swann's new home. While the work was going on, Swann periodically came over to observe the work at the new home. While Swann was recommending and approving JCESD actions worth millions of dollars, the contractor-defendants were providing hundreds of thousands of dollars in materials and services to renovate and expand Swann's new home.

Specifically, in the fall of 1998, Dougherty sent FWDE supervisors Wayne Hendon and Bill Bailey to meet with Swann and his wife about plans to remodel their new home. Over the course of the three-year project, FWDE employees continually supervised the remodeling of the new home. From about October 1999 to March 2001, FWDE paid employee John Stanger $28,839 for his work at Swann's home. During that time period, FWDE's Hendon spent half of every work day supervising other contractors at Swann's home and billed his time as a

nonpaying job. FWDE paid Hendon $94,090 for his work at Swann's home. In the fall of 1998, FWDE hired subcontractor Dudley Davis for framing, costing over $28,000. Dougherty visited the site periodically.

In the winter of 1999, Bobby Rast sent RAST superintendent Luke Cobb to supervise RAST crews who did demolition work and poured concrete for Swann's new home. Bobby Rast had RAST employee Derek Houston serve as a point of contact for RAST's suppliers and subcontractors for Swann's home and paid Houston $6,300 for his work there. In 2000, RAST paid its employees $18,867.20 in miscellaneous labor costs for their work on Swann's home and McNair's studio. RAST avoided using Swann's name on invoices, delivery tickets, and internal accounting reports, instead using his nickname, "Little Big Man."

RAST also bought bricks and other materials, and paid different subcontractors for installation of hardwood floors and stairs and exterior brickwork, plumbing work, and painting. RAST paid $3,535 for flooring and stairs installation that Don's Carpet One performed at Swann's new home in 2000 or 2001. In the fall of 1999, RAST paid $1,964 for brick and mortar work by Alabama Brick Delivery. In the fall of 2000, RAST paid Kimro Painting & Services, Inc. ("Kimro Painting") $9,733 for painting work at Swann's new home. In May 2001, RAST paid $4,441.50 to Sherman International for concrete work.

The delivery ticket for ready-mix concrete RAST purchased from Sherman International directed delivery to the Swann address but identified it as the "Rast Residence." In October 2001, RAST paid Brown Mechanical Contractors, Inc. ("Brown Mechanical") for $9,540 worth of plumbing work performed at Swann's new home. Bobby Rast had the payments to Brown Mechanical coded as expenses to RAST's Jefferson County contracts for "Annual Rehab" and "Minor Pump Station."

In the summer of 2000, PUGH began contributing to Swann's new home remodeling. PUGH's President Yessick hired subcontractor Aquatic Gardens to install a waterfall and koi pond at a cost of $7,422. Yessick told Aquatic Gardens to send its invoices to PUGH and not mention Swann by name.

Yessick hired other subcontractors for various work after Swann claimed to have overpaid for the remodeling. Yessick hired Guthrie to help landscape Swann's new home, and in July 2000 Guthrie gave an initial estimate of $40,000. PUGH's book entries and invoices for Guthrie's work on Swann's home were never kept in Swann's name, but always under some other code. Yessick had PUGH's accountant charge Guthrie's expenses to "Metro Park Roadway," a Jefferson County job. By December 2001, PUGH had paid Guthrie $93,680 for its landscaping work at the Swann home, which included $1,200 a month for ongoing

34

weekly yard maintenance.

In January 2002, PUGH's President Yessick asked Guthrie to stop submitting invoices to PUGH, and instead PUGH advanced Guthrie $47,000 for three years worth of landscaping and maintenance on Swann's new home; and Guthrie performed about $10,000 worth of work. Although PUGH's manager of accounts testified she filed Guthrie's invoices regularly and that PUGH kept these records for 5 to 7 years, the invoices were not found during the government's investigation.[23] In December 2001, Yessick used a PUGH check to buy $1,000 worth of bookstore gift certificates for Swann.[24]

In August 2002, after Grady Pugh and Yessick heard rumors of a government investigation, Guthrie was asked to stop working on Swann's property, even though there was a balance remaining on the advance Yessick had given to Guthrie. At that time, Yessick directed his assistant to send an invoice to Swann's mother-in-law for $12,572 for tree removal and "remodeling work." In

---

[23]Count 101 ($47,000 check from Guthrie) was dismissed on the government's motion during the third day of trial. On that trial day, Paul Guthrie (the owner of Guthrie) testified that, even though Guthrie received a $47,000 check from PUGH's Yessick for Guthrie's work at Swann's home, Guthrie to date had done about $10,000 worth of work on Swann's home, not $47,000. Swann was convicted on Count 52, which charges him with receiving approximately $100,000 in work done by Guthrie.

[24]The government also presented evidence that Bobby and Danny Rast used at least $4,000 of RAST's funds to pay for Swann's expenses on two trips to England. Swann and the Rast defendants were acquitted on Counts 59 (Swann accepted $3,015 trips to England and Scotland) and 68 (Rast defendants paid Swann for those trips).

September 2002, Yessick instructed his assistant to create an invoice, this time to Swann's mother, for $46,684 of landscaping work. In November 2002, the Swanns paid PUGH this amount with checks drawn from joint checking accounts the Swanns had taken out with their mothers, after taking out two home equity loans in each of their mothers' names.[25]

## C.    The Defense

In the *Swann* trial, the defense basically was that the defendants lacked the corrupt intent to commit bribery and acted at all times in good faith. The contractor-defendants contended they performed work on Swann's home out of goodwill and without expecting anything in return. Swann argued he did not have an intent to be influenced by the things the contractor-defendants gave him.

In addition, the defendants presented evidence showing that Nila Swann (Swann's wife) had an engineering background, acted as her own general contractor, hired and supervised subcontractors, and initially paid the bills for the work on the Swann home. Swann testified that Nila handled all of the couple's financial matters and that he assumed she was paying for the work. According to Swann, Nila frequently changed her mind, was not a good manager, and disputed the cost and scope of the work with the subcontractors. Dougherty and the Rast

---

[25]The plan all along had been for the Swanns' mothers to move into the old home after the new home was built.

brothers were longtime friends of Nila and Jack Swann.  Swann stated that Dougherty and the Rast brothers stepped in only to offer advice and take over supervision to make the work go more smoothly.  The contractor-defendants claimed that they paid several of these disputed bills to preserve their own business relationships with the subcontractors and their expectation was that the Swanns would eventually reimburse them.  However, with the sole exception of PUGH's belated invoices to Swann for landscaping and remodeling work, there was no evidence that the Swanns paid the contractor-defendants for the work at their new home.

As to the conspiracy charge, the defendants also claimed that the government had not presented sufficient evidence to show an unlawful agreement between Swann and any of the contractor-defendants.

In the *Swann* trial, the government presented 404(b) evidence about similar items of value the same contractor-defendants had provided to McNair for his studio, their help with McNair's home in Arkansas, and other benefits they provided for McNair, Barber, and Chandler.

## D.    Jury's Verdicts

The jury convicted defendants Swann, PUGH, Yessick, RAST, Bobby Rast, FWDE, and Dougherty of conspiring to bribe Swann (Count 51).

37

The jury convicted Swann on these substantive bribery counts: 52 ($100,000 from PUGH through subcontractor Guthrie Landscaping), 53 ($7,422 from PUGH through subcontractor Aquatic Gardens), and 54 ($1,000 in gift certificates to Alabama Book Smith from PUGH). The jury convicted defendants PUGH and Yessick on Counts 61-63 (same facts as 52-54, respectively).

The jury convicted defendants Swann, PUGH, and Yessick on Counts 90-100 (honest services mail fraud involving PUGH's paying $93,680 in checks to Guthrie for landscaping work performed for Swann).

The jury also convicted defendant Swann on Counts 57 ($9,733 in painting by Kimro Painting from RAST) and 58 ($8,940 in plumbing by Brown Mechanical from RAST) and defendants RAST and Bobby Rast on Counts 66 and 67 (same facts as Counts 57 and 58, respectively).[26]

The jury also convicted defendant Swann on Count 60 ($24,176 for construction supervision by FWDE's Stanger) and defendants FWDE and

---

[26]In the *Swann* trial, the jury acquitted defendant <u>Danny</u> Rast on Count 51 (conspiracy to bribe Swann), on Count 66 ($9,733 in painting work for Swann by Kimro Painting) and on Count 67 ($8,940 in plumbing work for Swann by Brown Mechanical).
    The jury also acquitted defendant Swann on Count 59 ($3,015 bribe received by Swann from the Rast defendants in the form of England and Scotland trips); defendants RAST, Bobby Rast, and Danny Rast on Count 68 ($3,015 bribe given to Swann in the form of England and Scotland trips); and defendant PUGH on Count 125 (obstruction of justice).

Dougherty on Count 69 (same facts as Count 60).[27]

In summary, the jury convicted defendant Swann on the bribery conspiracy count, six substantive bribery counts, and eleven honest services mail fraud counts. The jury convicted defendants PUGH and Yessick on the bribery conspiracy count, three substantive bribery counts, and eleven honest services mail fraud counts. The jury convicted defendants RAST and Bobby Rast on the bribery conspiracy count and two substantive bribery counts. The jury convicted FWDE and Dougherty on the bribery conspiracy count and one substantive bribery count. Defendants Swann, PUGH, RAST, Bobby Rast, FWDE, and Dougherty appeal all conviction counts.

---

[27]When the Indictment was severed into the five separate cases for trial, Counts 107-121 of the Indictment were scheduled to be tried in the *Wilson* trial (05-545). The government later dismissed Counts 107-121 and re-filed them essentially as Counts 1-17 in a new indictment docketed as case number 06-084. This case (06-084) was consolidated for trial with the *Swann* trial (05-544).

The *Swann* jury heard evidence on these 17 counts of honest services mail fraud under 18 U.S.C. §§ 1341 and 1346. In November 1999, Wilson resigned from the JCESD and formed his own engineering consulting firm, CEDS. With Swann's help, Wilson immediately obtained two no-bid engineering contracts ($483,000 and $350,000) from the County worth a total of $833,000. To get around "revolving door" provisions in Alabama's ethics law that prohibited former employees from doing business with the County for two years, Wilson made arrangements for his firm to operate as FWDE's "subcontractor." FWDE was awarded the contracts. Even though Wilson's firm performed the work, FWDE passed Wilson's invoices on to the County under FWDE's own name. These 17 counts of honest services mail fraud related to money paid to CEDS.

Wilson and CEDS pled guilty to one count each and are not defendant-appellants in the *Swann* appeal. The *Swann* jury acquitted Swann, FWDE, and Dougherty on these 17 counts involving money paid to CEDS through FWDE. This evidence was introduced only in the *Swann* trial, not in the *Wilson* trial.

## IV.  THE *WILSON* TRIAL (05-545)

In the *Wilson* trial, held from June 1 to 13, 2006, defendants Wilson and PUGH were charged with conspiring to commit bribery (Count 75).  Defendant Wilson was charged with accepting from PUGH a $4,500 bribe in the form of a scholarship for his son to attend the University of Alabama at Birmingham ("UAB") (Count 76).  The defense argued that the scholarship was not intended as a bribe.

The government called 9 witnesses, including Chandler, Grady Pugh, and Roland Pugh's secretary Janice Kuykendall.  The defense called 3 witnesses.

### A.      Wilson Helps PUGH

Defendant Wilson was the Chief Civil Engineer for the JCESD and served on the PRC.  As Chief Civil Engineer, Wilson was in charge of all sewer line work.  Wilson was also the project engineer on several construction contracts, including some of PUGH's.  As project engineer, defendant Wilson approved all sewer contractor pay requests, which were submitted monthly, before sending them on to Chandler, the JCESD's Assistant Director.  Project engineers also approved requests for extensions of time to complete contracts.  Contractors were subject to a penalty of $1,000 per day if they failed to complete a contract on time.

On July 26, 1999, PUGH submitted to USI — the outside consulting

engineer for the "Village East 3" contract — a request for a 175-day extension to complete work on the project. The completion date was May 11, 1999. On July 27, 1999, USI forwarded the request to defendant Wilson. When PUGH requested the 175-day extension on July 26, it was already 76 days overdue. PUGH was at risk for a $76,000 penalty — $1,000 in liquidated damages for each of the 76 days.

On August 20, 1999, defendant Wilson faxed Grady Pugh a letter instructing him to send $4,500 to UAB for Wilson's son. On August 23, defendant Wilson approved the extension. This saved PUGH not only the $76,000 penalty for the delay from May 11 to July 26 but also $1,000 per day for each day until PUGH completed the job. On August 24, 1999, PUGH sent a $4,500 check to UAB for Wilson's son.

In addition, defendant Wilson served on the PRC, which set technical standards for construction firms who bid on contracts for the County's sewer project. Some of the projects called for "cured-in-place" ("CIP") or "trenchless" techniques for replacing existing sewer lines. In the late 1990s, this was a relatively new technology, and only a handful of contractors had the expertise to do it properly. Like other municipalities, Jefferson County required contractors to meet specified minimum requirements for prior experience before they were permitted to bid on CIP work.

In September 1999, the PRC significantly tightened these requirements, making it more difficult for new contractors to pre-qualify. However, the three contractors who were already doing CIP work in Jefferson County were grandfathered in and did not have to go through the pre-qualification process. Two of those three CIP contractors were joint venture partners with RAST and PUGH. Although the three contractors did compete against each other in a sealed bidding process, Jefferson County's qualification requirements cut down the number of competitors and enabled these CIP contractors to charge Jefferson County higher prices than they could charge other municipalities for similar work. When two non-local competitors finally qualified to join the bidding in 2001, prices quickly dropped from over $50 per linear foot to about $28.

The government also offered 404(b) evidence showing certain items of value that PUGH provided for McNair, Chandler, and Barber, and that RAST provided for Wilson,[28] and the favorable decisions PUGH obtained from the JCESD. Grady Pugh offered similar testimony, and, as in the *McNair* trial, the defense again attempted to impeach Grady Pugh by pointing out inconsistencies in his testimony, his hatred of his father (Roland Pugh), and his efforts to obtain a favorable sentencing recommendation from the government.

---

[28]RAST paid for Wilson to spend a week in London and a weekend in Paris with his wife.

**B. Bribes of Wilson**

Sometime in mid-1999, defendant Wilson complained to Grady Pugh over lunch about the cost of college and that he might not be able to afford to send his son Justin to UAB for the upcoming semester (fall 1999). Grady Pugh responded that PUGH "had done a lot" for "colleges and education" and suggested PUGH might "sponsor a scholarship," but wanted to make sure "we couldn't get in any trouble for it." Sometime in August 1999, Wilson called Grady Pugh to accept the scholarship offer.

As noted above, on August 20, 1999, defendant Wilson used a JCESD fax machine to send Grady Pugh a letter expressing his gratitude and instructing him to send a $4,500 check to UAB to credit Wilson's son's account. PUGH sent the check to UAB four days later. There was no evidence that the son ever sent PUGH an application for the scholarship. Grady Pugh's secretary typed the letter and signed Grady Pugh's name. Grady Pugh never met nor spoke with Wilson's son before sending the $4,500 check to UAB on August 24, 1999. The accompanying letter simply asked UAB to credit the payment to Wilson's son's account and gave no other instructions. Although PUGH had made charitable contributions to schools and colleges, including UAB, it had never previously awarded a scholarship to an individual student. Grady Pugh thought the money would go

43

toward "books and tuition" but could not remember exactly what Wilson had said to him.

Grady Pugh was unaware that FWDE had already paid Wilson's son's tuition and fees for the 1999-2000 school year.[29] UAB applied PUGH's scholarship money to Wilson's son's account in four quarterly installments of $1,125 per installment, as was its standard practice for scholarships when a donor did not instruct otherwise. UAB took about one third of the PUGH money to cover the son's housing and other fees, and disbursed the remainder of the PUGH money directly to the son each quarter. The installments were disbursed to the son in September 1999, December 1999, March 2000, and June 2000. Wilson's son signed a receipt each time. Grady Pugh testified that he never did anything after August 1999 to follow up on the "scholarship" and he did not know that UAB would defer full payment into the following year. The government did not present any evidence that Wilson was aware of UAB's payment arrangements.

Grady Pugh explained his intent in giving the scholarship to Wilson's son:

When you offer somebody something like that . . . you expect them to help you if they can. And when I did that for [Wilson], I felt like if he got a chance to help us, he would.

Grady Pugh explained that giving things of value to County employees provided

---

[29]The government did not allege there was anything improper about the FWDE scholarship.

PUGH with the "general benefit" of "hav[ing] preferential treatment and, you know, if we had problems it would help resolve the problems. Numerous ways that things could be made easier."

## C.     Jury's Verdicts

The jury convicted defendants Wilson and PUGH on Count 75 and defendant Wilson on Count 76. Wilson has not appealed. PUGH appeals as to Count 75.[30]

## V.  THE *BARBER* TRIAL (05-542)

In the *Barber* trial, held from January 8 to 17, 2007, defendants Barber, PUGH, Roland Pugh, and Yessick were charged with conspiring to bribe Barber by, among other things, PUGH's paying and Barber's accepting $47,927 in real property and nearly $1,200 in trips to casinos and beaches (Count 78). Defendants PUGH and Roland Pugh were also charged with bribing Barber by giving him that $47,927 property (Count 83), and defendant PUGH was charged with paying for these trips (Counts 84-86).[31]

Defendants Barber and Yessick pled guilty to Count 78. Only PUGH and

---

[30]Count 77 charged PUGH with the substantive offense of bribing Wilson with the scholarship, but was dismissed before trial on the government's motion.

[31]The trips were to Isle of Capri Casino, Vicksburg, Mississippi ($148), Beau Rivage Resort & Casino, Biloxi, Mississippi ($546), and Phoenix III Condominiums, Gulf Shores, Alabama ($481).

Roland Pugh went to trial. The government called 7 witnesses, including

Chandler, Grady Pugh, and Yessick. The defense called 7 witnesses, including

Barber.

## A.    Barber Helps PUGH

Barber supervised the JCESD's twenty-six job-site County inspectors.

Barber was responsible for hiring sewer contractors to do no-bid emergency work,

approving contractors' paperwork, and certifying their expenses before sending the

expenses to JCESD Assistant Director Chandler.

In January 2000, Barber determined the sewer pipes in the Paradise Lake

subdivision should be replaced on an emergency basis instead of being repaired.

On January 7, Barber told City Inspector Hodges that Barber had chosen a

contractor who could do the job in about 45 days. PUGH's President Yessick sent

Barber a letter, dated January 27, 2000, offering that PUGH could do the job for

about $1.2 million. That same day, Yessick also sent Hodges a letter, dated

January 27, 2000, stating that PUGH would be performing the job. Given that

emergency work contracts were limited to $50,000 or less, PUGH eventually

received a no-bid field directive in the amount of $857,000, on which PUGH made

a 50% profit. However, because Barber had classified the work as an emergency,

there was no contract for Paradise Lake on which to put the field directive. The

emergency work contract therefore was placed on the unrelated multi-million-dollar Cahaba River project.

## B.     Bribes of Barber

Beginning in 1997 and continuing through 2001, PUGH's President Yessick caused PUGH to pay to send Barber on an annual beach resort or casino vacation in locations including Orange Beach, Alabama and Biloxi and Vicksburg, Mississippi.  PUGH paid $148 for Barber's stay in Vicksburg, $546 for his stay in Biloxi, and $481 for his stay at the Phoenix III Condominiums in Orange Beach, Alabama.  PUGH recorded the payments for the trips to Orange Beach and Biloxi in PUGH's books as sewer "rehab" projects.

In the spring of 2000, Barber asked PUGH's Yessick if he would find and purchase a piece of property in McCalla, Alabama on which Barber could retire.  Yessick consulted a realtor for this purpose, visited several properties himself, and, in November 2000, signed a contract to purchase land in the name of "Roland Pugh" for $47,500.  The next week, Yessick gave the realtor a check for $1,000, signed by PUGH's CFO Lorelei Heglas.  In anticipation of the cost PUGH would incur for the land purchase, Yessick instructed PUGH CFO Heglas to charge $45,000 to the Paradise Lake project.

However, days before closing, Roland Pugh's administrative assistant Janice

Kuykendall told Yessick that PUGH no longer intended to buy the land in PUGH's name but instead planned to give Barber a cashier's check to buy the land in his own name. PUGH assistant Kuykendall told Yessick to travel to Tuscaloosa to get the check and then take back from the realtor all documents referring to PUGH.

PUGH's Yessick got the check, which was made out to the settlement attorney for $46,877, and on which the "NAME OF REMITTER" line was left blank. Yessick then gave Barber the check. Barber closed on the land contract in his own name on December 18, 2000. Yessick also gave Barber a cashier's check for $1,050 to replace the check he gave to the realtor. The realtor prepared papers to refund PUGH's deposit.

In September 2002, a newspaper article revealed an investigation into PUGH and Barber. Six months later, over a seven-week period, Barber sent PUGH a series of checks amounting to $46,877. Yet Barber paid no interest, and there was no evidence of any document indicating a loan.

At trial Yessick testified that he paid the charged bribes in the hope that Barber, who supervised the JCESD's job-site inspectors, would assist if PUGH were to have a problem with an inspector being "irrational." Counsel for PUGH and Roland Pugh argued that they did not provide things to Barber with the intent

to influence him.[32]  The government presented 404(b) evidence showing that

PUGH's Yessick paid for Chandler to go on a fishing vacation, that Grady Pugh

bought a carpet for McNair, that Grady Pugh made cash payments to McNair, and

that PUGH worked on McNair's home in Arkansas.

## C.    Jury's Verdicts

The jury convicted PUGH on Counts 78 (bribery conspiracy), 83 ($47,927

in real property), and 84-86 (trips).  Roland Pugh was acquitted on Counts 78 and

83, the only counts against him in the *Barber* trial.  PUGH appeals all conviction

counts.

## VI.  QUID PRO QUO ISSUES

All defendant-appellants argue that their bribery convictions under 18

U.S.C. § 666[33] must be vacated because the Indictment failed to allege, and the

government failed to prove, the contractor-defendants gave specific benefits to

County employees in exchange for, and with the intent that, the employees perform

---

[32]Defendant Roland Pugh called Barber to testify that he (Barber) never met Roland Pugh until after the relevant time period and that Barber did not have an intent to be influenced by the trips that PUGH bought for him.

[33]The defendant-appellants' § 666 convictions are: (1) McNair, Counts 1-3, 5-12, 32; (2) Swann, Counts 51-54, 57, 58, 60; (3) PUGH, Counts 1, 15, 51, 61-63, 71, 75, 78, 83-86; (4) Roland Pugh, Count 1; (5) RAST, Counts 1, 19-24, 51, 66, 67, 72, 87; (6) Bobby Rast, Counts 1, 19-22, 51, 66, 67, 72, 87; (7) Danny Rast, Counts 1, 19, 20, 22; (8) FWDE, Counts 1, 28, 51, 69; and (9) Dougherty, Counts 1, 28, 51, 69.

a specific official act, termed a *quid pro quo*.[34]  The defendant-appellants also argue the district court erred, at a minimum, by refusing to charge the jury that the government must prove a specific *quid pro quo*.  We begin by reviewing the relevant parts of § 666.[35]

## A.    18 U.S.C. § 666

Section 666 proscribes theft and bribery in connection with programs of local governments receiving federal funds.[36]  Section 666(a)(1)(B) criminalizes a local government employee's "corruptly" soliciting or accepting a bribe:

(a) Whoever . . .

---

[34]Black's Law Dictionary defines *quid pro quo* as follows:  "An action or thing that is exchanged for another action or thing of more or less equal value; a substitute."  Black's Law Dictionary 1367 (9th ed. 2009).  Defendants argue the government must prove a specific or identifiable thing of value was exchanged for a specific or identifiable official act.

[35]The interpretation of a statute is a question of law we review de novo.  United States v. Searcy, 418 F.3d 1193, 1195 (11th Cir. 2005); United States v. Mazarky, 499 F.3d 1246, 1248 (11th Cir. 2007).  Whether an indictment is sufficient is also a question of law reviewed de novo.  United States v. Steele, 178 F.3d 1230, 1233 (11th Cir. 1999).  "An indictment is sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense."  Id. at 1233-34 (quotation marks omitted).

[36]A predicate to a § 666 offense is that the defendant must be an agent of an "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b).  It is undisputed that Jefferson County received the requisite amount of federal funds and that McNair, Swann, Wilson, Barber, Chandler, Ellis, and Creel were employees and thus agents of Jefferson County.

> > (1) being an agent[37] of [a] local . . . government, or any agency thereof--
> >
> > . . . .
>
> > > (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such . . . government, or agency involving anything of value of $5,000 or more; or
>
> > shall be fined . . . , imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a)(1)(B). Defendants McNair, Swann, Wilson, and Barber, as Jefferson County employees, violated § 666(a)(1)(B) if: (1) they solicited or accepted anything of value; (2) with the corrupt intent to be influenced or rewarded; (3) in connection with any business, transaction, or series of transactions of Jefferson County involving anything of value of $5,000 or more.[38] Id. The

---

[37]As to "agent," the district court in the *McNair* trial charged the jury: "The term 'agent' means a person authorized to act on behalf of a local government and includes an employee, officer, manager or representative of a local government. Jefferson County, Alabama is a local government of Alabama." In the *Swann*, *Barber*, and *Wilson* trials, the district court charged the jury: "The term 'agent' as relevant to this case means any employee, officer, director, manager or representative of a local government. Jefferson County, Alabama, is a local government of Alabama."

[38]The $5,000 in § 666(a)(1)(B) and (a)(2) refers to the value of the "business, transaction, or series of transactions," not the value of the bribe. See United States v. Zimmermann, 509 F.3d 920, 927 (8th Cir. 2007) (concluding a benefit of more than $5,000 received for less than $5,000 in bribes was sufficient for a § 666(a)(1)(B) conviction); see also Salinas v. United States, 522 U.S. 52, 57, 118 S. Ct. 469, 473 (1997) ("Subject to the $5,000 threshold for the business or transaction in question, the statute forbids acceptance of a bribe by a covered official . . . ."); United States v. Castro, 89 F.3d 1443, 1454 (11th Cir. 1996) (describing in dicta the $5,000 element in § 666(a)(2) as "in connection with any business transaction [sic] or series of transactions"); but see United States v. Abbey, 560 F.3d 513, 521 (6th Cir.) (stating in dicta that "§ 666 contains . . . a requirement that the illegal gift or bribe be worth over $5,000"), cert. denied, 130 S. Ct. 739 (2009). Where the bribe-giver receives an intangible benefit, some courts

counts in the Indictment as to McNair and Swann track the language of the statute.

Section 666(a)(2) also criminalizes "corruptly" offering or giving a bribe to a local government employee:

> (a) Whoever . . .
>
> . . . .
>
> (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of [a] . . . local . . . government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
>
> shall be fined . . . , imprisoned not more than 10 years, or both.

Id. § 666(a)(2). The contractor-defendants — PUGH, Roland Pugh, RAST, Bobby Rast, Danny Rast, FWDE, and Dougherty — violated § 666(a)(2) if: (1) they gave to a County employee anything of value; (2) with the corrupt intent to influence or reward them; (3) in connection with any business, transaction, or series of transactions of Jefferson County involving anything of value of $5,000 or more. Id. The counts in the Indictment as to these contractor-defendants also track the language of § 666(a)(2).

_____

have used the bribe amount as a proxy to stand for the value of the business or transaction. See United States v. Marmolejo, 89 F.3d 1185, 1194 (5th Cir. 1996) (using, under § 666(a)(1)(B), the more than $5,000 paid to sheriff to determine the value of conjugal visits received by prisoner); United States v. Fernandes, 272 F.3d 938, 944 (7th Cir. 2001) (using the value of bribes to prosecutor, under § 666(a)(1)(B), where prosecutor received bribes in exchange for his expunging the bribe-givers' DUI convictions). Here, the parties do not dispute that the $5,000 level was met.

It is well established in this Circuit that an indictment is sufficient if it tracks the language of the statute and provides a statement of facts that gives notice of the offense to the accused.  See United States v. Jordan, 582 F.3d 1239, 1246 (11th Cir. 2009); United States v. Walker, 490 F.3d 1282, 1296 (11th Cir. 2007); United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006); United States v. Ndiaye, 434 F.3d 1270, 1299 (11th Cir. 2006).  By listing the items of value received or given by the defendants, each count of the Indictment provides sufficient facts and circumstances to give adequate notice of the charges to be defended against.  Thus, we readily determine the Indictment itself was not defective for failure to allege a specific *quid pro quo*.

**B.     Paradies and US Infrastructure Decisions**

Nonetheless, this does not resolve whether the language in § 666(a)(1)(B) or (a)(2) effectively requires the government to prove a specific *quid pro quo* to obtain a § 666 conviction.  This question has been before this Court twice before but only under plain error review, and even then, we did not squarely answer it.  See United States v. US Infrastructure, 576 F.3d at 1212-14; United States v. Paradies, 98 F.3d 1266, 1289 (11th Cir. 1996).

In Paradies, the defendant claimed that the district court erred in failing to charge the jury that a *quid pro quo* was an element required to convict under § 666

53

Id. at 1289. This Court did not decide if *quid pro quo* was an element but concluded there was no reversible jury charge error because the jury charge tracked the statutory language of § 666 and the defendant did not object to the charge. Id.

The Paradies Court also rejected a challenge to the sufficiency of the evidence. Id. The Paradies Court stated: "the evidence at trial was sufficient for a jury to find that Jackson [the official] accepted payments for his votes and his influence upon the City Council and the administration," and "[s]uch a finding would satisfy any quid pro quo requirement under the statute." Id. In other words, Paradies concluded that even if § 666 requires a *quid pro quo*, that requirement is satisfied by showing a series of payments intended generally to influence the official's decisions.

Subsequently, our United States v. US Infrastructure decision involved an appeal from the fifth trial (the *USI* trial, 05-543) that arose out of the Indictment here. US Infrastructure, 576 F.3d at 1202-03. The defendants in US Infrastructure argued the jury charges on the § 666 counts were erroneous because they did not include their proposed instruction that the jury must find a specific *quid pro quo* to convict under § 666. Id. at 1213. This Court concluded that the district court "did not commit plain error by refusing [defendants'] *quid pro quo* [jury] instruction." Id. at 1214. As its sole basis for this conclusion, US Infrastructure stated this

Court had already rejected this argument in two prior cases: "This Court has rejected the argument that the government must 'show a direct *quid pro quo* relationship between [the defendants] and an agent of the agency receiving federal funds.'" US Infrastructure, 576 F.3d at 1214 (quoting United States v. Castro, 89 F.3d 1443, 1454 (11th Cir. 1996), and citing Paradies, 98 F.3d at 1289). However, as shown above, Paradies did not actually make a holding to that effect. Neither did United States v. Castro.[39] Nonetheless, US Infrastructure itself holds a specific *quid pro quo* is not required for a § 666 conviction. Because US Infrastructure was only plain error review, we now make the same holding but under de novo review.

We begin with the statutory language itself.[40] Importantly, § 666(a)(1)(B) and (a)(2) do not contain the Latin phrase *quid pro quo*. Nor do those sections

---

[39]In Castro, the issue was whether § 666(a)(2) required that the bribe-givers intended to enter into a direct exchange with an agent of an entity receiving the federal funds, or if it was sufficient that they offered the bribe to a third-person middleman with the intent to influence that agent by having that middleman authorize that agent to issue payments to the defendants. Castro, 89 F.3d at 1453-54. The Castro Court concluded that "influence" under § 666 could be exercised indirectly and that it was sufficient that the defendants intended to influence the agent by causing a middleman to authorize the agent to issue payments. Id. Although in reaching this conclusion the Castro Court stated, "[w]e reject appellants' suggestion that the government had to show a direct *quid pro quo* relationship between [the defendants] and an agent of the agency receiving federal funds," id., Castro was addressing whether there was a "directness" requirement between the bribe-giver and the agent and did not answer the question before us here.

[40]"When construing a criminal statute, [this Court] begin[s] with the plain language; where 'the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress said what it meant and meant what it said.'" United States v. Browne, 505 F.3d 1229, 1250 (11th Cir. 2007) (quoting United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc)).

contain language such as "in exchange for an official act" or "in return for an official act." In short, nothing in the plain language of § 666(a)(1)(B) nor § 666(a)(2) requires that a specific payment be solicited, received, or given in exchange for a specific official act. To accept the defendants' argument would permit a person to pay a significant sum to a County employee intending the payment to produce a future, as yet unidentified favor without violating § 666.

The requirement of a "corrupt" intent in § 666 does narrow the conduct that violates § 666 but does not impose a specific *quid pro quo* requirement. In all the trials consolidated in this appeal, the district court's jury charge, with slight variations, defined "corruptly" as follows: "An act is done 'corruptly' if it is performed voluntarily, deliberately and dishonestly for the purpose of *either* accomplishing an unlawful end or result *or* of accomplishing some otherwise lawful end or lawful result by an[y] unlawful method or means." It is acting "corruptly" — dishonestly seeking an illegal goal or a legal goal illegally — that separates permissible from criminal. The addition of a corrupt *mens rea* avoids prosecution for acceptable business practices.[41]

_____

[41]We do not read the definitional language of "corrupt" to impose a *quid pro quo* requirement. In any event, the district court charged that definition. It also has been suggested that § 666's language — a thing of value given with corrupt intent to influence — effectively constitutes a *quid pro quo* in that the payment is made for influence. This at best would be *"quid pro quo* light." Even if one views § 666 this way, the district court charged the language of the § 666 statute.

For all of these reasons, we now expressly hold there is no requirement in § 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act, termed a *quid pro quo*.

As to the defendant County employees, the government must show only what § 666(a)(1)(B) says: that a County employee "corruptly" accepted "anything of value" with the intent "to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the County. And as to the contractor-defendants, the government must show only what § 666(a)(2) says: that the defendant "corruptly" gave "anything of value" to a County employee with the intent "to influence or reward" that person "in connection with any business, transaction, or series of transactions" of the County.

To be sure, many § 666 bribery cases will involve an identifiable and particularized official act, but that is not required to convict. Simply put, the government is not required to tie or directly link a benefit or payment to a specific official act by that County employee. The intent that must be proven is an intent to corruptly influence or to be influenced "in connection with any business" or "transaction," not an intent to engage in any specific *quid pro quo*.[42]

---

[42]The defendant-appellants rely on United States v. Siegelman, 561 F.3d 1215 (11th Cir. 2009), petition for cert. filed, 78 U.S.L.W. 3083 (U.S. Aug. 10, 2009) (No. 09-167), 78

## C.     Other Circuits

In concluding § 666 does not require a specific *quid pro quo*, we align ourselves with the Sixth and Seventh Circuits.  See United States v. Abbey, 560 F.3d 513, 520 (6th Cir.), cert. denied, 130 S. Ct. 739 (2009) (stating "the text says nothing of a quid pro quo requirement to sustain a conviction" and "while a *quid pro quo* of money for a specific legislative act is sufficient to violate [§ 666(a)(1)(B) or (a)(2)], it is not necessary") (quotation marks omitted); United States v. Gee, 432 F.3d 713, 714-15 (7th Cir. 2005) (holding that "[a] *quid pro quo* of money for a specific legislative act" is not necessary under § 666(a)(1)(B) and that an exchange of money for the official's "influence" was enough); United States v. Agostino, 132 F.3d 1183, 1190 (7th Cir. 1997) ("We decline to import an

U.S.L.W. 3090 (U.S. Aug. 10, 2009) (No. 09-182), and United States v. Massey, 89 F.3d 1433 (11th Cir. 1996), but neither case answers the question here.  In Siegelman, the district court gave a *quid pro quo* instruction in response to the defendant's request.  The district court instructed the jury that they could not convict unless "the defendant and official *agree* that the official will take specific action in exchange for the thing of value."  Siegelman, 56 F.3d at 1225.  This Court stated "[s]o, whether or not a *quid pro quo* instruction was legally required, such an instruction was given," and "[t]herefore assuming a *quid pro quo* instruction was required in this case, we find no reversible error."  Id. at 1225, 1227.

In Massey, "[t]he jury convicted [attorney] Massey of one count of bribery in violation of 18 U.S.C. § 666(a)(2) finding that Massey purchased [Judge] Sepe's lunches at Buccione in exchange for court appointments."  Massey, 89 F.3d at 1439.  This Court rejected Massey's claim that the government was required to produce direct evidence of a verbal or written agreement to this effect and stated "inferences drawn from relevant and competent circumstantial evidence" were sufficient.  Id. (quotation marks omitted).  The *quid pro quo* issue here was not raised or discussed in Massey.  The fact that the evidence of a specific exchange was sufficient to sustain the § 666(a)(2) bribery conviction in Massey does not mean one is required to obtain a § 666(a)(2) conviction here.

additional, specific *quid pro quo* requirement into the elements of § 666(a)(2).");

but see United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998) (concluding

the "corrupt intent" element in § 666 requires the government to prove a *quid pro*

*quo*, but stating the "*quid pro quo* requirement is satisfied so long as the evidence

shows a 'course of conduct of favors and gifts flowing to a public official *in*

*exchange for* a pattern of official actions favorable to the donor'" and "the intended

exchange in bribery can be 'this for these' or 'these for these,' not just 'this for

that'" (citations omitted)).

The Second Circuit's decision in United States v. Ganim, 510 F.3d 134 (2d

Cir. 2007), also supports our analysis to some extent.[43]  The defendant "Ganim's

challenges to the jury charge primarily relate[d] to a single issue:  namely, whether

proof of a government official's promise to perform a future, but unspecified,

official act is sufficient to demonstrate the requisite quid pro quo for a conviction"

under § 666(a)(1)(B).  Id. at 141-42.  Although accepting a *quid pro quo*

requirement for a bribery conviction, the Second Circuit rejected Ganim's claim

---

[43]The defendant in Ganim was convicted of these "bribery-related crimes":  "(1) extortion in violation of the Hobbs Act, 18 U.S.C. § 1951; (2) 'honest services mail fraud' in violation of 18 U.S.C. §§ 1341 & 1346; (3) federal programs bribery in violation of 18 U.S.C. § 666(a)(1)(b) [sic]; and (4) bribe receiving in violation of Connecticut General Statutes section 53a-148 (collectively, the 'bribery-related crimes')."  Ganim, 510 F.3d at 141.  The Ganim opinion first analyzed the *quid pro quo* issue collectively as to the bribery-related crimes.  Id. at 141-42.  It later discussed the jury charges under an "Extortion" subheading, but much of that discussion related to all bribery-related crimes in the case.  Id. at 142-47.  Because Ganim discussed the bribery-related crimes collectively, it did not focus on the language of § 666(a)(1)(B).

that "a direct link must exist between a benefit received and a specifically identified official act." Id. at 142. The Second Circuit held "that the requisite quid pro quo for the crimes at issue [which included § 666(a)(1)(B)] may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise." Id. (emphasis added). The Second Circuit added that "so long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act." Id. at 147.

The Second Circuit also explained that "requiring a jury to find a quid pro quo . . . ensures that a particular payment is made in exchange for a *commitment* to perform official acts to benefit the payor in the future," and "[o]nce the quid pro quo has been established, however, the specific transactions comprising the illegal scheme need not match up this for that." Id. at 147. The Second Circuit's analysis lies somewhere beyond a no-*quid pro quo* requirement, as adopted by the Sixth, Seventh, and now the Eleventh Circuits, and the Fourth Circuit's requirement. While the Second Circuit requires a *quid pro quo*, that requirement is satisfied by a *quid* (thing of value) in exchange for a promise to perform an unidentified, official

60

act at some point in the future.  Id. at 142-47.  In other words, in the Second Circuit the *quo* need not be specific or even identifiable at the time of the *quid*, and to that extent the Second Circuit arguably supports our conclusion.  And to some extent, confusion reigns in this area because courts often use the term *quid pro quo* to describe an exchange other than a particular item of value for a particular action.

**D.    Sun-Diamond and § 201**

Because there is no support for the defendant-appellants' *quid pro quo* argument in the text of § 666, they rely on how the Supreme Court interpreted a different criminal statute, 18 U.S.C. § 201, in United States v. Sun-Diamond Growers of California, 526 U.S. 398, 119 S. Ct. 1402 (1999).  However, Sun-Diamond does not address § 666, and there are significant differences in the text of the two statutes (§§ 201 and 666).

The defendant Sun-Diamond was a trade association convicted of providing "illegal gratuities" under 18 U.S.C. § 201(c)(1)(A) for having given tickets, meals, and other items to the federal Secretary of Agriculture.  Id. at 401, 119 S. Ct. at 1404-05.  Section 201(c)'s illegal gratuity provision prohibited Sun-Diamond from: "giv[ing] . . . anything of value to any public official . . . for or because of any official act performed or to be performed by such public official . . . ."  18

U.S.C. § 201(c)(1)(A) (emphasis added).[44]  In <u>Sun-Diamond</u>, the district court

charged the jury it could convict if it found "Sun-Diamond provided [the

Secretary] with unauthorized compensation <u>simply because he held public office</u>,"

and that "[t]he government need not prove that the alleged gratuity was linked to a

specific or identifiable act or any act at all."  <u>Id.</u> at 403, 119 S. Ct. at 1405

(emphasis added).  The "point in controversy" was that the jury instructions

suggested that an illegal gratuity "did not require any connection between

[defendant's] intent and a specific official act."  <u>Id.</u> at 405, 119 S. Ct. at 1406.

The Supreme Court in <u>Sun-Diamond</u> concluded that § 201(c) <u>did require</u> a

link between the gratuity and a specific "official act" because the statutory text

prohibited gratuities given or received "<u>for or because of any official act performed</u>

<u>or to be performed</u>" and then defined "official act" as "any decision or action on

any question, matter, cause, suit, proceeding or controversy . . . ."  <u>Id.</u> at 406, 119

S. Ct. at 1407 (quoting § 201(c)(1)(A) and (a)(3)).  And it was specifically this text

of the illegal gratuity statute — "for or because of any official act" — that the

Supreme Court in <u>Sun-Diamond</u> found to be "pregnant with the requirement that

<u>some particular official act</u> be identified and proved."  <u>Id.</u> at 406, 119 S. Ct. at

1407 (emphasis added).  In stark contrast, none of these phrases are used in

_____

[44]There is no threshold monetary requirement in §§ 201(b) or 201(c)(1)(A).

§§ 666(a)(1)(B) or 666(a)(2).

We recognize that the Supreme Court in <u>Sun-Diamond</u> also distinguished between a § 201(b) bribery crime and a § 201(c) illegal gratuity crime.  <u>Id.</u> at 404-05, 119 S. Ct. at 1406.  The Supreme Court pointed out that bribery in § 201(b) "requires a showing that something of value was corruptly given, offered, or promised to a public official (as to the giver) or corruptly demanded, sought, received, accepted, or agreed to be received or accepted by a public official (as to the recipient) with intent, *inter alia*, 'to influence any official act' (giver) or in return for 'being influenced in the performance of any official act' (recipient)."  <u>Id.</u> at 404, 119 S. Ct. at 1406 (quoting 18 U.S.C. § 201(b)).  The Supreme Court explained that "[t]he distinguishing feature of each crime is its intent element."  <u>Id.</u> at 404, 119 S. Ct. at 1406.  The Supreme Court explained further that in § 201:

> Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act.  In other words, <u>for bribery there must be a *quid pro quo* – a specific intent to give or receive something of value in exchange for an official act.</u>  An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

<u>Id.</u> at 404-05, 119 S. Ct. at 1406 (emphasis added).[45]  The Supreme Court also

---

[45]A bribe under § 201(b) is punishable by up to 15 years' imprisonment, while the lesser crime of illegal gratuity under § 201(c) is punishable by up to 2 years' imprisonment.  18 U.S.C. § 201(b), (c).

stated: "The District Court's instructions in this case, in differentiating between a bribe and an illegal gratuity, correctly noted that only a bribe requires proof of a *quid pro quo*." Id. at 405, 119 S. Ct. at 1406.

Although § 201(b) requires that a bribe be given or received to influence an "official act" or "in return for" an "official act," § 666 sweeps more broadly than either § 201(b) or (c). Section 666 requires only that money be given with intent to influence or reward a government agent "in connection with any business, transaction, or series of transactions." 18 U.S.C. § 666(a)(1)(B) & (a)(2). Section 666 does not say "official act" but says "any business, transaction, or series of transactions." Id. Section 666 does not say "in return for" or "because of" but says "in connection with." Id.

More importantly, the Supreme Court in Sun-Diamond was concerned with accidentally criminalizing legal gratuities under § 201(c), such as giving a ball cap, a sports jersey, or token gift to the Secretary of Agriculture "based on his official position and not linked to an identifiable act." Id. at 406-07, 119 S. Ct. at 1407; see Ganim, 510 F.3d at 146 ("Undergirding the [Supreme] Court's decision in Sun-Diamond was a need to distinguish legal gratuities (given to curry favor of an official's position) from illegal gratuities (given because of a specific act)."). That concern is diminished here because § 666 contains a corrupt intent requirement. In

64

any event, as reasoned by the Second Circuit, "there is good reason to limit Sun-Diamond's holding to the statute at issue in that case, as it was the very text of the illegal gratuity statute — 'for or because of any official act' — that led the Court to its conclusion that a direct nexus was required to sustain a conviction under § 201(c)(1)(A)." Ganim, 510 F.3d at 146. "Nor is there any principled reason to extend Sun-Diamond's holding beyond the illegal gratuity context." Id.

## E.    Rule of Lenity

We also reject defendant-appellants' argument that the rule of lenity requires us to read a specific *quid pro quo* requirement into § 666. The rule of lenity may apply in a number of different circumstances. For example, "[t]he rule of lenity is applied when a broad construction of a criminal statute would 'criminalize a broad range of apparently innocent conduct.'" United States v. Svete, 556 F.3d 1157, 1169 (11th Cir. 2009) (en banc) (quoting Liparota v. United States, 471 U.S. 419, 426, 105 S. Ct. 2084, 2088 (1985)), cert. denied, __ S. Ct. __, 78 U.S.L.W. 3546 (U.S. Mar. 22, 2010) (No. 09-7576). However, "[t]he simple existence of some statutory ambiguity . . . is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." Muscarello v. United States, 524 U.S. 125, 138, 118 S. Ct. 1911, 1919 (1998). The mere possibility of a narrower statutory construction by itself does not make the rule of lenity applicable. Svete,

556 F.3d at 1169. Application of the rule requires a "grievous ambiguity."

Muscarello, 524 U.S. at 138-39, 118 S. Ct. at 1919 ("The rule of lenity applies only

if, 'after seizing everything from which aid can be derived,' . . . we can make 'no

more than a guess as to what Congress intended.'") (citation omitted).

The rule of lenity does not apply here because defendant-appellants fail to

identify a "grievous ambiguity" in § 666(a)(1)(B) or (a)(2), or to show that the

statutory language criminalizes innocent behavior. Section 666(a)(1)(B) and (a)(2)

criminalize only those acts done "corruptly," and, indeed, § 666 provides a defense

for "bona fide salary, wages, fees, or other compensation paid, or expenses paid or

reimbursed, in the usual course of business." 18 U.S.C. § 666(c).

## F.    Defendants' Proposed Jury Charges

In the *McNair*, *Swann*, *Barber*, and *Wilson* trials, all defendant-appellants

requested jury charges that included a *quid pro quo* requirement.[46]

---

[46]For example, in the *McNair* trial, PUGH requested this instruction:
In order for you to find defendant [PUGH] guilty, you must find beyond a reasonable doubt that [PUGH] gave something of value to Defendant McNair with the specific intent of obtaining a *quid pro quo*, that is, that [PUGH] gave the item of value with the specific intent to improperly cause Defendant McNair to commit a specific act in favor of [PUGH], or with the specific intent of illegally rewarding Defendant McNair for having previously committed such an act. In other words, the United States must show that [PUGH] provided the item of value either (1) with the expectation that Defendant McNair would improperly provide something specific in return or (2) for the purpose of rewarding McNair for something improper that Defendant McNair had previously done.
In the *Swann* trial, Bobby Rast, for example, requested this instruction:
[Y]ou must find beyond a reasonable doubt that Bobby Rast gave something of value to Defendant Swann with the specific corrupt intent of obtaining a *quid pro quo*, that

In the *McNair* trial, the district court rejected the proposed *quid pro quo*

instructions, gave the Eleventh Circuit's pattern jury instructions for § 666 as to

corruptly giving bribes, telling the jury:

> As I've said, the defendants, other than Jewell C. "Chris" McNair, are charged in various counts of violating a portion of Title 18, Section 666, which makes it a federal crime or offense for anyone to corruptly give, offer or agree to give anything of value to anyone who is an agent of a local government receiving significant benefits under a federal assistance program intending to reward or influence that agent in connection with any business, transaction, or series of transactions of such local government involving anything of value of $5,000 or more.
>
> . . . .
>
> Fifth: And this is another thing that the government would have to prove beyond a reasonable doubt.
>
> That each such gift, offer or agreement to give, that by each of those gifts, offer or agreement to give, the Defendant [] corruptly intended to reward or influence Jewell C. "Chris" McNair in connection with a transaction, or series of transactions, with Jefferson County, Alabama, which transaction or series of transactions involved something of value of $5,000 or more.
>
> Sixth: That in doing so, the Defendant [] acted corruptly.
>
> An act is done "corruptly" if it is performed voluntarily, deliberately, and dishonestly, for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by

---

is, that Bobby Rast gave the item of value with the specific corrupt intent to improperly influence Defendant Swann to commit a specific official act in favor of Bobby Rast, or with the specific corrupt intent of illegally rewarding Defendant Swann for having previously committed such an act. In other words, the United States must show that Bobby Rast corruptly provided the item of value either (1) with the expectation that Defendant Swann would improperly provide some official specific act or acts in return or (2) for the purpose of rewarding Jack W. Swann for some specific improper official act or acts that Defendant Swann had previously done.

an unlawful method or means.[47]

The district court also gave the pattern § 666 jury charge, with slight variations, as to corruptly receiving bribes. The judges in the subsequent trials (*Swann*,[48] *Barber*,[49] and *Wilson*[50]) agreed with the district

---

[47]See Eleventh Circuit Pattern Jury Instructions (Criminal Cases) at 180-81 (Offense Instruction 24) (2003). The district court instructed the jury the government must prove all elements of a § 666 crime, such as that McNair had to be an agent and the County had to receive over $10,000 in federal funds. We quote in the text only the part of the pattern charge about the corrupt intent element.

[48]In the *Swann* trial, the district court instructed the jury as to corruptly accepting bribes:
> As to [the § 666 substantive bribery] counts the defendant Jack W. Swann can be found guilty of [§ 666 bribery] only if all the following facts are proved beyond a reasonable doubt.
> . . . .
> The fifth element which is common to all of those counts as the first four were, that . . . by such acceptance or agreements, the defendant Jack W. Swann intended as to the count under consideration to be influenced or rewarded in connection with a transaction or series of transactions of Jefferson County, Alabama which transactions or series of transactions involve something of value of $5,000 or more.
> And six, that in so doing the defendant Jack W. Swann acted corruptly.
> An act is done corruptly if it is performed voluntarily and deliberately and dishonestly for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by any unlawful method or means.
The court gave a similar pattern § 666 jury charge as to corruptly giving bribes.

[49]In the *Barber* trial, the district court instructed the jury as to only PUGH's corruptly giving bribes because Barber, the acceptor, pled guilty:
> The defendant Roland Pugh Construction, Inc., can be found guilty of the offense charging a violation of [§ 666(a)(2)] only if all the following facts are proved beyond a reasonable doubt:
> . . . .
> Fifth, that by giving, offering, or agreeing to give things of value to Clarence R. Barber, defendant Roland Pugh Construction, Inc., intended to influence or reward Clarence R. Barber in connection with any business transaction or series of transactions which involve something of $5,000 or more.
> And, sixth, that in doing so, the defendant Roland Pugh Construction, Inc., acted corruptly.

court's ruling in the *McNair* trial and gave jury instructions that did not include

defendant-appellants' requested *quid pro quo* instructions.[51]

Given our conclusion that § 666(a)(1)(B) and (2) do not require proof of a

specific *quid pro quo*, defendant-appellants' proposed jury instructions containing

that requirement were incorrect statements of law. Thus, the district courts did not

. . . .
An act is done corruptly if it is performed voluntarily, deliberately, and
dishonestly for the purpose of either accomplishing an unlawful end or result, or
of accomplishing some otherwise lawful end or result by any unlawful method or
means.

[50]Because in the *Wilson* case only PUGH appeals, we quote the "corruptly giving" part of
the court's jury charge:
The purpose of the plan alleged by the government in the indictment was also for the
defendant, Pugh Incorporated, through Grady R. Pugh, Jr., to corruptly give, offer,
and agree to give things of value to defendant Ronald K. Wilson with the intent of
influencing and rewarding him for supporting their interests in connection with the
J.C.E.S.D. sewer rehabilitation construction program in violation of [18 U.S.C.
§ 666(a)(2)].
. . . .
Title 18 of the United States Code section 666(a)(2) makes it a federal crime or
offense for any person to corruptly give, offer, or agree to give anything of value to
any person with the intent to influence or reward an agent of a local government or
local governmental agency receiving significant benefits under a federal assistance
program, in connection with any business, transaction or series of transactions of
such local government or government agency involving anything of value of $5,000
or more.
. . . .
An act is done corruptly if it is performed voluntarily, deliberately, and
dishonestly for the purpose of either accomplishing an unlawful end or result or
of accomplishing some otherwise lawful result by any unlawful method or means.

[51]"In considering the failure of a district court to give a requested instruction, the
omission is error only if the requested instruction is correct, not adequately covered by the
charge given, and involves a point so important that failure to give the instruction seriously
impaired the party's ability to present an effective case." <u>Svete</u>, 556 F.3d at 1161 (quotation
marks omitted). The district court's refusal to give a requested instruction is reviewed for abuse
of discretion. <u>Id.</u>

69

abuse their discretion in refusing them.  See US Infrastructure, 576 F.3d at 1213

(determining omission of a specific *quid pro quo* requirement in § 666 jury

instruction was not plain error); Paradies, 98 F.3d at 1289 (same).

In the *McNair* trial, all defendant-appellants also requested that the jury be

instructed that if a thing of value was given out of friendship or merely to foster

goodwill and not to corruptly influence or reward, then a not-guilty verdict is

required.  After that request, the district court in the *McNair* trial supplemented the

pattern instructions with this:

> Section 666 . . . does not prohibit all gifts by or to a public official, does
> not prohibit all receipts -- does not prohibit receipt of all gifts by or to a
> public official, but only gifts received with the corrupt intent to be
> influenced or rewarded by that governmental official in connection with
> a business or transaction or series of transactions of that governmental
> entity involving $5,000 or more.[52]

After the defendant-appellants insisted the district court specifically identify

friendship and goodwill gifts as legal gratuities, the court responded "if it's corrupt

and dishonest, it's not for good will, is it?"  The district court explained that giving

defendant-appellants' instruction would "carr[y] with it some sort of suggestion

---

[52]In the *Swann*, *Barber*, and *Wilson* trials, PUGH also requested the same jury charge.
The Rast and Pugh defendants either requested this jury instruction or adopted PUGH's request,
in the *Swann* trial.  And in the *Swann*, *Barber*, and *Wilson* trials, the district court gave similar
supplemental jury charges expressly advising the jury that § 666 does not prohibit all gifts to a
public official, but only those gifts with the corrupt intent to influence or reward specified
government officials in connection with the business or transaction or series of transactions of
that governmental entity.

70

that I'm adopting that idea that that's what these payments were." This exchange then took place:

| | |
|---|---|
| THE COURT: | What if it's good will and corrupt? |
| [ROLAND PUGH'S COUNSEL]: | It can't be. |
| THE COURT: | Okay. That's your answer. |

A finding that a gift was made or accepted with corrupt intent necessarily excludes friendship and goodwill gifts. There is no reversible error in the court's charge in this regard.[53]

## VII. SUFFICIENCY OF THE EVIDENCE

### A. Conspiracy and Corrupt Intent

All defendant-appellants challenge the sufficiency of the evidence to support their convictions on various counts.[54] Defendants' primary arguments are the government failed to prove a conspiracy among the defendants (as to Counts 1, 51,

---

[53]We also find no merit to defendant-appellants' claims on appeal as to any other proposed jury instructions because they were either incorrect, too argumentative or flawed in some way, not necessary, or already adequately covered by the court's charge as a whole. In particular, we conclude the court's charge adequately covered defendants' theory of defense that the payments were gifts made out of friendship or to foster good will and adequately charged the jury on the honest services mail fraud counts (90-100) as discussed later.

[54]"This Circuit reviews the sufficiency of the evidence de novo, examining the evidence in the light most favorable to the government and resolving all reasonable inferences and credibility issues in favor of the guilty verdicts." US Infrastructure, 576 F.3d at 1203. We "will not overturn a conviction on the grounds of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004) (quotation marks omitted).

75, and 78) or any corrupt intent as to all the bribery counts.[55]

To sustain the conspiracy convictions, the government must prove (1) "the existence of an agreement to achieve an unlawful objective, here, giving things of value" to County employees with the corrupt intent to influence or reward them; (2) "the defendant[s'] knowing and voluntary participation in the conspiracy;" and (3) "an overt act in furtherance of the conspiracy." US Infrastructure, 576 F.3d at 1203; see also United States v. Jennings, 599 F.3d 1241, 1250-51 (11th Cir. 2010). Defendants argue the government failed to present any evidence of an agreement among them.

The problem for defendants is direct evidence of an agreement is unnecessary; the existence of the agreement and a defendant's participation in the conspiracy may be proven entirely from circumstantial evidence. Id.; United States v. Massey, 89 F.3d 1433, 1439 (11th Cir. 1996). "A defendant may be found guilty of conspiracy if the evidence demonstrates he knew the 'essential objective' of the conspiracy, even if he did not know all its details or played only a

_____

[55]Defendants PUGH, Roland Pugh, Yessick, RAST, Bobby Rast, Danny Rast, FWDE, and Dougherty were convicted on Count 1 for participating in a conspiracy to bribe defendant McNair. Defendants PUGH, Yessick, RAST, Bobby Rast, FWDE, and Dougherty were convicted on Count 51 of participating in a conspiracy to bribe defendant Swann. Defendants PUGH and Wilson were convicted on Count 75 of participating in a conspiracy (between PUGH, Grady Pugh, and Wilson) to bribe Wilson. Defendant PUGH was convicted on Count 78 of participating in a conspiracy (between PUGH, Roland Pugh, Barber, and Yessick) to bribe Barber.

minor role in the overall scheme." United States v. Guerra, 293 F.3d 1279, 1285 (11th Cir. 2002). The government need not show "each defendant had direct contact with each of the other alleged co-conspirators." Id. "It is not necessary for the government to prove that a defendant knew every detail or that he participated in every stage of the conspiracy." United States v. Jones, 913 F.2d 1552, 1557 (11th Cir. 1990). "For a wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise." United States v. Fernandez, 892 F.2d 976, 986 (11th Cir. 1989) (quotation marks omitted). "[A] common purpose or plan may be inferred from a development and collocation of circumstances." US Infrastructure, 576 F.3d at 1205 (quotation marks omitted).

Extensive witness and documentary evidence firmly established that the things of value described in the conviction counts were given by the contractor-defendants and accepted by McNair, Swann, Barber, Wilson, and other County employees. The defendants in the *McNair* and *Swann* trials mainly dispute whether the government proved they acted (1) with corrupt intent (versus for friendship), and (2) in agreement (versus independently). The government presented more than sufficient evidence of both corrupt intent and a conspiracy agreement.

First, ample evidence showed that the contractor-defendants worked together on McNair's studio and Swann's home and that they did so with a common purpose of providing sizable benefits to influence McNair and Swann in the billion-dollar sewer rehabilitation program. There was no evidence of gifts to these "friends" before the sewer projects began. Instead, the gifts to McNair and Swann and other County employees were made during the same time period of the sewer projects. The large sums — both in bribes and sewer payments — indicate a common scheme of all defendant-appellants to receive County sewer money through illegal means. The jury was free to disbelieve the defendants' claims of gifts for friendship and to find corrupt intent to influence McNair and Swann in connection with the County's massive sewer payments to the contractor-defendants. The juries could readily believe the gifts worth hundreds of thousands of dollars to McNair and Swann after the sewer work began were actually bribes intended to make sure the contractors profited excessively from the work. In fact, the evidence recounted above showed pervasive and entrenched corruption.

Second, the evidence of how the contractor-defendants divided up and coordinated their work on the same personal projects for McNair (his studio) and Swann (his home) during the same time frame is strong evidence of a conspiracy. For example, FWDE's Bailey supervised the construction of McNair's studio

while PUGH and RAST provided labor and materials. RAST furnished the labor to build the deck, and PUGH furnished the materials. RAST excavated for the footings, and PUGH ordered the concrete and poured concrete walls. FWDE paid Mosley Construction for the wood framing initially, and then RAST began paying Mosley. FWDE ordered the aluminum handrails, PUGH paid for them, and RAST installed them. The same pattern of dividing up the work was followed for the Swann home. For example, an FWDE employee supervised the work at Swann's home. PUGH's Yessick hired a company to install a koi pond for Swann, and PUGH listed Danny Rast as a point of contact.[56]

Third, the extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent. For example, evidence in the *McNair* trial showed FWDE employed Bailey as a full-time construction superintendent for the McNair studio renovation and reported Bailey's time as purportedly performed on a JCESD sewer project. FWDE concealed a $50,000 payment Dougherty made to subcontractor George Word Construction for building McNair's Arkansas retirement home.[57] FWDE has no record of the transaction at all. The only

---

[56]In addition, after McNair's retirement, PUGH, FWDE, and Bobby Rast each gave McNair a check for the same amount — $5,000 — all within a two-day period.

[57]Earlier, PUGH had paid Word $44,192.75 in the first half of October 2001, and, per Yessick's instruction, internally charged the expense to miscellaneous jobs/construction materials. McNair told George Word that FWDE would make the next payment.

existing record of this transaction was made by a bookkeeper, who copied the invoice and check and kept them at home because of his suspicions. FWDE also supplied a construction superintendent, Hendon, for Swann's home remodel. For nearly two years, Hendon was on FWDE's payroll but actually spent half of every workday at Swann's home. FWDE's Stanger replaced Hendon for an additional nine months. Dougherty was aware of this work at Swann's home. FWDE paid a subcontractor over $28,000 — with checks signed by Dougherty — to frame the addition to Swann's home.

Likewise, RAST paid nearly $77,000 for materials and subcontractors for McNair's studio. RAST also supplied significant amounts of labor for McNair's studio, including excavating for the footings and constructing its deck and metal steps. RAST hid these expenses by coding them to JCESD projects.

After a newspaper article revealed RAST's work on Swann's home, Bobby Rast told his bookkeeper that they "didn't need any document invoices in the files with Jack Swann's or Chris McNair's shipping address on them," causing her to discard these invoices. Before the article, RAST had treated its payments to McNair and Swann as business expenses, deducting them on its tax returns. After the article, RAST amended several years' returns to eliminate more than $140,000

of those deductions.[58]

Similarly, RAST crews performed demolition work and poured concrete for the basement, walls, stairs, and elevator pit at Swann's home. RAST also spent more than $28,000 purchasing concrete and bricks and paying subcontractors to repair the plumbing, paint Swann's home, and install hardwood floors and stairs. As with McNair, RAST concealed its work for Swann, in particular avoiding the use of Swann's name on invoices, delivery tickets, and accounting reports, and coding the work and expenses either to miscellaneous or JCESD projects.

PUGH also concealed its work on McNair's studio. For example, when Besco delivered steel to McNair's studio, Besco's delivery tickets identified PUGH and Yessick as its customer and indicated that some of the steel was for the Valley Creek Treatment Plant, a JCESD sewer job on which PUGH was the contractor and FWDE the consulting engineer.

Defendants claim they could not have intended to corruptly influence McNair because his authority was purely "ministerial," since he only ratified what JCESD officials below him (such as Swann) had already approved. Given

_____

[58]Sufficient evidence also supports the Rast defendants' convictions for bribing Chandler and Ellis. First, Chandler asked Bobby Rast for money to attend technical conferences that Ellis was also planning to attend. Instead of giving Chandler a check for $250-$500 as Chandler expected, Bobby Rast gave Chandler an envelope containing $5,000 cash and told Chandler to split it with Ellis.

77

McNair's ultimate authority and responsibility, a jury could infer McNair became a "rubber-stamp" for the defendants' pay requests, field directives, and contract modifications that crossed his desk because of the large sums in goods and services he received from the contractor-defendants. And because he was responsible for placing sewer items on the County Commission's weekly agenda, McNair controlled every sewer matter requiring Commission approval.[59]

## B.    PUGH's Challenges to Counts 75 and 78

PUGH challenges the sufficiency of the evidence as to its bribery conspiracy convictions on Count 75 (the Wilson scholarship) and Count 78 (land and vacations for Barber). However, ample evidence supports both convictions.

The evidence established that when Grady Pugh gave Wilson's son the scholarship, he expected Wilson to return the favor. Grady Pugh testified that when he provided the Wilson scholarship, he "felt like if [Wilson] got a chance to

---

[59]Defendants also contend the government failed to prove any specific payment (or work on McNair's studio or Swann's home) was given or done in exchange for a specific official act by McNair or Swann. Because a specific *quid pro quo* is not an element of a § 666(a)(1)(B) or (a)(2) crime, there was necessarily no failure of proof as to that element.

Alternatively, even assuming these § 666 crimes require, as the Second Circuit concluded in Ganim, that the government prove payments or such work were given or done in return for a promise of as yet unidentified future conduct favorable to the contractor-defendants in their County sewer projects, the evidence overwhelmingly established such facts and thus any error in the jury charge was harmless. And even under the Fourth Circuit's approach in Jennings, which requires a "course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor," the evidence here was sufficient, and thus any jury charge error was harmless. Jennings, 160 F.3d at 1014.

help us and return the favor, he would." Only three days after Wilson faxed Grady

Pugh information as to where PUGH should send the scholarship check — and the

day before Grady Pugh sent it — Wilson approved PUGH's request for a time

extension that had been sitting on Wilson's desk for four weeks. When PUGH

submitted its extension request, PUGH was already exposed to liability of $76,000

in liquidated damages. The amount of exposure exceeded $100,000 by the time

Wilson actually granted PUGH's request.

The evidence also supports the verdict that PUGH and Yessick conspired to

bribe Barber. Barber oversaw all of the JCESD inspectors and awarded the no-bid

emergency work contracts. In 1997, 1998, 1999, and 2001, PUGH paid for

Barber's vacations, but hid the payments in the company's books. PUGH readily

agreed to Barber's June 2000 request to buy him a lot for a retirement home.

PUGH's Yessick contracted for the lot in Roland Pugh's name but charged

$45,000 to the Paradise Lake project to pay for it. Then, just before the closing,

PUGH instead gave Barber a cashier's check to buy the lot in his own name. The

remitter's name was left blank on that check. Yessick was told to retrieve all

evidence that PUGH was ever involved. This required the realtor to fabricate a

fictitious house sale to refund the original $1,000 deposit.

Moreover, just months before Barber solicited PUGH for the purchase of the

lot, Barber designated the Paradise Lake project as an emergency. Because the cost of the project — $827,417.75 — greatly exceeded Barber's $50,000 emergency work approval limit, and because there was no Paradise Lake contract on which to grant a field directive, the work was performed as a field directive on the unrelated multimillion dollar Cahaba River project. PUGH netted a profit of more than $400,000.

PUGH argues the Wilson scholarship and Barber land transaction are not bribery conspiracies, but merely "buyer-seller" transactions. PUGH relies primarily on two drug cases, United States v. Mercer, 165 F.3d 1331, 1335 (11th Cir. 1999) (cash for drugs), and United States v. Dekle, 165 F.3d 826, 830-31 (11th Cir. 1999) (sex for drugs), for the proposition that there is no conspiracy where there is merely a "buy-sell transaction" without an "agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction." Mercer, 165 F.3d at 1335 (quotation marks omitted). PUGH argues that there was nothing agreed upon with Wilson or Barber outside of the one gift or one buy-sell transaction. The drug cases of Mercer and Dekle are materially different from § 666 bribery conspiracy cases. In a drug deal, once the sale is complete, there is no further criminal objective. In § 666 cases, once the gift is made, the defendant typically intends to corruptly influence the County employee's

80

future actions.  See United States v. Tilton, 610 F.2d 302, 307 (5th Cir. 1980)[60]

(bribee conspired with briber in part because of common goal of increasing their

personal wealth).  In § 666 cases, the defendants share both an anticipation of

future action and a common goal of increasing their wealth illegally.[61]

## C.    Swann and PUGH's Challenges to Counts 90-100

In the *Swann* trial, Swann, PUGH, and Yessick were convicted of eleven

counts (90-100) of honest services mail fraud under §§ 1341 and 1346.  The

convictions involve Swann's receiving landscaping services worth $140,000 from

PUGH and Yessick.  On appeal, Swann and PUGH claim the evidence was

insufficient to support their convictions.[62]

To establish a violation of § 1341, the government must show the defendant

"(1) intentionally participates in a scheme or artifice to defraud another of money

or property, and (2) uses or 'causes' the use of the mails . . . for the purpose of

executing the scheme or artifice."  United States v. Ward, 486 F.3d 1212, 1222

---

[60]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[61]To the extent defendant-appellants make sufficiency of the evidence arguments as to any other § 666 conviction counts, we reject them as without merit.

[62]Yessick does not appeal.  On appeal, Swann and PUGH do not challenge the constitutionality of the honest services statute.  Instead, Swann raises two claims:  (1) insufficient evidence to sustain his §§ 1341, 1346 convictions, and (2) the district court erred by refusing to give a "good faith" instruction to the jury.  PUGH adopted Swann's claim of insufficient evidence.

(11th Cir. 2007).[63]

Section 1346 adds "honest services" language to the § 1341 offense, providing that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. "To prove 'honest services' mail fraud, the Government must show that the accused intentionally participated in a scheme or artifice to deprive the persons or entity to which the defendant owed a fiduciary duty of the intangible right of honest services, and used the United States mails to carry out that scheme or artifice." United States v. Browne, 505 F.3d 1229, 1265 (11th Cir. 2007). When a public official "secretly makes his decision based on his own personal interests — as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest — the official has defrauded the public of his honest services." United States v. Lopez-Lukis, 102 F.3d 1164, 1169 (11th Cir. 1997).

Here, Swann received approximately $100,000 in landscaping and lawn

---

[63]Section 1341 provides in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.
18 U.S.C. § 1341.

maintenance from a company (PUGH) that he had the power to favor in the sewer rehabilitation program. In the summer of 2000, after Swann told PUGH's Yessick he had overspent in remodeling his house, Yessick hired Guthrie Landscaping to landscape Swann's two properties. By December 2001, PUGH had paid Guthrie more than $93,000, including $1,200 per month in 2001 for lawn maintenance. In January 2002, Yessick asked Guthrie to stop submitting invoices to PUGH and instead advanced Guthrie $47,000 for three years of landscaping and maintenance. PUGH paid a total of approximately $140,000 to Guthrie for landscaping work for the Swanns.[64]

Although Swann contends there was "no bribe" and none of this was "done in secrecy," the evidence shows PUGH and Swann took steps to conceal any record of the services provided to Swann. Guthrie mailed its invoices to PUGH and, at Yessick's request, identified the work by job number only. Yessick directed PUGH's controller to charge the expense to the Metro Park Roadway, a County job. Guthrie's invoices were never found in PUGH's files.

After Swann and Yessick learned of the investigation, Guthrie was abruptly asked to stop working at Swann's home, even though there was a balance

---

[64]In addition to the substantive bribery counts against Swann (Count 52) and PUGH (Count 61) for these landscaping services, both defendants were convicted of separate counts (Counts 90-100) of honest services mail fraud for payments PUGH made by mail to Guthrie.

remaining on its $47,000 advance. In August and September 2002, approximately two years after hiring Guthrie, Yessick directed his assistant to create invoices to Swann's mother and mother-in-law for landscaping, tree removal, and "remodeling work." The Swanns then took out home equity loans in the names of their mothers, and wrote two checks to PUGH totaling approximately $59,000 on joint accounts they held with their mothers. Yessick gave these checks directly to PUGH's controller, telling her they were partial payment for $105,000 in landscaping work PUGH had done, which work he had previously directed her to record as "miscellaneous AR." Yessick told the controller to credit the $59,000 in checks to PUGH as "miscellaneous income" and "to write off" the approximately $46,000 that remained.

Swann contends that PUGH merely located the landscaping contractor and that he always intended to reimburse PUGH for payments to Guthrie. However, PUGH and Swann concealed the landscaping arrangement. The concealment itself is strong evidence that Swann accepted these services not as a loan, but as a bribe. See United States v. Hunt, 521 F.3d 636, 646-47 (6th Cir. 2008), cert. denied, 129 S. Ct. 2157 (2009); United States v. Dial, 757 F.2d 163, 170 (7th Cir. 1985).

Swann also claims he was unable to, and did not, assist PUGH in any way. Yet, five days after PUGH's President Yessick hired Guthrie to landscape Swann's

two properties, Swann granted a 180-day extension for PUGH's joint venture on the Vestavia Trunk project. That extension saved PUGH's joint venture $180,000 in potential liquidated damages. Two months earlier, Swann had denied a 120-day extension request on the same project, noting that timely completion of the project was "a requirement of the specifications." And in 2000, Swann approved a $827,417.75 field directive for PUGH's Paradise Lake project and caused it to be charged to the unrelated Cahaba River project. As noted earlier, Barber had designated the project as an emergency, and then Swann later approved this field directive.

The evidence fully supports the jury's guilty verdict on Counts 90-100 as to Swann and PUGH.[65]

## D.    Roland Pugh's Arguments

Roland Pugh challenges the sufficiency of the evidence to support his conviction for conspiracy to commit bribery of McNair (Count 1). Roland Pugh

---

[65]Swann also claims the district court erred by refusing his proposed jury instruction that good faith is a complete defense to mail fraud. The district court instructed the jury that to convict, it must find beyond a reasonable doubt that defendants "knowingly devised or participated in a scheme to fraudulently deprive the public of an intangible right of honest services" and did so willfully with intent to defraud. The court defined "intent to defraud" as "to act knowingly and with the specific intent to deceive someone." Because a finding of specific intent to defraud necessarily excludes a finding of good faith, Swann's requested instruction was "substantially covered by other instructions that were delivered," and Swann has shown no error in the refusal to give his requested good faith charge. United States v. Opdahl, 930 F.2d 1530, 1533 (11th Cir. 1991) (quotation marks omitted).

also argues the government failed to prove a "wheel" or "hub and spoke" conspiracy because there was no evidence he knew the Rast and Dougherty defendants (the other "spokes") were bribing McNair (the "hub").

This ignores the fact that Roland Pugh directed Grady Pugh to fly McNair's daughter and FWDE's superintendent Bill Bailey (who was overseeing construction at McNair's studio) on the PUGH company airplane to Georgia to pick out carpet for McNair's studio. Before take-off, Roland Pugh told Grady Pugh that "McNair has called now and says that he's broke and he doesn't have enough money to leave for the deposit on the carpet. So, if you would, write a check for the deposit." Grady Pugh paid the deposit with a $4,820 PUGH check and had it treated on the company's books as an expense on the "last rehab contract."[66]

Roland Pugh also gave McNair money in connection with the project to develop McNair's studio. When the project began, Roland Pugh told PUGH's other three owners, Grady Pugh, Andy Pugh, and Yessick, that they had to give money to McNair because he was building a studio and, as ten percent owners, they had to "kick in" their ten percent. Grady Pugh gave approximately $1,500 in

---

[66]Grady Pugh's testimony in this regard was corroborated by Bill Bailey's testimony.

cash to Roland Pugh's secretary that time to give to McNair.[67]

On another occasion, Roland Pugh collected money from the three other PUGH owners to give to McNair for his studio. On July 18 and 19, 2000, three of them wrote checks to cash in proportion to their ownership interests. (Roland Pugh: $7,000, Andy Pugh: $1,000, Yessick: $1,000). Roland Pugh gave Grady Pugh an envelope of money and asked him to give it to McNair. Grady Pugh took it to McNair's studio where he saw FWDE's Bailey and told Bailey he (Grady Pugh) was there to help McNair, and that it was "financial help" that McNair needed at that time. Grady Pugh then visited with McNair for a few minutes and set the envelope down between the seats of the van they were in as McNair watched. After McNair retired, Roland Pugh complained to Grady Pugh about McNair's demand for help building a retirement home, saying that "surely this is the last time we'll have to do anything for him since he's out of office."[68]

---

[67]We reject Roland Pugh's claim that his conspiracy conviction falls outside of the statute of limitations because no member of the "Pugh spoke" committed an overt act after August 26, 2000. The Rast and Dougherty defendants took actions in furtherance of the conspiracy well within the statute of limitations. "[A]n individual conspirator need not participate in the overt act in furtherance of the conspiracy. Once a conspiracy is established, and an individual is linked to that conspiracy, an overt act committed by any conspirator is sufficient." United States v. Thomas, 8 F.3d 1552, 1560 n.21 (11th Cir. 1993). Because Roland Pugh had joined the conspiracy to bribe McNair and because that conspiracy continued into the statute of limitations period, Roland Pugh's conviction stands even if he took no actions within that period. The district court properly instructed the jury that it could convict Roland Pugh if any co-conspirator committed an act after August 26, 2000.

[68]Roland Pugh cites the drug case of United States v. Mercer, 165 F.3d at 1335-36, for the proposition that there is no conspiracy where there is merely a "buy-sell transaction." As

Later, after McNair asked Roland Pugh to pay for the studio's $40,000 air conditioning system, Roland Pugh gathered funds by writing checks to his daughters-in-law and to cash. Once again, Grady Pugh delivered an envelope of cash to McNair, this time at his house.

As a result, there was sufficient evidence for the jury to convict Roland Pugh and to find that he was aware of at least some of the other co-conspirators, such as FWDE and FWDE's Bailey, given that they were working on separate parts of a larger project. Accordingly, we reject Roland Pugh's sufficiency of the evidence challenge to his conviction on Count 1.

The cases Roland Pugh relies on are inapposite. In United States v. Chandler, 388 F.3d 796, 807-08 (11th Cir. 2004), the "hub" of the conspiracy ensured "there was no connection whatsoever between the various spokes," and the spokes "knew nothing about each other." The evidence here shows that Roland Pugh was aware not only of PUGH, Yessick, and Grady Pugh's involvement in the McNair project, but also that of the Dougherty and Rast defendants' involvement. For the same reason, United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998), is not on point. Id. at 1251 n.5 (concluding "hub and spoke" conspiracy must have

---

explained earlier, Mercer is materially different from § 666 bribery conspiracy cases. In any event, Roland Pugh's argument lacks merit as to Count 1 because there is ample evidence that persons other than Roland Pugh and McNair were involved in the transactions in the bribery conspiracy.

88

"some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object") (quotation marks omitted).

## E.  McNair's Arguments Regarding Dawson

The evidence at the *McNair* trial showed McNair's conviction for accepting a bribe from Dawson is adequately supported.  Dawson's firm received millions of dollars in no-bid engineering contracts from McNair, and the vast majority of Dawson's work was on JCESD contracts.  McNair solicited the studio's $16,400 audio-video system from Dawson.  Dawson "was uncomfortable with the whole situation" and would not have agreed if McNair was not part of the sewer rehabilitation process, so he had the store conceal the delivery address on the invoice.

## VIII.  404(B) EVIDENCE

All defendant-appellants challenge the admission of other bad acts evidence under Federal Rule of Evidence 404(b).[69]  Specifically, they contend the district courts erred by admitting, for example, Swann-bribe evidence in the *McNair* trial and McNair-bribe evidence in the *Swann* trial.

---

[69]A district court's evidentiary rulings under Federal Rule of Evidence 404(b) are reviewed only for "a clear abuse of discretion."  US Infrastructure, 576 F.3d at 1208.  "[T]his Court 'will not hold that the district court abused its discretion where it reached the correct result even if it did so for the wrong reason.'"  Id. (quoting United States v. Samaniego, 345 F.3d 1280, 1283 (11th Cir. 2003)).

Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). This Court uses a three-part test to determine whether other bad acts are admissible under Rule 404(b):

> First, the evidence must be relevant to an issue other than the defendant's character; Second, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice . . . .

United States v. Matthews, 431 F.3d 1296, 1310-11 (11th Cir. 2005) (quotation marks omitted). "[I]n every conspiracy case, a not guilty plea renders the defendant's intent a material issue. Evidence of such extrinsic evidence as may be probative of a defendant's state of mind is admissible unless the defendant affirmatively takes the issue of intent out of the case." Id. at 1311 (alterations and internal quotation marks omitted).

Moreover, Rule 404(b) does not exclude evidence that is "inextricably intertwined" with evidence of the charged offense. United States v. Wright, 392 F.3d 1269, 1276 (11th Cir. 2004); United States v. Aleman, 592 F.2d 881, 885 (5th Cir. 1979). Rule 404(b) does not exclude evidence that is "linked in time and

circumstances with the charged crime" or that "forms an integral and natural part of an account of the crime to complete the story of the crime for the jury." Wright, 392 F.3d at 1276 (quotations omitted); United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007).

We conclude the contested evidence was admissible for three reasons. First, the evidence was inextricably intertwined with evidence of the charged bribery offenses. Second, even if not inextricably intertwined, this evidence was relevant to show corrupt intent and admissible under 404(b). Defendant-appellants expressly argued they lacked corrupt intent and gave gifts to McNair and Swann out of friendship and good will.[70] Evidence that the contractor-defendants gave things of value to Swann in McNair's trial and to McNair in Swann's trial was highly probative of the contractor-defendants' intent. See Edouard, 485 F.3d at 1345 (concluding extrinsic evidence is relevant "where the state of mind required for the charged and extrinsic offenses is the same"). Moreover, evidence of similar conduct that occurs during the same time period has "heightened" probative value. Jones, 913 F.2d at 1566. Indeed, the district court judge, in the *McNair* trial, explained in a pre-trial order:

---

[70]Roland Pugh does not stress lack of corrupt intent because he claims he was not involved at all in any gift. Other than Roland Pugh, defendants do not argue things of value were not given by them to County officials, but they claim they were gifts, not bribes.

While the jury might conceivably find that the defendant felt such a strong sense of friendship with McNair that they would give him substantial gifts or make him substantial loans, the fact that they gave alleged "gifts" or made "loans" to others involved with the same or similar projects would certainly be relevant to the issues of "motive" and "intent." It could also bear on "plan" . . . [and i]f the projects are the same or similar, they may well be a part of the same "series of transactions." . . . [W]hat might arguably be a "gift" to one person becomes less likely a gift if the "gifts" are widespread to others involved with the same or similar projects.[71]

Similarly in the *Swann* trial, another district court judge found that this sort of evidence of intent is "exactly what 404(b) testimony is here for."

Third, the evidence was admissible under 404(b) to show the contractor-defendants' common plan and motive. Specifically, the evidence showed a common plan of bribing County officials controlling the sewer projects by providing them with work on their personal homes or businesses and working together to do so during the same time frame of the sewer projects. For example, in the *McNair* trial, evidence showed — just as FWDE's Bailey was supervising, and RAST and PUGH were providing labor and materials for the McNair studio expansion — FWDE's Stanger was supervising and using a RAST credit card to purchase materials for Swann's separate home renovation. Similarly, in the *Swann* trial, the evidence showed that RAST sent Luke Cobb to pour a concrete

---

[71]The *McNair* judge stated in a subsequent order, "[t]he offenses were similar and temporally close. The 404(b) evidence was clearly appropriate to meet the government's requirement to prove intent."

foundation for McNair's studio, just as he had done for the expansion of Swann's home, and that PUGH had provided Chandler with landscaping, just as it did for Swann. Indeed, the evidence recounted at length above gives repeated examples of how the 404(b) evidence was relevant to show both corrupt intent and a common plan and motive.

Furthermore, the district courts in both the *McNair* and *Swann* trials gave limiting instructions for the 404(b) evidence several times during the trials. See United States v. Diaz-Lizaraza, 981 F.2d 1216, 1225 (11th Cir. 1993) (concluding prejudice could be mitigated by giving a cautionary instruction on the limited use of such evidence). In the *McNair* trial, for example, after testimony of Dougherty's contributions to Swann's remodeling, the court instructed in part:

> This evidence is being allowed for the limited purpose, with respect to Mr. Dougherty, as to what Mr. Dougherty's intent may have been at the time that he may have made payments, or contributions, or gifts, to Mr. McNair. Not that Mr. McNair is charged with receiving anything in connection with Mr. Swann's house.

> But the evidence is allowed for the purpose of your considering that if Mr. Dougherty was making some sort of payments, or contributions, or gifts, on behalf of Mr. McNair; and if he was also making some sort of gifts, or payments, or contributions on behalf of Mr. Swann, you can consider that combination with regard to your determination, which will be a necessary determination for you to make, as to what Mr. Dougherty and his company's intent was, and the nature of that intent, whether it be corrupt or otherwise, at the time he made gifts, or contributions, or payments, on behalf of Mr. McNair.

93

In the *Swann* trial, the court gave similar limiting instructions several times.[72]

And the jury acquitted some defendants on some counts while convicting them on others. This further demonstrates the jury was not confused and could segregate the 404(b) evidence from other evidence. United States v. Prosperi, 201 F.3d 1335, 1346 (11th Cir. 2000) ("A discriminating acquittal also can signal that the jury was able to sift through the evidence properly."); United States v. Coy, 19 F.3d 629, 635 (11th Cir. 1994) (concluding that a split verdict demonstrates "absence of confusion" for 404(b) purposes).[73]

---

[72]In the *Barber* and *Wilson* trials, the district courts admitted 404(b) evidence but gave similar limiting instructions several times.

For the first time on appeal, Swann contends that the limiting instructions were not specific enough because they did not always identify by name the defendant against whom the 404(b) evidence was not being offered. We review this issue for plain error. See infra section XII.D. Where, as here, the district court's instructions accurately reflect the law, this Court gives "wide discretion as to the style and wording employed . . . ." United States v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995). Moreover, at several times during trial, the district court specifically offered to name defendants against whom the evidence was not offered, and appellants — including Swann — declined:

| | |
|---|---|
| COURT: | I have asked y'all that every single time we have given a limiting instruction if you want me to use specific names and I have been told no up to this point. . . . I want you to know I am willing to sit here and tell you the names. I think it would be appropriate, but you are asking me not to; is that right? |
| [SWANN'S COUNSEL]: | Yes, sir. |

Swann has not shown reversible error, plain or otherwise, in any of the jury instructions.

[73]For example, in the *Swann* trial, the jury convicted Swann of bribery conspiracy, 6 substantive bribery counts, and 11 fraud counts, but acquitted him of one bribery count and 17 fraud counts. In the *McNair* trial, the jury convicted and acquitted different defendants on the same charges. In *McNair*, the jury convicted McNair on Counts 1-3 and 5-12 but acquitted him on Count 4. In both the *McNair* and *Swann* trials, the jury convicted Bobby Rast but acquitted Danny Rast on some of the same counts. In the *Barber* trial, the jury convicted PUGH but

94

Defendant-appellants' claim that the 404(b) evidence should have been excluded under Rule 403 lacks merit too. Under Federal Rule of Evidence 403, evidence must be excluded if its probative value "is substantially outweighed by the danger of unfair prejudice." Wright, 392 F.3d at 1276. "Rule 403 is an extraordinary remedy that must be used sparingly because it results in the exclusion of concededly probative evidence." US Infrastructure, 576 F.3d at 1211. This Court in US Infrastructure rejected defendant USI's argument that certain 404(b) evidence of a non-party's bribes of McNair was inadmissible on Rule 403 undue prejudice grounds, stating "in cases where this Court has found other acts evidence inextricably intertwined with the crimes charged, the Court has refused to find that the evidence should nonetheless be excluded as unduly prejudicial . . . ." Id. "[T]he test under Rule 403 is whether the other acts evidence was 'dragged in by the heels' solely for prejudicial impact." Id. (quoting United States v. Veltmann, 6 F.3d 1483, 1500 (11th Cir. 1993)). Because the other acts evidence was inextricably intertwined with the charged crimes, it was not excludable under Rule 403. In any event, its probative value substantially

acquitted Roland Pugh on the same counts.

Moreover, in the *Swann* and *Wilson* trials, the district court charged the jury to consider each defendant "separately and individually" and reminded them that "each defendant is on trial only for the specific offenses or offense charged against such defendant in the indictment." In the *McNair* and *Barber* trials, the district court gave the same instruction with slight variations. Such jury instructions substantially mitigate the risk of spillover prejudice. United States v. Cross, 928 F.2d 1030, 1039 (11th Cir. 1991).

outweighed any undue prejudice.

Appellant McNair also points out that the government did not introduce any evidence that McNair knew about, condoned, arranged, or otherwise sanctioned any of the transactions constituting 404(b) bribe evidence against Swann. However, the Swann evidence was inextricably intertwined with the case against McNair because sewer rehabilitation decisions went through two or three stages of review in some situations, and thus the evidence showed the contractor-defendants were giving things of value to County employees at every level of the JCESD. For example, pay requests, contract modifications, and change orders were sometimes approved at the lower levels by the JCESD's assistant director and engineers or by private engineers (like FWDE and Dougherty), and then, when necessary, sent to Swann as the JCESD's director — and then passed on to McNair for approval or submission to the County Commission with McNair's recommendation. The bribery of other County employees shown in the *McNair* and *Swann* trials was an integral part of the overall bribery scheme because it showed a common plan and motive of the contractor-defendants and completed the story. The government amply showed linkage between contractor-defendants' bribes to McNair and those to Swann and other County employees and vice versa. While the *USI* trial considered in US Infrastructure involved 404(b) testimonial

96

evidence by electrical contractor Henson, which is not at issue in this appeal, this Court's analysis in US Infrastructure is apt here: "Henson's testimony was relevant to the chain of events surrounding the charged crimes, including context and setup . . . ." US Infrastructure, 576 F.3d at 1211.[74]

Finally, defendant-appellants point out that the two trials were severed and that "[s]everance under Rule 14 of the Federal Rules of Criminal Procedure is warranted only when a defendant demonstrates that a joint trial will result in 'specific and compelling prejudice' to his defense." Defendant-appellants argue that, because the district court severed the case, it "must have found that the jury would be unable to consider the evidence separately as it pertained to individual defendants."

This argument is unavailing. The district judge who severed these cases stated in a later telephone conference that, "perhaps some of [these cases] didn't even call for severance, but I leaned toward trying to avoid as much confusion as I

---

[74]The district court also did not err in admitting evidence of cash deposits to McNair's studio's construction account. See United States v. Lattimore, 902 F.2d 902, 903 (11th Cir. 1990) (stating "[w]here the charged crime involves pecuniary gain and the Government presents other evidence of the defendant's guilt, evidence of the sudden acquisition of money by the defendant or his or her spouse is admissible, even if the Government does not trace the source of this new wealth."). This evidence was highly relevant to McNair's intent to accept goods and services bribes, especially since these cash deposits were to the McNair studio account and the goods and services bribes involved the same McNair studio. The cash deposits also were listed as overt acts in Count 50. The defendants also have not shown reversible error as to their claim of untimely notice under 404(b).

could."  In the same teleconference, the district court ruled that 404(b) evidence of other bribes was relevant and that jury instructions would prevent improper use of that evidence.  ("I'm going to assume that if I tell them three or four times, they'll understand it.")  At the beginning of the *McNair* trial, the court stated the cases were severed because it would be "cumbersome to try" them together, but "[t]hat doesn't necessarily mean that evidentiarily, they're not related."  During the *McNair* trial, the district court again rejected defendant-appellants' argument that severance of the counts meant that evidence related to the severed counts was irrelevant, stating:

> But that doesn't have anything to do with whether or not something is or is not relevant evidence to some other situation. That's like saying, they indicted them for a bank robbery thing but you can't show that they spent some of the cash over here in another deal or something.

Defendant-appellants cite no legal support for their argument that severance per se means other bribe evidence cannot be admitted.  That the district court gave the defendants the benefit of trying McNair and the contractor-defendants in one trial, and then Swann and the contractor-defendants in a separate trial, does not mean all evidence about bribes to Swann could not be introduced in the *McNair* trial and vice versa.

## IX.  PROSECUTORIAL MISCONDUCT IN *MCNAIR* TRIAL

As to their convictions in the *McNair* trial, defendants PUGH and Roland

Pugh argue that the prosecutor engaged in misconduct by (1) failing to correct Grady Pugh's false testimony, and (2) eliciting additional false testimony from Grady Pugh, thereby violating their due process rights.[75] Specifically, these defendants argue that at trial Grady Pugh falsely denied having previously said he delivered cash bribes to McNair before a May 24, 2000 trip to buy carpet and falsely testified that he delivered the money after that May 24, 2000 trip.

These cash bribes were part of Counts 13 and 14. During the *McNair* trial, the time line of these events was at issue because it determined whether Counts 13 and 14 were barred by the statute of limitations.[76] The jury acquitted PUGH and Roland Pugh on Counts 13 and 14.[77] While the acquittal moots the statute of limitations issue, the time line of the cash bribes remains relevant only as to Count 1 (bribery conspiracy) and only because those cash bribes were alleged as overt

---

[75]PUGH's brief specifically adopts Roland Pugh's prosecutorial misconduct arguments, and Roland Pugh adopts all relevant portions of PUGH's brief as to all issues. McNair, RAST, Bobby Rast, Danny Rast, FWDE, and Dougherty adopt all arguments of all defendants as to all issues.

[76]The parties referenced the five-year limitations period for Counts 13 and 14 as from August 26, 2000 to August 26, 2005, the date the Second Supseding Indictment was submitted, which added Roland Pugh as a defendant. 18 U.S.C. § 3282. Count 13 charged PUGH and Yessick with giving McNair $20,000 in cash. Count 14 charged PUGH and Roland Pugh with giving McNair at least $10,000 in cash in January 2001. However, if the cash bribes occurred before the May 24, 2000 carpet purchase in Georgia, the defendants argued Counts 13 and 14 would be barred by the five-year statute of limitations.

[77]While PUGH was convicted on multiple counts, Roland Pugh was convicted on only Count 1, the bribery conspiracy count. Other than some documentary evidence, Grady Pugh was the only witness testifying against Roland Pugh as to Count 1.

acts in furtherance of the overall conspiracy to bribe McNair, for which PUGH and Roland Pugh were convicted. On appeal PUGH and Roland Pugh argue Grady Pugh's false testimony about the time line goes to his credibility and that if the jury knew he was lying, this could have affected the guilty verdict on Count 1.[78]

To establish prosecutorial misconduct for the use of false testimony, a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material.[79] See United States v. Woodruff, 296 F.3d 1041, 1043 n.1 (11th Cir. 2002); United States v. Dickerson, 248 F.3d 1036, 1041 (11th Cir. 2001); United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995); see also Napue v. Illinois, 360 U.S. 264, 270-71, 79 S. Ct. 1173, 1177-78 (1959). Perjury is defined as testimony "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." United States v. Ellisor, 522 F.3d 1255, 1277 n.34 (11th Cir. 2008).

"When a government lawyer elicits false testimony that goes to a witness's credibility, we will consider it sufficiently material to warrant a new trial only

---

[78]For the conspiracy charged in Count 1, it did not matter whether the cash deliveries were within the statute of limitations because there was ample evidence of other overt acts within the five-year statute of limitations period. See United States v. Arias, 431 F.3d 1327, 1340 (11th Cir. 2005).

[79]We review a claim of prosecutorial misconduct de novo because it is a mixed question of law and fact. United States v. Duran, 596 F.3d 1283, 1299 (11th Cir. 2010).

when the estimate of the truthfulness and reliability of the given witness may well be determinative of guilt or innocence." United States v. Cole, 755 F.2d 748, 763 (11th Cir. 1985) (quotation marks and alteration omitted). In other words, "[t]he materiality element is satisfied if the false testimony could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Dickerson, 248 F.3d at 1041 (quotation marks omitted). The false testimony is deemed material if there is a reasonable likelihood the false testimony could have affected the judgment of the jury. Alzate, 47 F.3d at 1110; United States v. Barham, 595 F.2d 231, 242 (5th Cir. 1979).

In addition, a prior statement that is merely inconsistent with a government witness's testimony is insufficient to establish prosecutorial misconduct. United States v. Michael, 17 F.3d 1383, 1385 (11th Cir. 1994) ("We refuse to impute knowledge of falsity to the prosecutor where a key government witness'[s] testimony is in conflict with another's statement or testimony."); Hays v. Alabama, 85 F.3d 1492, 1499 (11th Cir. 1996) (determining there was no due process violation where "there has been no showing that [the witness's] later, rather than earlier, testimony was false"); United States v. Gibbs, 662 F.2d 728, 730 (11th Cir. 1981) ("Though knowing prosecutorial use of false evidence or perjured testimony violates due process . . . it is not enough that the testimony . . . is inconsistent with

101

prior statements."); <u>United States v. Brown</u>, 634 F.2d 819, 827 (5th Cir. 1981) ("[D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements.").

## A.    Grady Pugh's Testimony About Cash Deliveries

The false testimony claim stems from notes the prosecutor made during Grady Pugh's two meetings with the prosecutor for plea negotiations on June 17 and 21, 2005.  An FBI agent, counsel for Grady Pugh, and separate corporate counsel for PUGH were also present.  The prosecutor's 2005 notes refer to Grady Pugh's two cash deliveries to McNair and his trip to Georgia where Grady purchased carpet for McNair on May 24, 2000 (for which Grady signed a PUGH company check bearing that date).  The government disclosed the prosecutor's notes to defense counsel several months before trial.

At the *McNair* trial, Grady Pugh testified he delivered two envelopes of cash to McNair — the first at McNair's studio and the second at McNair's home at Christmas 2000 — both <u>after</u> he (Grady Pugh) took a flight to Georgia to purchase the carpet on May 24, 2000.  In response, PUGH's counsel sought to impeach Grady Pugh using the prosecutor's 2005 notes, attempting to show the notes

reflected Grady Pugh gave both cash envelopes to McNair <u>before</u> Grady Pugh

purchased the carpet on May 24, 2000.  PUGH's counsel showed Grady Pugh the

notes of the June 17, 2005  meeting indicating Grady delivered two cash envelopes

to McNair:

> [GRADY PUGH]:　　　　It says in here that I delivered money to the studio and to his house, in these notes. . . .
> [PUGH'S COUNSEL]:　Does it not say, the next time that Roland [Pugh] asked Grady [Pugh] to deliver an envelope of money, it was to McNair, was at McNair's studio?
> [GRADY PUGH]:　　　　It says that, yes, sir.
> [PUGH'S COUNSEL]:　Okay. Despite that, that does not refresh your recollection?
> [GRADY PUGH]:　　　　Despite what it says, it's not true.[80]

PUGH's counsel then showed Grady Pugh the prosecutor's notes from the June 21,

2005 meeting and asked if he recalled that he told the prosecutor the two cash

---

[80]The June 17, 2005 meeting notes state:
–Roland Pugh asked Grady to deliver the money to McNair
–One Roland money [sic]
–Grady recalls being at Northport and having to take the envelope, which was a half inch thick, to McNair's house
–Grady and McNair sat down together in the house and chatted and then Grady left the envelope there between the two of them where McNair saw him put it
–The next time that Roland asked Grady to deliver an envelope of money it was to McNair was at McNair Studio
–McNair was late and Grady had to wait for him
–When McNair showed up, Grady and McNair went to the van where they chatted and then Grady left the envelope there where McNair saw him put it down
–This delivery of money was after the shell of the studio had been erected
–Roland Pugh called Grady and told him that "McNair needs to look at some carpet" (or words to that effect) and that McNair needed RPC [PUGH] to make the deposit on the carpet
–Grady got the company plane to Birmingham and took McNair's daughter and Bill Bailey to LaGrange, Georgia to pick out the carpet

deliveries were <u>before</u> the carpet trip, but Grady replied he did not recall saying it

in that order as follows:

| | |
|---|---|
| [PUGH'S COUNSEL]: | I want to direct you to the portion of [the prosecutor's] notes which read, Grady [Pugh] delivered the second envelope of cash to McNair at the studio. <br> . . . . |
| [PUGH'S COUNSEL]: | And after that, I want to direct your attention to the portion of [the prosecutor's] notes that say, Bill Bailey was there. And it continues, quote "best I recall" close quote, this was the first time Grady [Pugh] met Bill Bailey; and then it continues. Months later, Grady [Pugh] flew to Georgia for the carpet. . . . Does this refresh your memory that when you met with [the prosecutor and an FBI agent], that the sequence you provided was that the first delivery was to the house, the second delivery was to the studio, and they were both done months before you flew to Georgia for the carpet? |
| [GRADY PUGH]: | I don't recall saying it in that order. The order that I remember it in, is the order that I told you Friday. I went to the studio first, then I went to the carpet, and then I went to Mr. McNair's house; and that's the way I remember it. That's the way it happened.[81] |

_____

[81]The June 21, 2005 meeting notes state:

–Grady thinks the RPC [PUGH] office was still in Northport when he delivered the first envelope to McNair

–Grady had to drive from Northport

–Grady thinks the second McNair envelope was when RPC's office was in the trailers in Avondale

. . . .

–Grady delivered the second envelope of cash to McNair at the studio

–He and McNair had already spoken inside the studio and then went to McNair's van

–Bill Bailey was there when Grady delivered the cash to McNair Studio but Grady does not appear to recall talking to Bailey about the money he was giving to McNair

PUGH's counsel suggested to the district court that he might call the prosecutor as a witness. The Court responded: "I think whatever you'd be calling him for doesn't amount to a hill of beans, and I'm not going to let it be done just to cause friction or embarrassment or whatever. So my strong inclination will be not to allow it." The defense did not call the prosecutor to testify.

In closing argument, PUGH's counsel argued Grady Pugh lied about the time line of these events, that his cash deliveries occurred outside the statute of limitations, and that the prosecutor's notes supported this argument. PUGH's counsel also recited portions of the prosecutor's notes.[82]

---

–'Best I recall' this was the first time Grady met Bill Bailey
–The weather was sunny but not cold
–Months later, Grady flew to Georgia for the carpet

[82]In closing argument, PUGH's counsel stated:
And then you heard on Monday, I finally got to show in Mr. Dillon's notes of that very interview. And he read to you from Mr. Dillon's own notes of the June 17th meetings. And he read to you, where they were talking chronologically in the June 17th, the first meeting, where he said that he delivered a note, an envelope to Mr. McNair's house, and the next time he was asked to deliver the envelope to the studio, and that then he was talking chronologically about going to look for carpet. And it was even clearer when he got into the notes of the second interview where he said he delivered the second envelope of cash to McNair at the studio, the best he could recall. Remember I even got him -- I think it was in quotes. Best I recall, this was the first time Grady met Bill Bailey. The next line, months later, Grady flew to Georgia for the carpet. Those are from Mr. Dillon's own notes of that meeting and that's what you heard the testimony was. Those do not establish any payment in July, whatsoever. They don't establish any payment that's been alleged in this case whatsoever. . . .
He gave even another story while on the stand. I was asking about the sequence and I was asking him whether these notes from his meeting refreshed his memory and he said I don't recall saying it in that order. The order that I remember it in is the order that I told you Friday. I went to the studio first, then I went to the carpet, and then

105

We conclude defendants PUGH and Roland Pugh have not met their burden to show Grady Pugh's testimony was actually false, much less that the government knew it was false. First, the notes themselves are in bullet form and contain no dates nor any explicit indication that they were necessarily intended to be read in chronological order. At trial Grady Pugh agreed he had a "clear recollection" of what he said during the meetings. At trial Grady Pugh reviewed the notes on defense counsel's instruction and stated that the notes were "not laid out in the order that things happened," that he did not "recall saying it in that order," and, "[d]espite what it says, it's not true."[83]

Importantly, the documentary evidence is consistent with Grady Pugh's trial testimony that he delivered the money after the carpet purchase. The government introduced these checks: on May 24, 2000, Grady Pugh signed a $4,820.81 PUGH check made out to the carpet store; on July 18-19, 2000, Grady Pugh, Roland Pugh, and Yessick signed checks to cash totaling $9,000; and from December 15 to 22, 2000, Roland Pugh signed $38,750 in checks to Roland Pugh's daughters-in-law and to cash. Further, other witnesses corroborated Grady Pugh's

_____

I went to Mr. McNair's house, that's the way I remember it; and that's the way it happened.

[83]Nothing in the record indicates that after the 2005 meetings, Grady Pugh checked or adopted the prosecutor's notes.

106

trial testimony. For example, Bill Bailey testified he flew with Grady to pick out carpet and saw him "again" at the studio, where they "talked about airplanes for a second" before Bailey asked Grady "if he was here to help Chris McNair again," to which Grady answered yes.

Even assuming that Grady Pugh's denials of prior inconsistency were false or his time line of events was false, defendants, at a minimum, have not shown the prosecutor knew Grady Pugh's testimony was false, especially given how the documents and other witnesses corroborated his testimony.

In any event, defendants have shown no reversible error. The jury heard the relevant portions of the notes read into the record when PUGH's counsel was cross-examining Grady Pugh. During closing arguments, PUGH's counsel argued that the prosecutor's notes contradicted Grady Pugh's trial testimony and again recited relevant portions of the notes. Defense counsel thoroughly and exhaustively cross-examined Grady Pugh. Defense counsel pointed out other inconsistencies within Grady Pugh's trial testimony and in his grand jury testimony. The jury was also well aware Grady Pugh had made a plea deal and that the government's assessment of his cooperation would impact his eventual sentence. The jury had the information it needed to make an informed decision as to Grady Pugh's credibility. See United States v. Calderon, 127 F.3d 1314, 1325

(11th Cir. 1997) ("[C]redibility determinations are the exclusive province of the jury.") (quotation marks omitted). "Therefore, because we find that the uncorrected, allegedly perjurious statements do not 'undermine confidence in the verdict,'" we reject defendants' prosecutorial misconduct claims. Dickerson, 248 F.3d at 1042 (citations omitted).[84]

## B.     Grady Pugh's Testimony About Note-Taking

Defendants PUGH and Roland Pugh also claim the prosecutor intentionally elicited from Grady Pugh the false testimony that "everyone was taking notes" at the 2005 meetings, even though the prosecutor knew he had instructed the FBI agent not to take notes.[85]

At trial the prosecutor asked Grady Pugh about the note-taking:

Q:     And when you signed that plea agreement, Mr. Pugh, had you
       already met with us on two occasions at the FBI office?
A:     Yes, sir.
Q:     And when you met with the FBI and myself, was your lawyer
       there?
A:     Yes, sir.
Q:     And was the company lawyer there?
A:     Yes, sir.

---

[84]We note the defense did not call others present at the 2005 meetings as to what Grady Pugh said. And regardless of whether others at the 2005 meetings were taking notes, defense counsel still could have called them to elicit their personal recollection of what Grady Pugh said. However, we need not rely on this fact as it is abundantly clear counsel effectively cross-examined Grady Pugh.

[85]The prosecutor acknowledged he told the FBI agent not to take notes during the 2005 meetings.

Q:    And was everybody taking notes?
A:    Yes, sir.

On cross-examination, the defense attempted to clarify this assertion, but Grady Pugh stated that it "looked to me like everybody was taking notes."  PUGH's corporate counsel asked Grady Pugh, "[a]nd do you remember that I objected and I indicated that I would take notes?"

The foregoing colloquy is ambiguous as to whether the prosecutor was referring to the lawyers in the room or also to the FBI agent.  Grady Pugh reasonably could have taken "everybody" to mean the two lawyers about whom the defense had just asked.  Moreover, while the record shows the FBI agent was not taking notes, defendants submitted no evidence that Grady Pugh's counsel or PUGH's counsel were <u>not</u> taking notes.[86]  In sum, the defense has not met its burden to show the prosecutor believed or knew Grady Pugh's note-taking testimony was false.  In any event, the defendants have not shown a reasonable likelihood that correction on this particular point, even if it did constitute "false testimony," could have changed the jury's evaluation of Grady Pugh's overall

----

[86]The government stresses it would have been remarkable had Grady Pugh's counsel not taken notes during his own client's debriefings and plea negotiations in these two meetings.  The prosecutor also points out that there is a reference in a December 2005 hearing before the magistrate judge that there was note-taking by Grady Pugh and PUGH's counsel at these meetings.  We need not rely on that reference because it is enough to say defendants submitted no evidence that Grady Pugh or PUGH's counsel were not taking notes and have not carried their burden to show Grady Pugh's testimony was false.

109

credibility. Therefore, it does not undermine confidence in the verdict. See

Dickerson, 248 F.3d at 1041.

## X. STATUTE OF LIMITATIONS IN *WILSON* TRIAL

In the *Wilson* case, defendant PUGH claims the district court erred by

denying its motion to dismiss Count 75 as time-barred under the five-year statute

of limitations. See 18 U.S.C. § 3282.[87] Count 75 charged that from about August

1999 and continuing though June 2000, defendants PUGH and Wilson (as the

JCESD's Chief Engineer) entered into a bribery conspiracy whereby Wilson

corruptly solicited and accepted, and PUGH corruptly gave, a $4,500 payment (in

the form of a bogus scholarship for Wilson's son) with the intent of influencing

and rewarding Wilson for supporting PUGH's interests in connection with the

JCESD sewer rehabilitation reconstruction program. Count 75 alleged that an

object of the conspiracy was for Wilson to enrich himself and that PUGH and

Wilson conspired to conceal PUGH's payment to Wilson by having it disguised as

a bogus scholarship to UAB.

PUGH argues that Count 75 falls outside of the five-year limitations period

because the latest overt act by a co-conspirator charged in the Indictment — Grady

---

[87]"We review a district court's denial of a motion to dismiss the indictment for an abuse of discretion." United States v. Clarke, 312 F.3d 1343, 1345 n.1 (11th Cir. 2002). "We review the district court's interpretation and application of statutes of limitations de novo." Id.

Pugh's sending a $4,500 check to UAB — was committed no later than August 24, 1999, which was outside the limitations period of February 7, 2000 to February 7, 2005.[88]  The government responds that the Indictment charged Wilson's receipt of the benefit of UAB's four quarterly disbursements to his son as four separate overt acts, and the last two disbursements (March 17 and June 7, 2000) were made to the son within five years of PUGH's indictment on February 7, 2005.  In reply, PUGH stresses that it is undisputed that UAB and Wilson's son were not members of the bribery conspiracy, and thus there was no overt act by a co-conspirator within the limitations period.

"In a conspiracy prosecution brought under § 371 the government in order to avoid the bar of the limitation period of § 3282 must show the existence of the conspiracy within the five years prior to the return of the indictment, and must allege and prove the commission of at least one overt act by one of the conspirators within that period in furtherance of the conspiratorial agreement."  United States v. Davis, 533 F.2d 921, 926 (5th Cir. 1976); see Grunewald v. United States, 353 U.S. 391, 396, 77 S. Ct. 963, 969-70 (1957) (addressing a three-year limitations period and concluding the government must prove that conspiracy was still in

_____

[88]In this statute of limitations calculation, the parties use the February 7, 2005 date of the initial indictment.  While the initial indictment itself bears the dates of February 3 and February 7, we use what the parties use.

111

existence at beginning of limitations period and that at least one overt act was performed after that date); United States v. Dynalectric Co., 859 F.2d 1559, 1564 n.6 (11th Cir. 1988) (stating if an overt act is necessary for the commission of the conspiracy, then "the indictment must charge and the evidence at trial must show that an overt act in furtherance of the conspiracy was made within the limitations period").

By contrast, for "conspiracy statutes that do not require proof of an overt act, the indictment satisfies the requirements of the statute of limitations if the conspiracy is alleged to have continued into the limitations period." United States v. Gonzalez, 921 F.2d 1530, 1548 (11th Cir. 1991) (citation and quotation marks omitted) (determining RICO conspiracy statute, unlike the general federal conspiracy statute, does not require an overt act). Unlike conspiracy statutes that do not require proof of an overt act,[89] the conspiracy statute PUGH was charged under, 18 U.S.C. § 371, does require proof of an overt act. See 18 U.S.C. § 371 (requiring that "one or more [co-conspirators] do any act to effect the object of the conspiracy").

As recounted above, Wilson solicited the bribe to help pay his son's college

---

[89]For example, neither a drug conspiracy under 21 U.S.C. § 846 nor a RICO conspiracy under 18 U.S.C. § 1962(d) requires proof of an overt act. See United States v. Terzado-Madruga, 897 F.2d 1099, 1121 (11th Cir. 1990) (drug conspiracy); United States v. Coia, 719 F.2d 1120, 1124 (11th Cir. 1983) (RICO conspiracy).

expenses in mid-1999, and Grady Pugh mailed a $4,500 check to UAB on August 24, 1999.  Because the tuition had already been paid by FWDE, Wilson did not actually receive the full benefit of the $4,500 check until UAB disbursed the final installment to Wilson's son in June 2000.  The money disbursed to the son was a benefit to Wilson because he would otherwise have paid his son's expenses himself.  Furthermore, where enrichment is an object of a conspiracy, the conspiracy continues until the conspirators receive the full economic benefits anticipated by their scheme, and a conspirator's <u>receipt</u> of a benefit can be considered an overt act.  <u>See</u> <u>United States v. Anderson</u>, 326 F.3d 1319, 1328 (11th Cir. 2003); <u>United States v. Girard</u>, 744 F.2d 1170, 1171-74 (5th Cir. 1984).  For example, in <u>Anderson</u>, the defendants conspired to obtain contracts by rigging bids in violation of antitrust laws and § 371.  <u>Id.</u> at 1323.  Although the bid-rigging contracts were beyond the limitations period, the final payment on one of the contracts came within it.  <u>Id.</u> at 1328.  The defendant Anderson contended that the final "payment was not an <u>overt act</u> in furtherance of the conspiracy but merely the <u>result</u> of the conspiracy."  <u>Id.</u>  This Court held that a <u>conspirator's acceptance of payment</u> on the illegally obtained contract constituted an overt act in furtherance of the conspiracy and brought the conspiracy within the statute of limitations.  <u>Id.</u>

Although acceptance or receipt of a benefit can be an overt act, that overt act

must be an act that is knowingly committed.  See United States v. Hogue, 812 F.2d 1568, 1579 (11th Cir. 1987) (stating as an "essential element[]" of a § 371 offense that "the overt act was knowingly committed"); Eleventh Circuit Pattern Jury Instructions (Criminal Cases) at 137 (2003) ("An 'overt act' [under § 371] is any transaction or event . . . which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy."). The jury in the *Wilson* trial was correctly instructed on this point.

The problem for the government is the last two disbursements in 2000 were from a non-conspirator (UAB) to another non-conspirator (the son), and the government presented no evidence that defendant PUGH (through Grady Pugh) or Wilson knew that Wilson was receiving part of the benefit of the $4,500 in March or June 2000, rather than all at once in August 1999. There is also no evidence that Grady Pugh or Wilson gave any direction to UAB after August 24, 1999. At trial, Grady Pugh testified he was unaware of UAB's disbursement arrangements, and no evidence contradicted him on that point. Likewise, there was no evidence that Wilson was aware of the timing of the disbursements or that Wilson had any communications at all with UAB after the $4,500 check was sent on August 24, 1999. Accordingly, Wilson's receipt of the benefit of the March and June 2000 disbursements cannot be considered "overt acts" knowingly committed by him,

114

and the bribery conspiracy in Count 75 was beyond the statute of limitations.[90]

For these reasons, we reverse PUGH's conviction on Count 75.

## XI. WHARTON'S RULE

Defendants argue they cannot be charged, convicted, or sentenced on both conspiracy to commit § 666 bribery and the substantive § 666 offenses, and thus their convictions violate Wharton's Rule. Roland Pugh additionally claims his sole conviction on Count 1 is barred by Wharton's Rule.

As the Supreme Court noted in Iannelli v. United States, 420 U.S. 770, 95 S. Ct. 1284 (1975), ordinarily a defendant can be convicted of both conspiracy to commit a crime and the substantive crime itself. Id. at 777, 95 S. Ct. at 1289-90. Historically, Wharton's Rule was only a narrow common law exception that provided that a defendant cannot be punished for conspiracy and a substantive offense if the substantive offense itself requires the participation of two persons. See Iannelli, 420 U.S. at 773, 95 S. Ct. at 1288. "The basic idea of Wharton's Rule is that where a [substantive] crime requires a plurality of agents for its commission, a charge of conspiracy cannot be used to impose a heavier penalty." United States

---

[90]The knowledge requirement was not at issue in Anderson, where the conspirator received the last payment or benefit directly. Anderson, 326 F.3d at 1328. While a third party can receive the payment on behalf of a conspirator (for example to disguise the payment), the conspirator must at least be aware of it. There was simply no evidence that Grady Pugh or Wilson was aware of how UAB applied and disbursed the money in 2000.

v. Collins, 779 F.2d 1520, 1527-28 (11th Cir. 1986).

Wharton's Rule reflects an era where conspiracy law was still developing, and it traditionally applied to offenses such as adultery, incest, bigamy, and dueling that were "characterized by the general congruence of the agreement and the completed substantive offense. . . ." Iannelli, 420 U.S. at 782, 95 S. Ct. at 1292. Wharton's Rule, however, is not grounded in the Constitution or in double jeopardy law and "has 'current vitality only as a judicial presumption, to be applied in the absence of legislative intent to the contrary.'" Collins, 779 F.2d at 1528 (quoting Iannelli, 420 U.S. at 782, 95 S. Ct. at 1292); accord Curtis v. United States, 546 F.2d 1188, 1190 (5th Cir. 1977). "The former Fifth Circuit did not generally favor Wharton's Rule, and it expressed doubt that it could ever be applicable to a conspiracy to distribute narcotics." Collins, 779 F.2d at 1528 (citing Curtis, 546 F.2d at 1190); see United States v. Previte, 648 F.2d 73, 77 (1st Cir. 1981) (stating "Wharton's Rule is, to some extent a relic of the discredited merger doctrine and should be interpreted narrowly" and explaining "the Rule does not forbid charging both a conspiracy and the substantive offense, even when it applies" as it "merely forbids sentencing on both counts").

In Iannelli, the Supreme Court held that Wharton's Rule did not apply to an illegal gambling statute, 18 U.S.C. § 1955. Iannelli, 420 U.S. at 791, 95 S. Ct.

116

1296. The Supreme Court determined Congress intended that conspiracy to violate § 1955 and the substantive § 1955 offense should be separate crimes, stating, "[h]ad Congress intended to foreclose the possibility of prosecuting conspiracy offenses under § 371 by merging them into prosecutions under § 1955, we think it would have so indicated explicitly." Id. at 789, 95 S. Ct. at 1296.

We have already rejected, albeit without discussion, a Wharton's Rule challenge to a conviction for conspiracy to commit § 201 bribery. United States v. Evans, 344 F.3d 1131, 1133 & n.2 (11th Cir. 2003); see United States v. Finazzo, 704 F.2d 300, 306 (6th Cir. 1983) (holding Wharton's Rule does not apply to a § 371 conspiracy to commit § 201 bribery, noting "the consequences of bribery not only affect the parties to the crime but have a negative effect on society at large," and pointing out "the agreement connected with the substantive offense of bribery . . . poses 'the distinct kinds of threats to society that the law of conspiracy seeks to avert'") (quoting Iannelli, 420 U.S. at 783, 95 S. Ct. at 1292).

Other circuits have concluded Wharton's Rule does not preclude a conviction for conspiracy to violate § 666(a)(1)(B). See United States v. Bornman, 559 F.3d 150, 156 (3d Cir. 2009); United States v. Hines, 541 F.3d 833, 838 (8th Cir. 2008), cert. denied, 129 S. Ct. 1385 (2009).

We now hold Wharton's Rule does not apply to § 666 crimes for two

117

reasons, either one of which is sufficient alone. For starters, Congress has not expressed any intent that § 666 crimes and § 371 crimes for conspiracy to violate § 666 should merge. If Congress had intended to foreclose prosecuting § 371 conspiracy offenses in § 666 crimes, it could have said so or merged the offenses. Defendants point to nothing in the legislative history that suggests any intent to depart from the established general rule that a court can impose separate sentences for conspiracy to commit bribery and the substantive offense itself.

Second, the effect of the crime of § 666 bribery is not limited to the bribe-payor and recipient, as the crime involves public corruption, which harms society as a whole. "The purpose of § 666, to protect the integrity of federal funds, indicates that the immediate consequences of the behavior it proscribes rest on society at large," in this case, on the federal government and the people of Jefferson County. Hines, 541 F.3d at 838 (quotation marks omitted). Accordingly, we reject defendants' claims based on Wharton's Rule.[91]

_____

[91]The defendant-appellants raise these additional conviction-related issues. Swann argues that (1) there was a material variance as to the conspiracy charged in the Indictment and any conspiracy proven, (2) the district court erred by failing to instruct the jury on multiple conspiracies, (3) the district court erred in not giving his proposed good faith instruction, (4) the district court should have severed his case alone for trial and apart from the contractor-defendants who bribed him, and (5) the district court committed cumulative error.

Roland Pugh and PUGH argue that (1) the district court erred in not giving a proposed instruction defining goodwill gifts and legal gratuities, (2) Count 15 as to PUGH should have been dismissed as "duplicitous," (3) there was a material variance as to their convictions for bribery conspiracy, (4) their involvement at most consisted of one-time buyer-seller transactions insufficient to sustain a conspiracy conviction, and (5) the district court committed cumulative

## XII.  MCNAIR'S SENTENCE[92]

McNair was sentenced to concurrent 60-month sentences on one bribery conspiracy count (Count 1) and ten substantive bribery counts (Counts 2-3, 5-12) from the *McNair* trial and one bribery conspiracy count from the *USI* case (Count 32).[93]  The district court ordered McNair to pay restitution of $851,927 to the Jefferson County Commission and a special assessment of $1,200 but no fine.  This restitution represented $376,927 in bribes to McNair by Dawson and the Pugh, Rast, and Dougherty defendants, and $475,000 in bribes to McNair by the USI contractors.[94]  On appeal, McNair challenges only the restitution part of his

error.  As noted before, McNair, RAST, Bobby Rast, Danny Rast, FWDE, and Dougherty adopt all arguments of all defendants as to all issues.  In his cumulative error claims, Swann adopts all arguments of all defendants as to all issues.

After review and oral argument, we conclude there is no reversible error as to any of these listed issues or as to any other conviction-related issues raised by any defendants.

[92]Defendants McNair, Swann, and PUGH appeal their sentences.  Defendants Roland Pugh, RAST, Bobby Rast, Danny Rast, FWDE, and Dougherty do not appeal their sentences.

[93]McNair pled guilty to Count 32 in the *USI* case.  In his plea agreement, he waived the right to "challenge any sentence so imposed or the manner in which the sentence was determined."  Thus, McNair waived his right to challenge his sentence as to Count 32.  See United States v. Johnson, 541 F.3d 1064, 1067 (11th Cir. 2008), cert. denied, 129 S. Ct. 2792 (2009) ("[A] waiver of the right to appeal a sentence necessarily includes a waiver of the right to appeal the restitution imposed.").  Accordingly, we consider McNair's sentence on only Counts 1, 2-3, 5-12 in the *McNair* case.  The district court did not tie or link the restitution to Count 32 so we reject the government's argument that McNair has waived his right to challenge the restitution.

[94]This $851,927 consisted of:
(1) $142,921 from PUGH ($11,709 for concrete work; three $20,000 payments; $4,820 carpet purchase; $17,200 in handrails; $5,000 retirement payment; and $44,192 check to George Word for McNair's Arkansas home);
(2) $84,566 from RAST ($52,990 in construction work by Mosley; $5,866 for security

sentence.[95]

## A.    Presentence Report

McNair's presentence investigation report ("PSI"): (1) assigned McNair a

base offense level of 10, pursuant to U.S.S.G. § 2C1.1 (2001); (2) added 2 levels

because McNair's conduct involved more than one bribe, pursuant to

§ 2C1.1(b)(1); and (3) added 24 levels because the net profit or benefit

($67,980,043)[96] to the contractors in connection with their bribes of McNair was

gate; $5,300 in carpet installation by Gilley; $5,500 in landscaping by Bailey & Sons; $1,775 in plumbing by Buchanan; $5,000 retirement payment; and $8,135 for Alaskan cruise);
     (3)  $133,040 from FWDE ($74,220 to Bailey for supervision; $5,000 retirement payment; $50,000 check to George Word for Arkansas home; and $3,820 for construction work on guard shack);
     (4) $16,400 from Dawson for an audio visual system; and
     (5) $475,000 from USI ($335,000 in cash and $140,000 paid on bogus invoices).
In the restitution amount, the district court included bribe amounts from some of the counts either that were not submitted to the jury (such as counts involving the Arkansas home and the three $5,000 payments after McNair's retirement) or on which McNair was acquitted (such as cash bribes).

     In our earlier recitation of the jury's verdict, we used the amount of the bribe listed in the Indictment. During trial or at sentencing, the government proved that some bribe amounts actually were higher. For example, the Indictment as to Swann alleged the amount paid to Stanger was $24,176, but the ultimate amount proved was $28,839. The Indictment as to McNair alleged the amount paid to Bailey was $27,434, but the ultimate amount proved was $74,220.

     [95]This Court reviews de novo "the legality of an order of restitution," and reviews for an abuse of discretion the determination of the restitution "value" of lost or destroyed property. United States v. Robertson, 493 F.3d 1322, 1330 (11th Cir. 2007). This Court reviews for clear error "factual findings underlying a restitution order." Id.

     [96]McNair's PSI calculated this $67,980,043 as follows:  (1) from July 2000 to October 2002, RAST received $82,668,465 through County contracts and earned an average profit of 17.5%, yielding $14,466,981 in profit; (2) from October 1999 to November 2002, FWDE received $19,647,100 in County contracts and earned an average profit of 12%, yielding $2,357,652 in profit; (3) from August 1999 to March 2002, PUGH received $109,015,665 in

between $50 million and $100 million, pursuant to §§ 2B1.1(b)(1)(M) and

2C1.1(b)(2)(A).[97]  A total offense level of 36 and a criminal history category of I

yielded an advisory guidelines range of 188-235 months' imprisonment.

The PSI pointed out the total value of the bribes received by McNair was

$889,962 and that restitution was mandatory, "pursuant to 18 U.S.C.

§ 3663A(a)(1)."  The PSI reviewed McNair's financial records and determined his

net worth was $497,163, calculated as follows:

**Assets**
Cash Assets
     * Checking Accounts                  $379.00
     Insurance, Cash Surrender Value      $10,521.00
Subtotal:                             $10,900.00

Unencumbered Assets
     Motor Vehicles                $22,500.00
Subtotal:                             $22,500.00

Equity in Other Assets
     * Residence                  $96,000.00
     McNair Investments (McNair Studio Bldg.)
                                $379,455.00
Subtotal:                          $475,455.00

---

County contracts and earned an average profit of 43.61%, yielding $47,541,731 in profit; (4) from November 2000 to March 2001, Dawson Engineering received $2,108,283 in County contracts and earned an average profit of 12%, yielding $252,993 in profit; and (5) from February 1999 to February 2002, USI received $28,005,724 in County contracts and earned an average profit of 12%, yielding $3,360,686 in profit.

[97]The PSI for McNair used the November 1, 2001 edition of the United States Sentencing Commission Guidelines Manual (the "Sentencing Manual").

|                           |              |
|---------------------------|-------------:|
| **Total Assets**          | $508,855.00  |

**Unsecured Debts**

|                              |              |
|------------------------------|-------------:|
| * Credit Card Debt           | $11,242.00   |
| * Internal Revenue Service   | $450.00      |
| **Total Unsecured Debts**    | $11,692.00   |

|               |                      |
|---------------|---------------------:|
| **Net Worth** | $497,163.00[98]      |

Notably, McNair's net worth is largely due to his equity of $379,455 in McNair's studio building that was improved with the bribe money.[99]

The PSI stated that McNair's monthly household income was $5,850, with monthly expenses of $4,109, resulting in net monthly cash flow of $1,741, calculated as follows:

**Income**

|                                           |              |
|-------------------------------------------|-------------:|
| Defendant's Social Security               | $1,779.00    |
| Defendant's Jefferson County Retirement   | $1,794.00    |
| Spouse's Social Security                  | $826.00      |
| Spouse's Teachers Retirement              | $1,451.00    |
| **Total Income:**                         | $5,850.00    |

**Necessary Living Expenses**

---

[98]The PSI states: "Items marked with an asterisk (*) represent [McNair's] half of assets or obligations shared jointly with his spouse."

[99]The PSI's net worth calculation does not include McNair's partial ownership of certain Arkansas property, which the PSI described as follows:
> In addition to the above, the defendant indicated that he owns a one-twelfth share (along with his siblings) of his parents' home-place in Fordice, AR. The property includes 50 acres, the parents' original home, and a dwelling built in 2001. He indicated that the value of the property is approximately $300,000, so his share would be approximately $25,000. However, the property would be difficult to sell due to its joint ownership.

| | |
|---|---|
| Home Mortgage | $1,990.00 |
| Groceries, Supplies | $377.00 |
| Utilities | $664.00 |
| Telephone | $62.00 |
| Transportation | $240.00 |
| Auto Insurance | $89.00 |
| Clothing | $53.00 |
| Medical | $200.00 |
| Credit Card Minimum Payments | $434.00 |
| **Total Expenses:** | $4,109.00 |
| **Net Monthly Cash Flow** | $1,741.00 |

McNair filed three sets of written objections to parts of the PSI, and the PSI was revised twice, resolving some objections. McNair's main unresolved objections were his claims that the government failed to show: (1) that there was any victim owed restitution; and (2) that $889,962 was the amount of loss incurred by Jefferson County. In his written objections, however, McNair did not claim that he lacked the financial ability to pay restitution at all or in the amount of $889,962.[100]

## B.    Sentencing Hearing

At sentencing, McNair again claimed the government failed to identify any victim and failed to show any identifiable losses by Jefferson County or any connection between the bribes and the County's losses. McNair ultimately

---

[100]McNair filed no objection to ¶¶ 154-157 of the PSI that set forth all of this financial information.

conceded he had received $851,927 in things of value but only for purposes of the guidelines imprisonment calculations.[101]

McNair maintained that no restitution should be awarded, because the government had not shown the County suffered a loss in that $851,927 amount or any amount for that matter. McNair's counsel argued that under "Title 18, 3663, the Mandatory Victims Restitution Act, that the Government is required to show losses connected to victims, and that the amount of bribes paid to Mr. McNair does not constitute losses to victims, and that there's been no showing of that. . . ." McNair contended "the amount of bribes paid to us is in no way connected to whatever losses these victims may or may not have sustained." McNair claimed there was no showing that $851,927 was the loss to the County. Citing "3663(B)(ii)" twice, McNair also argued the district court should not order restitution because the complexity and prolongation of the sentencing process in identifying victims and determining the amount of losses attributed to those victims outweighed the need to provide restitution. We pause to point out here that 18 U.S.C. § 3663 is the Victim & Witness Protection Act ("VWPA"), not the

---

[101]Contrary to the government's arguments, McNair's counsel repeatedly objected to the victims' identities and loss amounts for the basis of restitution. For example, McNair's counsel stated: "We have agreed, for guidelines calculations, concerning that amount, but we do not believe that that is an appropriate figure or that there is any appropriate figure for restitution in this case. And there is no basis legally to — for the Court to impose that kind of restitution order in this matter."

Mandatory Victims Restitution Act ("MVRA"), and the substance of McNair's argument comes from the VWPA.[102]  And as discussed later, the district court's judgment effectively refers to the VWPA.

During the sentencing hearing, McNair again did not claim he lacked the financial ability to pay restitution at all or in the amount of $889,962 referenced in the PSI.  Ultimately, the district court found the Jefferson County Commission was the identifiable victim and found the amount of loss suffered was $851,927, reasoning:

> [C]ommon sense seems to me that, in any business, it doesn't intentionally go into business for the purpose of losing money; that the evidence in all of these cases clearly shows that there was a great deal of profit to be earned from these sewer contracts.  And it seems to me, commonsensically, that if you pay a certain amount of money as bribe money, whether it's cash or for services performed, you're going to add that back into the contracts or the bills submitted to the Jefferson County Commission which pays the bills, in the first instance.
>
> It is how they do business.  Stated more clearly, it is a cost of business, a direct cost of business that it paid and made up for, at some point, by the Jefferson County Commission directly, and then indirectly to the rate payers of Jefferson County.[103]

---

[102]Section 3663(a)(1)(B)(ii) is part of the VWPA and provides:
(ii) To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order.
18 U.S.C. § 3663(a)(1)(B)(ii).  Although citing "3663(B)(ii)," McNair's counsel argued the substance of § 3663(a)(1)(B)(ii).

[103]Judge C. Linwood Smith sentenced McNair after Judge Robert B. Propst conducted the

Recognizing the sewer construction contracts were awarded through a bidding process, the district court found that "the benefit to the bribe payors did not necessarily accrue in the awarding of those contracts in the first instance, but, rather, the benefit accrued during the performance phase of the work that they were engaged to perform through change orders, through agreements to additional payments due to change orders, and things of that nature." The district court also found, "[a]t some point, any direct cost of business is going to be added back by the bribe payors in the bills, the padded bills, that are submitted to the Jefferson County Commission," and "therefore, the Jefferson County Commission, in the first instance, which paid those bids, is an identifiable victim."

The district court reduced McNair's total offense level by 10 levels from 36 in the PSI to 26. Specifically, the district court reduced the 24-level enhancement in the PSI to a 14-level enhancement under §§ 2C1.1(b)(2)(A) and 2B1.1(b)(1)(H). For the § 2C1.1(b)(2)(A) calculation, the district court used the $851,927 in bribes the contractors made to McNair, not the $67,980,043 in net profits or benefits the contractors received.[104] After determining McNair's offense level was 26 and

---

*McNair* trial.

[104]The guidelines provide that for an offense where the benefit received or loss to the government is more than $400,000 but not more than $1 million, a defendant's offense level will increase 14 levels. U.S.S.G. §§ 2C1.1(b)(2)(A), 2B1.1(b)(1)(H) (2001). Section 2C1.1 governs the offense level for bribery of public officials but also uses, in part, the theft table in § 2B1.1.

criminal history category was I, the district court determined that the advisory

guidelines range was 63 to 70 months' imprisonment.[105]

The district court sentenced McNair to 60 months' imprisonment for each

count, to run concurrently, followed by two years' supervised release, and ordered

restitution of $851,927 to the Jefferson County Commission and a special

assessment of $1,200. Although the advisory guidelines fine range was $20,000 to

$135,960,086, the district court did not impose any fine. After noting its review of

the PSI's financial information, the district court stated it imposed restitution but

no fine, as follows:

> I reviewed the financial information provided in your presentence
> investigation. And in reliance upon that information, I find that you do
> not have the financial ability to pay even a minimum guideline fine.
> Further, the imposition of such a fine would unduly burden your wife,
> who is totally dependent upon you for not just physical and spiritual, but
> financial support. Therefore, no fine will be imposed.
>
> I do order, however, as I must order, that you pay to the United States a
> special assessment in the aggregate amount of $1,200. You also are
> ordered to pay restitution in the amount of $851,927. That is due to the
> Jefferson County Commission at the address shown in paragraph 172 of
> your presentence report.

---

[105]McNair objected to the PSI's failure to accord McNair a reduction for acceptance of responsibility. The district court overruled that objection. McNair does not appeal the district court's calculation of his advisory guidelines range as 63 to 70 months' imprisonment.

In addition, the government has not challenged the district court's use of the bribe amounts, as opposed to the net profits amounts, as the basis for the enhancement calculation under § 2C1.1(b)(2)(A), nor McNair's advisory guidelines range. So we assume for present purposes that the use of the bribe amounts and the guidelines range were proper.

At sentencing, the district court did not expressly state the statutory basis for its order of restitution. However, the district court's judgment states that, "pursuant to the Victim & Witness Restitution Act," the court finds the Jefferson County Commission is a victim of McNair's criminal conduct, has sustained a loss in the amount of $851,927, and orders restitution in the amount of $851,927.[106]

## C.    Restitution for Victim's Loss

The VWPA, 18 U.S.C. § 3663, provides that:

The court, when sentencing a defendant convicted of an offense under [Title 18] . . . other than an offense described in section 3663A(c),[[107]] may order . . . that the defendant make restitution to any victim of such offense, . . .

(B)(i) The court, in determining whether to order restitution under this section, shall consider–
        (I) the amount of the loss sustained by each victim as a result of the offense; and

---

[106]We reject the government's argument that the district court imposed restitution under the MVRA. The PSI recommended the district court order restitution under "18 U.S.C. § 3663A(a)(1)," which is the MVRA. Although referring to the MVRA, McNair's attorney (in the sentencing hearing) cited sections in the VWPA and made arguments premised on the substance of the VWPA (§ 3663). And the district court's judgment references the "Victim & Witness Restitution Act." Although this reference used "Restitution" instead of Victim & Witness Protection Act, it more closely resembles the VWPA than the MVRA. The government never objected to that reference and never moved to correct it. Thus, we conclude the district court imposed restitution under the VWPA.

[107]The VWPA, under which restitution is discretionary, excepts offenses in § 3663A(c), which is the MVRA, under which restitution is mandatory. We sua sponte note there is a potential issue of whether bribery is "an offense against property" covered by § 3663A(c) and whether the MVRA applies to bribery crimes. 18 U.S.C. § 3663A(c). Nothing herein should be read as implying the answer to that question. We review the VWPA only because that is the only thing the district court referenced in McNair's sentence.

128

(II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate. . . .

(2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663. "The government bears the burden of demonstrating the amount of the victim's loss by a preponderance of the evidence." United States v. Futrell, 209 F.3d 1286, 1290 (11th Cir. 2000) (citing 18 U.S.C. § 3664(e), which states, "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence."). However, "[t]he burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents shall be on the defendant." 18 U.S.C. § 3664(e); see United States v. Twitty, 107 F.3d 1482, 1494 n.14 (11th Cir. 1997) (stating the burden rests on the defendant to demonstrate lack of financial resources by a preponderance of the evidence).

D.    County's Losses

McNair argues that the government failed to prove any losses suffered by the County. We disagree. For starters, the evidence showed McNair received $851,927 in goods, services, labor, materials, and money as a result of the bribery

129

scheme. Further, during the same time period, the contractor-defendants received hundreds of millions of dollars in payments under their County contracts and made millions of dollars in profits.[108]

And the district court did not clearly err in finding that the contractors essentially recouped their bribe money by adding it back to their sewer and engineering contract bills as a cost of doing business with the County. See United States v. DeVegter, 439 F.3d 1299, 1303 (11th Cir. 2006) ("Assuming the bribe achieves its intended result, the benefit would usually exceed the bribe."); see also Futrell, 209 F.3d at 1292 (concluding the district court did not abuse its discretion in ordering restitution under the MVRA based on "approximation" of loss resulting from defendants' fraud).

The district court's determination is consistent with Supreme Court precedent stating that when a public official acquires an ill-gotten benefit as a result of his office, the government suffers losses in that amount. See United States v. Carter, 217 U.S. 286, 305-06, 30 S. Ct. 515, 520 (1910).[109]

_____

[108]See supra note 96.

[109]In Carter, the Supreme Court stated:
It is not enough for one occupying a confidential relation to another, who is shown to have secretly received a benefit from the opposite party, to say, ". . . you cannot show that you have sustained any loss by my conduct." Such an agent has the power to conceal his fraud and hide the injury done his principal. It would be a dangerous precedent to lay down as law that unless some affirmative fraud or loss can be shown, the agent may hold on to any secret benefit he may be able to make out of his

130

McNair next contends the district court erred by failing to consider his financial ability to pay restitution and by not making an explicit finding that he had the financial ability to pay restitution of $851,927. We can locate no place in this voluminous record where McNair claimed in the district court that he lacked the financial ability to pay restitution or the $889,962 amount of restitution recommended in the PSI and sought by the government. See Jones, 289 F.3d at 1265. Because McNair raises this issue for the first time on appeal, we review it only for plain error. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). We may not correct an error the appellant failed to raise in the district court unless there is: "'(1) error, (2) that is plain, and (3) that affects substantial rights.'" Id. (quoting United States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002)). If the preceding three conditions are met, we may exercise discretion to correct a forfeited error, but only if "(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (quotation marks omitted).

---

agency. The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.

Carter, 217 U.S. at 305-06, 30 S. Ct. at 520.

McNair has not shown plain error for several reasons. First, "[d]istrict courts are not obliged to make explicit factual findings of a defendant's ability to pay restitution if the record provides an adequate basis for review." United States v. Dabbs, 134 F.3d 1071, 1084 (11th Cir. 1998) (quoting Twitty, 107 F.3d at 1493); accord United States v. Fuentes, 107 F.3d 1515, 1529 n.27 (11th Cir. 1997); United States v. Remillong, 55 F.3d 572, 574-78 (11th Cir. 1995); United States v. Hairston, 888 F.2d 1349, 1353 (11th Cir. 1989) (stating, "[i]f the record provides an adequate basis for . . . review, the court need not assign specific reasons for its decision to order full restitution. If the record is insufficient, reasons must be assigned.") (quotation marks omitted).[110]  "'In order to warrant a reversal of the restitution order, the challenging party must show that the record is devoid of any evidence that the defendant is able to satisfy the restitution order.'" Dabbs, 134 F.3d at 1084 (quoting United States v. Davis, 117 F.3d 459, 463 (11th Cir. 1997)). However, "we will not uphold the district court's exercise of discretion if the record is devoid of any evidence that the defendant is able to satisfy the restitution order." Remillong, 55 F.3d at 574.

Second, the record is not devoid of any evidence of McNair's ability to

---

[110]Since 1989 this Court has agreed "with the courts that have declined to adopt a rigid rule requiring district courts to make findings of fact whenever they impose an order of restitution under the VWPA." Hairston, 888 F.2d at 1352.

satisfy the restitution order. The PSI set forth McNair's finances in detail, the district court said it had reviewed that financial information, and McNair did not contest the facts as to his finances. There is no dispute that McNair has equity of $379,455 in his studio building, which was built in part using the bribe money. The studio value could reduce the restitution from $851,927 to $472,472.

In addition, McNair has a net cash flow of $1,741 per month, which is about the size of his monthly Jefferson County retirement check of $1,794. That retirement check alone permits McNair to pay $21,528 annually toward the restitution. Five years of $21,528 payments annually would equal over $100,000 in restitution. The unique problem in this case, however, is that McNair is now 84 years old.[111] Although the PSI states McNair "reports no current medical problems or prescription medications taken on a regular basis," it would take McNair 21.94 years at $21,528 per year to pay the remaining $472,472 left in restitution. Therefore, the record does not necessarily show that McNair has the financial ability to pay the full $851,927 in restitution.

Nonetheless, under the fourth prong of plain error review, we conclude any error does not seriously affect the fairness, integrity, or public reputation of judicial proceedings because (1) McNair, not the government, has the burden to prove lack

_____

[111]The PSI states McNair's date of birth is November 22, 1925.

of financial ability to pay the restitution in full; (2) the district court did not impose any fine but only restitution; (3) McNair does not dispute that he received $851,927 in goods, services, materials, labor, and other things of value; (4) no one, not even the district court if we remanded for further findings, knows how long McNair will live and continue to receive his monthly Jefferson County pension and thus be able to pay some restitution each month; and (5) the party owed this restitution is the same party currently paying McNair $1,749 per month, making it eminently fair to recapture these payments as restitution for as long as they are made. Given all of the unique circumstances in this case, McNair has not shown plain error in the district court's restitution order.

McNair also challenges the restitution order on the ground that United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), requires that the factual predicate for restitution be found by a jury beyond a reasonable doubt. McNair's Booker challenge is foreclosed by our precedent. United States v. Williams, 445 F.3d 1302, 1310 (11th Cir. 2006) ("Booker does not apply to restitution orders."), abrogated on other grounds by United States v. Lewis, 492 F.3d 1219, 1222 (11th Cir. 2007). We thus reject this argument.[112]

---

[112]McNair objected to this statement in the PSI: "Theo Lawson, County Attorney for Jefferson County, AL, appeared at the sentencing in U.S. v. Dougherty, (05-61, 05-544) and indicated that the county requests restitution in each of these cases on the amount of the bribes." On appeal McNair claims the PSI's inclusion of this "testimony" violated his right to

134

For the first time on appeal, McNair also claims the district court erred in ordering any restitution because co-defendant Roland Pugh was not ordered to pay restitution. We review this claim for plain error. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). Seven of McNair's co-defendants were ordered to pay restitution, to wit: PUGH ($239,652), Bobby Rast ($141,000), Danny Rast ($141,000), RAST ($141,000), Swann ($355,533), FWDE ($225,149), and Dougherty ($225,149). McNair has shown no plain error in this regard.[113]

For all these reasons, we affirm the restitution order as to McNair.

## XIII. SWANN'S SENTENCE

Swann was sentenced to 102 months' imprisonment, followed by three years' supervised release, on one bribery conspiracy count (Count 51), six substantive bribery counts (Counts 52-54, 57, 58, and 60), and eleven counts of honest services mail fraud (Counts 90-100). The district court ordered Swann to pay restitution of $355,533 and a fine of $250,000. On appeal, Swann challenges

---

confrontation in the Sixth Amendment. We disagree. The district court never mentioned Lawson, let alone relied on his statement as the basis for restitution. In any event, this Court has held that "Crawford dealt with trial rights and we see no reason to extend Crawford to sentencing proceedings. The right to confrontation is not a sentencing right." United States v. Cantellano, 430 F.3d 1142, 1146 (11th Cir. 2005).

[113]McNair received no fine while some co-defendants had significant fines, such as Roland Pugh ($250,000), PUGH ($19.4 million), Bobby Rast ($2.5 million), Danny Rast ($1 million), RAST ($1,702,500), Swann ($250,000), FWDE ($3,830,760), and Dougherty ($750,000).

the imprisonment and his fine but not the restitution.

## A.    Presentence Report

The PSI: (1) assigned Swann a base offense level of 10, pursuant to U.S.S.G. § 2C1.1 (2003); (2) added 2 levels because Swann's conduct involved more than one bribe, pursuant to § 2C1.1(b)(1); (3) added 22 levels because the net profit or benefit ($42,460,880)[114] to the contractors in connection with their bribes of Swann was between $20 million and $50 million, pursuant to §§ 2C1.1(b)(2)(A) and 2B1.1(b)(1)(L); and (4) added 2 levels for obstruction of justice, pursuant to § 3C1.1.[115]  A total offense level of 36 and a criminal history category of I yielded an advisory guidelines range of 188 to 235 months' imprisonment.

The PSI provided a detailed financial analysis of Swann's assets, including his cash, checking and savings accounts, savings bonds, deferred compensation account, debt, investments, income, and living expenses.  The PSI reported Swann had $118,194 in assets, including $109,380 in deferred compensation, $95,000 in

---

[114]Swann's PSI calculated this $42,460,880 in profit as follows:  (1) from September 1998 to October 2002, RAST received $127,182,375 through County contracts and earned an average profit of 17.5%, yielding $22,256,740 in profit; (2) from September 1998 to November 2002, FWDE received $23,884,498 through County contracts and earned an average profit of 12%, yielding $2,866,139 in profit; and (3) PUGH's total profits for 2001 and 2002 amounted to $17,338,000.

We recognize that McNair's PSI showed total contractor profits of $67,980,043, but McNair's PSI included $3,360,686 in USI profits and $47,541,731 in PUGH profits (based on a longer time span of almost four years from August 1999 to March 2002).  See supra note 96.

[115]The PSI for Swann used the November 1, 2003 edition of the Sentencing Manual.

debt (taxes and attorneys' fees), and a net worth of $23,194. The PSI stated

Swann's monthly income was $6,729 ($6,604 in Jefferson County pension and

$125 salary for niece's trust fund). Thus, at the time of the PSI, Swann had an

annual income of $80,748.

The PSI reported that Swann's total monthly expenses were $6,971,

calculated as follows:

**Necessary Living Expenses**

| | |
|---|---|
| Home Mortgage/Equity Line (645 Winwood) | $2,321.00 |
| Home Mortgage/Equity Line (641 Winwood) | $1,201.00 |
| Groceries/Supplies/Transportation<br>(Includes all credit card purchases<br>other than non-copay medical<br>expenses.) | $1,435.00 |
| Utilities | $452.00 |
| Telephone | $118.00 |
| Auto Insurance | $122.00 |
| Life Insurance | $395.00 |
| Home Maintenance Insurance | $36.00 |
| Clothing | $20.00 |
| Medical | $488.00 |
| Printing/Copying/Postage | $60.00 |
| Dry Cleaning | $10.00 |
| Pest Control/Termite Bond | $48.00 |
| OTC Medications/Personal Grooming | $122.00 |
| Lawn Maintenance | $120.00 |
| Internet Service | $23.00 |
| **Total Expenses:** | **$6,971.00**[116] |

The PSI noted (1) Swann's wife was retired from Bellsouth, (2) their newly

_____

[116]Swann also submitted other expenses as "necessary," which the PSI did not include in the above calculations as "necessary": meals out $75; entertainment $30; and newspaper $12.40.

137

remodeled home at 645 Winwood Drive was in her name, and (3) she owned their former home, at 641 Winwood Drive two doors down, jointly with her mother and paid that mortgage.[117]  According to the PSI, Swann's wife had refused to provide any additional financial information for the PSI.  Swann claimed he had no knowledge of the value of his wife's investments, nor of the income generated from her investments or retirement.

In calculating Swann's fine under 18 U.S.C. § 3571(d),[118] the PSI stated the "gross loss" amount was the $42,460,880 benefit the contractors received.  Based on this information, the PSI determined the guidelines fine range was $20,000 to $84,921,760 (i.e., double the gross loss amount pursuant to U.S.S.G. § 5E1.2). The PSI stated:  "Based on his financial condition it appears that the defendant [Swann] could pay a fine within the guideline range or make a lump-sum payment toward restitution shortly after sentencing through use of liquid assets."  The PSI noted that Swann's "future ability to make payments on an installment basis will

---

[117]Swann filed no objections to ¶¶ 153-159 of the PSI that set forth all of this financial information.

[118]Section 3571(d) provides:
If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process.
18 U.S.C. § 3571(d).

be dependant [sic] on several factors including the sentence in this case, his family situation, and his ability to contain monthly expenses."

The PSI stated that restitution was mandatory under 18 U.S.C. § 3663A(a)(1) (the MVRA) and that the County had requested restitution.

Swann objected to the 22-level increase to his offense level under U.S.S.G. § 2C1.1(b)(2)(A), arguing his offense level should be based on the amount of bribes ($355,533) rather than the net profits or benefits ($42,460,880) the contractors received. Section 2C1.1(b)(2)(A) provides:

> If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest (i) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (ii) exceeded $5,000, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

U.S.S.G. § 2C1.1(b)(2)(A) (2003).[119] Swann argued there was no evidence of a causal connection linking any bribe to the award of any contract, and therefore, the 22-level adjustment under § 2C1.1(b)(2)(A) was improper. Even if a *quid pro quo* is not required for a § 666 conviction, Swann claimed evidence of a *quid pro quo* was necessary under § 2C1.1(b)(2)(A) to increase his offense level.

**B.    Sentencing Hearing**

---

[119]The guidelines provide that for an offense where the benefit received or loss to the government is more than $20 million but not more than $50 million, a defendant's offense level will increase by 22 levels. U.S.S.G. §§ 2C1.1(b)(2)(A), 2B1.1(b)(1)(L).

At sentencing, Swann objected to the PSI on the ground that co-defendants RAST, Bobby Rast, and Danny Rast's offense levels were based on the amount of bribes given, not the financial benefit or profit to them. Swann also objected to any obstruction of justice enhancement. The district court sustained Swann's objection to the obstruction enhancement.[120]

The district court, however, concluded the benefit, not bribe, amount should be used under § 2C1.1(b)(2)(A) and found the evidence was "absolutely clear that there is at least 20 million dollars that was benefit" to the bribe-payor contractors. As support for the $20 million figure, the district court cited instances where Swann (1) decided not to invoke the performance bond against RAST, (2) allowed RAST to rebid the Valley Creek job for an additional $23.927 million, and (3) was involved in granting RAST a $2.677 million change order when RAST's boring machine became stuck. The district court found that a preponderance of the evidence established that the $20 million benefit to the bribe-payors "was a direct result of that influence of [RAST's] bribes." The court also pointed out that Swann

---

[120]Because some of Swann's co-defendants were sentenced under an earlier guidelines edition and that edition would result in a lower guidelines range for him, Swann urged the court to use the earlier edition to avoid a sentencing disparity with his co-defendants. The district court overruled that objection.

On appeal Swann does not challenge the applicability of the 2003 guidelines edition to the calculations of his advisory guidelines range. Rather, as discussed later, Swann claims his sentence is substantively unreasonable because the use of different editions as to co-defendants caused disparities in his and his co-defendants' sentences that are unwarranted. We address that issue later.

granted PUGH's joint venture a 180-day extension just days after PUGH's Yessick

hired a landscaper for Swann's property, saving PUGH's joint venture $180,000 in

liquidated damages. At sentencing, the district court expressly found a direct

connection between the bribes to Swann and the financial benefit to the bribe-

payor contractors, stating:

> I think it is absolutely clear that there is at least 20 million dollars that was benefit, for instance, to [RAST], two change orders being 2.677 million of the digging out of the boring machine and pulling out a boring machine and rebid of that job, 23.927 million. The testimony as I recall it at trial and the testimony that was presented today, I conclude, based on the burden of proof that's required, not beyond a reasonable doubt but by a preponderance of the evidence, that that is due to be calculated at 2B1.1 as a gain of over 20 million dollars, that because of the decision by Mr. Swann that I believe was a result of the bribes and stuff that was provided him by RAST, I think that that was a direct result of that influence of those bribes. And I am not going to go through the others. Like for instance, the extensions, just one example is with regard to exhibit 36, the 180 extension that was granted to PUGH. A thousand dollars a day is what I recall the evidence to be that it would have been if they weren't granted that extension and that's $180,000. I am not even necessarily having to go to the aspect of whether or not because Mr. Swann was Mr. Wilson's supervisor the effect of the contracts or the approval of the committee because I find I am going to, for calculation of fine purposes, set that amount at 20 million and one dollars. More than 20 million, I am going to set it at 20 million and one dollars as clearly – in fact, actually I think I figured it at 26 million at the bottom end, but I am going to set it at 20 million and one dollars for the purpose of calculating the fine range, and I will ask him that you do that for me, and we'll need to recalculate the other.

The district court found that Swann's base offense level was 10, added 2

levels because Swann's offenses involved multiple bribes, and added 22 levels

because the benefit to the bribe-payor contractors was between $20 million and $50 million, resulting in a total offense level of 34. See U.S.S.G. §§ 2C1.1(b)(2)(A), 2B1.1(b)(1). This total offense level of 34 and a criminal history category of I yielded an advisory guidelines range of 151 to 188 months' imprisonment.

In considering the § 3553 factors, the district court found that Swann (1) was not credible in stating his wife was the one responsible and he did not know that these contractors were doing the work and what was going on, (2) had "not indicated any remorse whatsoever," and (3) refused to accept responsibility. The district court also considered that it was "bribery on a large scale of a public official" that had affected many people. The court noted "the need to reflect the seriousness of this offense and to promote respect for the law and to provide just punishment for this offense." The court also commented that, because Swann held a position of public trust, he was different than the contractor-defendants that were bribing him. The district court stated it had considered all of the § 3553 factors. Citing Swann's "history" and "character," the district court varied downward from the 151 to 188 months' range and imposed a sentence of 102 months' imprisonment, followed by 3 years' supervised release.[121]

_____

[121]As to Counts 51 and 90 to 100, the district court imposed a sentence of 60 months' imprisonment, to run concurrently. As to Counts 52, 53, 54, 57, 58, and 60, the district court

Importantly, the district court also stated that, even if it had adopted Swann's view that the U.S.S.G. § 2C1.1(b)(2)(A) calculation should be based on the bribe amount Swann received (instead of the net benefit to the contractors) and even if Swann's total offense level was 24 and his guidelines range was 51 to 63 months, it would nonetheless vary upward on Swann's sentence, explaining:

> [C]ounsel has urged me to utilize the guideline range that would result from considering the bribes of $355,533 in calculating your sentencing range and indicated that if I used that, it would result in a guideline offense level, criminal offense level of 24 when combined with a criminal history category of roman numeral one would result in imprisonment range of 51 to 63 months. I am going to state for the record that if I used that, I would nonetheless vary upward because I would believe that would not be sufficient to account for the other factors in [18 U.S.C. § 3553] that I am charged with the responsibility of weighing, including the nature and circumstances of this particular offense, as well as the need to reflect the seriousness of the offense, provide respect for law. I would have varied upwards, in other words, on that sentence. So if the Eleventh Circuit has any question about that when they get this on appeal which I suppose they will, if they ask or wonder what I would have done had I went that way, that's what I would have done. I believe that's appropriate and I have given that weight. I have actually considered that, and I started to just go ahead and do that. But I thought it appropriate in this instance because I think it is very clear that at least the 23 million dollars that I discussed earlier was a correct calculation.

(Emphasis added). Although the district court did not say the precise words — "I would impose the same 102 months sentence" — the record is patently clear that is

---

imposed a sentence of 102 months' imprisonment, to run concurrently. The sentences for all 18 counts thus run concurrently.

143

what the district court meant.

As to restitution, Swann disputed that the amount of the bribes paid was $355,533, but conceded that, if restitution was owed, it should be based on the amount of bribes paid. Based on the evidence, the district court found the total bribe amount Swann received was $355,533. The district court rejected Swann's argument that restitution should be only the total $93,680 bribe amount referenced in the conviction counts (Counts 52-54, 57-58, 60, 90-100) that the jury found Swann received beyond a reasonable doubt. The district court ordered Swann to pay restitution of $355,533[122] to the "Jefferson County Commission."

As to the fine, Swann pointed out he "has no money," that his house was transferred to his wife's name before he became aware of the subpoenas in the investigation, and that he lost the respect of his community and thereby lost his ability to earn a living. Swann argued for a reduced fine but did not propose any specific fine amount.

---

[122]This $355,533 consisted of:
(1) $149,102 from PUGH ($7,422 for waterfall and koi pond, $1,000 in gift certificates to Alabama Book Smith, and $140,680 in landscaping by Guthrie);
(2) $55,885 from RAST ($4,441 for concrete work; $3,535 for flooring; $1,054 in brick work; $8,940 in plumbing; $9,733 for painting; $6,300 to Derek Houston for supervision; $18,867 in labor for miscellaneous employees; and $3,015 for Swann's trip to England and Scotland); and
(3) $150,929 from FWDE ($28,839 to Stanger for supervision; $94,090 to Hendon for supervision; and $28,000 to Dudley Davis for framing). The sentencing court and its judgment use $355,533, and we do too. But these amounts total $355,933.

After determining the advisory guidelines fine range was $17,500 to

$40,000,002, the court imposed a $250,000 fine and a $1,800 special assessment.

As to the $250,000 fine, the district court stated:

> You are ordered to pay a fine in the amount of $250,000. I don't know
> whether that's collectable or not. I don't think it is, but I think it's
> appropriate considering the circumstances.

## C.      Guidelines Range Calculations

On appeal Swann claims the district court improperly calculated his

guidelines range because "[t]he court utilized a 'net benefit' approach instead of

the amount of the alleged bribes in calculating the base offense level." This is a

challenge to the procedural reasonableness of Swann's 102 months' imprisonment

sentence.[123]

As noted earlier, the bribery offense level is calculated using *the greater* of

the value of the bribe payment or the benefit received in return. See U.S.S.G.

§ 2C1.1(b)(2)(A). "The value of 'the benefit received or to be received' means the

---

[123]In reviewing the reasonableness of a sentence, we apply an abuse-of-discretion standard using a two-step process. United States v. Pugh, 515 F.3d 1179, 1189-90 (11th Cir. 2008) (relying on Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007)). First, we look at whether the district court committed any significant procedural error, such as miscalculating the advisory guidelines range, treating the guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to explain adequately the sentence. Pugh, 515 F.3d at 1190. Then we look at whether the sentence is substantively reasonable under the totality of the circumstances. Id.

net value of such benefit." § 2C1.1 cmt. n.2.[124] "The net value of the improper

benefit need only be estimated, and the bribe amount should be used only when the

net value cannot be estimated." DeVegter, 439 F.3d at 1303. The net value "need

only be a reasonable estimate given the information available to the government."

United States v. Cabrera, 172 F.3d 1287, 1292 (11th Cir. 1999).[125]

On appeal Swann does not claim that the bribe amount ($355,533) he

received was greater than the net benefit amount (over $20 million) the contractor-

defendants received.[126] Rather, Swann argues that, to use the net benefit approach,

the government first must show a connection (i.e., a *quid pro quo*) between a

_____

[124]The Commentary to § 2C1.1 gives the following examples of net value: "(1) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (2) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000." U.S.S.G. § 2C1.1 cmt. n.2.

The Commentary to § 2C1.1 also provides: "[F]or deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is higher." Id. cmt. Background.

[125]In United States v. DeVegter, 439 F.3d at 1304, this Court adopted the Fifth Circuit's approach to calculating net value under § 2C1.1 as set forth in United States v. Landers, 68 F.3d 882 (5th Cir. 1995). The Fifth Circuit in Landers concluded that the profit on a contract, not the gross revenue or value, is to be used to determine net value. We stated in DeVegter, "[w]e agree with the Fifth Circuit's approach [in Landers] which subtracts direct costs, but not indirect costs, from profits to determine the net improper benefit." DeVegter, 439 F.3d at 1304.

[126]Swann's appeal brief refers to the $20 million as the "net benefit" and does not argue that the district court erred by using $20 million in its calculation of net benefit. Although the district court's finding that the benefit was $20 million to the contractor-defendants appears to be based on gross revenue received by the contractor-defendants and not their net profit, other portions of the trial record amply support total profits in excess of $20 million to the contractor-defendants RAST, PUGH, and FWDE, and thus a net benefit in excess of $20 million. This may be why no remand was requested on this issue.

146

particular bribe and a particular contract or action by a public official. Swann claims the government's evidence failed to show the requisite causal connection.

In this regard, Swann first argues there is no connection between the bribes he received and the contractors' revenue because he had no authority to award the sewer or engineering contracts. Alternatively, Swann claims, "there was no tie or connection of any kind between any alleged bribe and any contract awarded even if Appellant Swann could have influenced the award of the contract." Therefore, Swann says, "the proper loss amount to be utilized under § 2C1.1 was the amount of the alleged bribes paid to Appellant Swann and the court erred in failing to utilize said amount." Swann points out that had the $355,533 bribe amount been used (as opposed to the $20 million benefit amount), the district court would have added only 12 levels (not 22) under § 2C1.1, resulting in a total adjusted offense level of 24 (not 34).

This Court has not addressed what type of connection under § 2C1.1(b)(2)(A) the government must establish between the bribe given and the benefit received. Section 2C1.1(b)(2)(A) does speak in terms of "the value of . . . the benefit received or to be received in return for the payment . . . ." U.S.S.G. § 2C1.1(b)(2)(A). Other circuits have held that the threshold for establishing a causal connection under § 2C1.1(b)(2)(A) is low. See United States v. Sapoznik,

161 F.3d 1117, 1119 (7th Cir. 1998) (concluding that "[t]o show that the bribes benefitted the people paying them [the bar owners/illegal gambling], . . . it is enough for the government to show that the bribes facilitated the gambling operations"); United States v. Kinter, 235 F.3d 192, 198 (4th Cir. 2000) (stating "[t]he threshold for the causation inquiry for § 2C1.1 calculations is relatively low"). In Sapoznik, the Seventh Circuit explained that the question of causation between the bribe and the benefit is different from the question of quantification of the actual benefit received, concluding the government had established a causal connection between the bribe and the benefit even though it had not shown the precise amount of the benefit to the bribe-payor. Sapoznik, 161 F.3d at 1119. And the bribes need only contribute or facilitate the business activity involved. Id.

Here, given the wealth of evidence in the record, we readily conclude the district court did not clearly err in finding that the benefits the contractors received (such as the RAST revenue from the $2.6 million change order, the RAST job rebid for an additional $23,837,350, and the PUGH time extension on the Vestavia Trunk Sewer Replacement project) were a result of the corrupt bribes to Swann. This amply satisfies any causal connection requirement in § 2C1.1(b)(2)(A).[127]

---

[127]We review the district court's findings of fact in sentencing for clear error. DeVegter, 439 F.3d at 1303. We do not find clear error unless "'we are left with a definite and firm conviction that a mistake has been committed. . . . [T]he clear error standard is purposefully deferential to the district court, . . . [but r]eview for clear error does not mean no review.'" Id.

Accordingly, we find no reversible error in the district court's calculations adding 22 levels under § 2C1.1(b)(2)(A) to Swann's offense level.

The district court alternatively stated that even if it used the bribe amount approach and not the net benefit approach, it would vary upward from the lower range (51 to 63 months) urged by Swann based on "other factors in 18 USC Section 3553 that I am charged with the responsibility of weighing." Therefore, we also conclude any error in the guidelines calculations as to Swann was harmless. See United States v. Barner, 572 F.3d 1239, 1248 (11th Cir. 2009) ("Where a district judge clearly states that he would impose the same sentence, even if he erred in calculating the guidelines, then any error in the calculation is harmless."); United States v. Dean, 517 F.3d 1224, 1232 (11th Cir. 2008), aff'd, Dean v. United States, 129 S. Ct. 1849 (2009); United States v. Keene, 470 F.3d 1347, 1348-49 (11th Cir. 2006).

D.    Substantive Reasonableness

Swann also argues his 102-month sentence was substantively unreasonable because the district court impermissibly considered that (1) Swann showed no remorse, and (2) because he was a public official, Swann was more culpable than the contractors and, without his conduct, the bribe-payors could not have

_____

(quoting United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005)). We review questions of law arising under the federal Sentencing Guidelines de novo. Id.

committed the crime.[128]

This Court considers the substantive reasonableness of the sentence imposed by inquiring whether the sentence is supported by the 18 U.S.C. § 3553(a) factors. Gall v. United States, 552 U.S. 38, 56, 128 S. Ct. 586, 600 (2007).[129]

The district court need not discuss each of the § 3553(a) factors. United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005) ("[N]othing in Booker or elsewhere requires the district court to state on the record that it has explicitly considered each of the section 3553(a) factors or to discuss each of the section 3553(a) factors.") (quotation marks omitted). The district court's acknowledgment that it considered the defendant's arguments and the factors in § 3553(a) is sufficient. Id.

The district court's consideration of Swann's lack of remorse was not improper. A district court is permitted to consider lack of remorse in its § 3553(a)

---

[128]Swann claims these were improper factors (1) for not varying even lower than 102 months from the 151 to 188 months guidelines range and alternatively (2) for varying upward to 102 months from the 51 to 63 months guidelines range.

[129]The § 3553(a) factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a). We review de novo whether the district court considered an impermissible factor. United States v. Velasquez Velasquez, 524 F.3d 1248, 1252 (11th Cir. 2008).

analysis as to several factors, such as the characteristics of a defendant, the need to promote respect for the law, and the need to protect society. See United States v. Kapordelis, 569 F.3d 1291, 1318 (11th Cir. 2009) (stating "district court did not abuse its discretion by considering . . . [defendant's] lack of remorse" and affirming where district court found "upward variance was necessary to protect society because it was unlikely that [the defendant] would be rehabilitated given his attitude and lack of remorse"), cert. denied, 130 S. Ct. 1315 (2010); United States v. Cruzado-Laureano, 527 F.3d 231, 236-37 (1st Cir. 2008) (upholding consideration of lack of remorse as a permissible factor under § 3553(a)(1) as to the characteristics of a defendant, under § 3553(a)(2)(A) to promote respect for the law, and under § 3553(a)(2)(C) to protect the public from future crimes of the defendant). The district court also did not err in considering Swann was a public official, another characteristic of the defendant. See 18 U.S.C. § 3553(a)(1).

Swann further argues there was an unwarranted disparity between his 102-month sentence and those of his co-defendants Bobby Rast (51 months), Danny Rast (41 months), and Dougherty (51 months). Swann claims Bobby and Danny Rast received lower sentences because the district court sentenced them using the bribe amount (not the net benefit amount) in calculating their guidelines ranges

under § 2C1.1.[130]  Swann argues that in using the net benefit in his case, the district court created sentencing disparity with similarly situated co-defendants because it had utilized different methods to calculate the guidelines range for various co-defendants.  This ignores a number of factors that differentiate Swann from these particular co-defendants:  (1) Swann was a public official and the private contractors were not, (2) Swann took bribes not just from the Rast defendants but also from the Pugh and Dougherty defendants, (3) the district court found Swann not credible in stating he did not understand the home remodeling work was intended to influence him, and (4) Swann showed a lack of remorse.  Simply put, Swann has not proved he and these particular co-defendants are similarly situated.

As to FWDE and Dougherty, Swann also argues they received lower sentences because the district court applied an earlier edition of the sentencing guidelines.  As to FWDE, Swann is incorrect because the PSI and the district court applied the 2003 guidelines to calculate FWDE's sentence.  As to Dougherty, the 2000 guidelines were used.  Under the 2000 guidelines, a $20 million net benefit resulted in a 16-level increase, rather than the 22-level increase in the 2003 version.  Compare U.S.S.G. § 2F1.1(b)(1)(Q), (R) (2000) with § 2B1.1(b)(1)(L),

---

[130]Judge L. Scott Coogler conducted the *Swann* and *Wilson* trials and sentenced Swann on March 30, 2007, the Rast defendants on March 29, 2007, and the Dougherty defendants on March 28, 2007.  Different judges sentenced McNair and PUGH.

(M) (2003).[131]  That a district court may have used the wrong version of the guidelines in a co-defendant's separate sentencing (to the benefit of a defendant) does not make another defendant's sentence under the correct version unreasonable in any way.  In addition, the Dougherty defendants' profits were much lower than the Pugh and Rast defendants, who also gave bribes to Swann.  Also, Swann ignores the fact that the district court granted a downward variance to 102 months from his advisory guidelines range of 151-188 months.  Swann has shown no reversible error in his 102-month sentence based on disparity with his co-defendants.

E.    **Swann's Fine**

The district court ordered that Swann pay a fine of $250,000, based on a fine guidelines range of $20,000 to approximately $84 million.  See U.S.S.G. § 5E1.2.  Swann argues that the district court erred in not considering any of the fine guidelines factors, including Swann's ability to pay.

The sentencing guidelines require courts to "impose a fine in all cases, except where the defendant establishes he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).  The defendant has the burden

---

[131]With a 16-level increase, Swann's total offense level would be 28, which, with a criminal history category of I, would yield an advisory guidelines range of 78 to 97 months under the 2000 guidelines.  For Dougherty, the PSI used the 2000 edition, and, apparently, there was no objection by the government.

of proving inability to pay a fine. United States v. McGuinness, 451 F.3d 1302,

1307 (11th Cir. 2006).[132]

After determining a fine is appropriate, the district court shall consider these

factors in fixing the amount of the fine:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
> (4) any restitution or reparation that the defendant has made or is obligated to make;
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
> (6) whether the defendant previously has been fined for a similar offense;
> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and
> (8) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).

"While some circuits require that the district court make specific findings,

we have adopted the less rigid approach, and do not require the sentencing court to

make specific findings of fact with respect to the Sentencing Guideline factors as

---

[132]This Court reviews a district court's decision that a defendant can pay a fine for clear error. United States v. Gonzalez, 541 F.3d 1250, 1255 (11th Cir. 2008).

long as the record reflects the district court's consideration of the pertinent factors prior to imposing the fine." United States v. Hernandez, 160 F.3d 661, 665-66 (11th Cir. 1998) (citations and quotation marks omitted); see United States v. Lombardo, 35 F.3d 526, 530 (11th Cir. 1994) (holding that where the record contains sufficient information with respect to the factors to permit us to find that the district court did not clearly err in imposing or in setting the amount of the fine, we will not reverse merely because the district court failed to make specific findings on each of the factors). "Explicit findings on these factors are not required . . . ." United States v. Khawaja, 118 F.3d 1454, 1459 (11th Cir. 1997). We have applied this rule to uphold a fine where the district court did not make explicit findings of fact as to the defendant's ability to pay. United States v. Long, 122 F.3d 1360, 1367 (11th Cir. 1997). However, "[i]f the record does not reflect the district court's reasoned basis for imposing a fine, we must remand the case so that the necessary factual findings can be made." United States v. Gonzalez, 541 F.3d 1250, 1256 (11th Cir. 2008) (quotation marks omitted).

Swann claims the PSI said Swann could pay a fine within the guidelines range or make a lump-sum restitution but not both. That is not correct. We quoted the PSI earlier as it (1) says that Swann could pay a fine or make a lump-sum payment toward restitution shortly after sentencing with liquid assets, and then (2)

155

states it does not determine Swann's future ability to pay a fine or further restitution on an installment basis.

Furthermore, the district court adopted the factual findings in the PSI, which included numerous findings relevant to Swann's current income and future earning capacity. The PSI set forth Swann's net worth, educational background, work history, and monthly income of $6,729, yielding $80,748 annually. Swann holds two bachelors degrees, one in civil engineering and one in textile management, and a masters degree in sanitary engineering. Swann has retired from Jefferson County but submitted no evidence to show he had tried and failed to gain employment. Swann already has an annual retirement income of $80,748 even without social security or future wages from working.[133]

Although Swann makes two mortgage payments on the two Winwood Drive residences and pays over $658 in monthly home utility, lawn, pest control, and maintenance expenses, the homes are in his wife's name and she lives there too. The record shows Swann can pay at least some fine. The record also shows Swann's counsel argued for a reduced fine and the district court considered the pertinent factors. As the district court reviewed the PSI before imposing the fine and heard argument of counsel about the fine, "we infer without hesitation that the

[133]The PSI, dated February 5, 2007, did not show Swann drawing any social security. In 2010, Swann is now 64.

156

district court considered the pertinent factors prior to imposing the fine." Khawaja, 118 F.3d at 1459.

Although Swann has shown no clear error in the district court's imposition of some fine, the record is not sufficient to permit us to say there is no error in the amount of the fine. As to the $250,000 amount, the district court remarked: "I don't know whether that's collectable or not. I don't think it is . . . ." We cannot glean from the record the basis for this statement or how the court determined that the fine should be $250,000 as opposed to $150,000 or $750,000, especially given the fine guidelines range goes up to $84 million. Thus, we vacate and remand as to the amount of the fine. See Khawaja, 118 F.3d at 1459-60 (requiring remand where record does not reflect court's reasoned basis for amount of $175,000 fine).

## XIV. PUGH'S SENTENCE

PUGH was sentenced to 60 months' probation on four bribery conspiracy counts (Counts 1 involving McNair, 51 involving Swann, 75 involving Wilson, and 78 involving Barber), nine substantive bribery counts (Counts 15, 61-63, 71, 83-86), and eleven counts of honest services mail fraud (Counts 90-100). The district court ordered PUGH to pay a $19.4 million fine, a special assessment of $9,600, and $239,652 in restitution to the Jefferson County Commission. On appeal, PUGH challenges only the fine.

## A.    Presentence Report

The PSI stated that PUGH performed nearly $200 million worth of construction work for sewer projects for Jefferson County between 1997 and 2003 and that a majority of this work was for JCESD-related projects.  The PSI listed bribes given by PUGH to McNair, Swann, Chandler, Barber, and Wilson, totaling $395,514.[134]  The PSI stated that PUGH had this net income: $19.09 million in 2001, $15.32 million in 2002, $9.10 million in 2003, $2.94 million in 2004, and $3.67 million in 2005.  PUGH's federal tax returns reported net income of $17.89 million in 2001, $14.95 million in 2002, $8.10 million in 2003, $3 million in 2004, and $3.97 million in 2005.

According to the PSI, PUGH received more than $109 million in JCESD contracts related to the bribery conspiracy from August 1999 to June 2003.  This $109 million reflected only PUGH's portion of its joint venture work for Jefferson County.  The PSI determined that from 1999 to 2002 PUGH earned an average

---

[134]This $395,514 in restitution consists of PUGH's payments of:
(1) $192,000 to McNair ($175,000 for construction, remodeling, and cash for his studio and $17,200 installation of hand railings for his studio);
(2) $149,102 to Swann ($140,680 for Guthrie Landscaping, $7,422 for installation of waterfall and pond, and $1,000 in gift certificates to Alabama Book Smith);
(3) $610 to Chandler for condominium rental at Pelican Beach Condominiums;
(4) $49,102 to Barber ($47,927 for McCalla, Alabama land, $148 for casino trip to Vicksburg, Mississippi, $546 resort trip to Biloxi, Mississippi, and $481 trip to Gulf Shores, Alabama); and
(5) $4,500 to Wilson (UAB scholarship).

profit of 43.61% and that PUGH's profit from County contracts was $47.92 million.[135]

The PSI: (1) assigned PUGH a base offense level of 10, pursuant to U.S.S.G. § 2C1.1(a) (2003); (2) added 2 levels because the offense involved more than one bribe, pursuant to § 2C1.1(b)(1); and (3) added 22 levels because the net profit to PUGH was between $20 million and $50 million, pursuant to §§ 2C1.1(b)(2)(A) and 2B1.1(b)(1)(L),[136] yielding a total offense level of 34.[137] Under the § 8C2.4(d) table, this total offense level of 34 required a base fine amount of $28.5 million.

However, the PSI determined PUGH's pecuniary gain under § 8C2.4(a)(2) was its $47.92 million profit from the County contracts. Under § 8C2.4(a), the base fine amount became $47.92 million, because PUGH's $47.92 million pecuniary gain was greater than the $28.5 million amount from the § 8C2.4(d) fine table and greater than the pecuniary loss of $319,425 suffered by the victim

---

[135]PUGH later filed for Chapter 11 bankruptcy. At the time PUGH's PSI was prepared, the bankruptcy case was pending. In April 2008, the bankruptcy court confirmed PUGH's proposed plan of liquidation. See In re Roland Pugh Constr., Inc., No. Bk-06-71769-CMS-11, 2007 WL 509225 (Bankr. N.D. Ala. Feb. 12, 2007). The bankruptcy court ordered PUGH to establish a trust account in the amount of $19,409,600, which would be used to pay the federal criminal fine assessed in the present case. In re Roland Pugh Constr., Inc., No. Bk-06-71769-CMS-11 (Bankr. N.D. Ala. Apr. 21, 2008).

[136]The PSI listed the table section as "§ 2B1.1(b)(1)(M)" but applied the enhancement listed in § 2B1.1(b)(1)(L) of that table, which provides a 22-level enhancement for amounts between $20 million and $50 million.

[137]The PSI for PUGH used the November 1, 2003 edition of the Sentencing Manual.

County.

The PSI determined PUGH's culpability score was 7 under § 8C2.5, because (1) PUGH had 50 or more employees and (2) individuals with substantial authority (Board Chairman Roland Pugh, CEO Grady Pugh, and President Yessick) participated in the offenses. This culpability score of 7 resulted in a minimum fine multiplier of 1.4 and a maximum multiplier of 2.8, under § 8C2.6. Based on these multipliers and the base fine of approximately $47.92 million, the PSI calculated the guidelines fine range to be $67,089,446.48 to $134,178,892.96.

The statutory maximum fine was $95,842,066, pursuant to 18 U.S.C. § 3571(b), (d) (i.e., double the pecuniary gain of $47.92 million). Thus, the PSI concluded PUGH's advisory guidelines fine range was $67,089,446 to $95,842,066.

The PSI stated PUGH appeared unable to pay a fine within that $67 million to $95 million guidelines range and recommended the district court reduce the fine if it determined PUGH was unable to pay the minimum fine amount. The PSI noted that, under § 8C3.4, the guidelines fine could be offset by 67.75%, because (1) PUGH was a closely held organization, (2) three of PUGH's owners (Roland Pugh, Yessick, and Grady Pugh) whose total interests amounted to 67.75% had already been fined for the same offense conduct, and (3) one owner (Andy Pugh)

160

had a 32.25% interest and was not convicted in the bribery scheme.

PUGH objected to the PSI's calculation of profits or pecuniary gain. PUGH argued there was no evidence that PUGH obtained any contracts, or the $47.92 million in profits, because of its bribes. PUGH contended its base offense level should be based on the $129,138.81 amount of bribes PUGH paid, which would result in a total offense level of 22 and a base fine of $1.2 million.[138]

## B. Supplemental Briefing Before Sentencing

The district court ordered briefs addressing the fine amount. PUGH's brief reiterated its challenge to the PSI's calculations, arguing there was no evidence the County suffered any pecuniary loss from the bribery scheme.

The government recalculated PUGH's pecuniary gain based on a job-by-job analysis of PUGH's contracts with the County. The government submitted a list of bribery and post-bribery jobs, which showed the revenue earned, gross profit, gross profit percentage, and "improper gain" for each job. The government calculated an average unit price for items used by PUGH in eight of its projects over a 20-month period from 2001 to 2002 and then compared those prices for this time period to the average unit price PUGH charged the County for these items during the bribery

---

[138]PUGH's total did not use certain amounts that were included in the PSI, such as (1) $60,696 that PUGH claimed Swann repaid to PUGH, (2) $37,000 worth of unperformed work on Swann's home that PUGH paid Guthrie for, and (3) $167,679 in items PUGH gave to McNair.

period of 1997 to 2001. The government determined PUGH's improper gain was $24.667 million, while PUGH made about $20 million in "normal profit." Based on the improper gain of $24.667 million and applicable multipliers, the government concluded PUGH's guidelines fine range was $34.533 million to $69.067 million.[139]

PUGH's reply brief then challenged the government's recalculation for failing to account for a price increase that occurred in 2003 and for using artificially low post-bribery prices in 2001 and 2002. PUGH claims this skewed the government's analysis of PUGH's profits to reflect greater profits during the bribery period. PUGH also claimed that, to prove PUGH profited from the bribery scheme, the government had to show that PUGH's bribes caused the PRC to limit the number of cured-in-place contracts.

## C.     Sentencing Hearing

The district court conducted a lengthy sentencing hearing, including two days of evidence and a partial day of argument on evidence assessment and factual

---

[139]When comparing the unit prices of bribery-period and post-bribery jobs, the government's analysis used only PUGH's sewer rehab jobs — and not other jobs such as wastewater treatments, trunk sewer jobs, and annual contracts — so that the analysis would reflect an "apples-to-apples" comparison. FBI Agent Tom Mayhall stated PUGH earned about $55 million from other work from the County, which was not included in the improper gain calculation.

Although the government points out PUGH continued to make some bribes in 2001 and well into 2002, the majority of PUGH's bribes were given prior to December 31, 2000, and the government thus compared the profit before the end of 2000 with that in 2001-02.

determinations. The government presented evidence as to the bribes PUGH paid

and the revenue and profits PUGH earned from its County contracts during the

bribery scheme. For example, FBI Agent Tom Mayhall calculated PUGH's

improper gains by comparing (1) the average unit price of items on invoices for

sewer rehab jobs PUGH submitted to the County during the bribery scheme

through the end of 2000 with (2) the average unit price of items on eight sewer

rehab jobs PUGH performed in 2001 and 2002. Based on this comparison, Agent

Mayhall concluded PUGH's improper gain was approximately $24.667 million.[140]

Agent Mayhall testified about PUGH's bribes to County employees and the

benefits PUGH received from its County contracts and as a result of the PRC's

decisions. PUGH maintained that the increase in profits was not substantial and

was based on areas of PUGH's business other than its work for the County.

The district court rejected the government's pricing analysis, finding that the

evidence failed to show the line items in PUGH's contracts were affected by the

bribes PUGH paid. The court found PUGH paid bribes to County employees

because PUGH was "afraid of what might happen if [it] did not do so" and that

---

[140]Agent Mayhall testified PUGH made about $44.536 million total gross profit on about $109 million in revenue on JCESD rehab jobs during the bribery period. Mayhall testified that of this $44.536 million total gross profit, about $19.869 million was a result of PUGH's normal profit margin, and the remaining $24.667 million was therefore improper gain. Mayhall added that PUGH had about $22 million in cash on hand, which earned about $77,000 per month in interest, and bankruptcy creditors claimed less than $200,000 of that cash.

"what might have happened is that [PUGH] might have lost all its contracts, those current and future, with the County and the profits associated with those contracts."[141] The court further found, for example, "that the Swann bribes . . . were designed to ensure that [PUGH] stayed in good favor with Mr. Swann so that [PUGH] would have and continue to have the opportunity to receive contracts and be paid on contracts from Jefferson County." The court later stated "there [was] an expectation that if you do business with the County, you're expected to do this. And I think that the reason [PUGH] did it was because others were doing it and it wanted to protect the contracts it had."

The court also found that, beginning in August 1999, PUGH started making bribes "in order to maintain its standing in the revenues and profits realized in the contracts awarded by Jefferson County; and, indeed, they became extremely high profits during that bribe period."

The district court found that PUGH made its first bribe in August 1999 and its final bribe in September 2002. The court found that (1) from September 1, 1999 to December 31, 2002, PUGH benefitted from the bribes, (2) during this 1999-2002 period PUGH generated from its County contracts a total profit of

---

[141]Judge David R. Proctor conducted the *Barber* trial and sentenced the Pugh defendants.

$43,985,869,[142] and (3) given PUGH's $107,887,832 in revenues, this $43,985,869

profit was a 40.77% profit margin during that period. Using that profit to calculate

the base fine amount, the district court determined the guidelines fine range was

$61,580,216 to $87,971,738. See U.S.S.G. §§ 8C2.5, 8C2.7. After considering

PUGH's ability to pay, the district court reduced the fine to $21 million. The

district court then gave a $1.6 million offset for fines paid by individuals who

owned at least 5% of PUGH, which resulted in a final fine of $19.4 million.

## D.     Challenges to $19.4 Million Fine

On appeal, PUGH primarily raises objections to the manner in which the

district court arrived at the $19.4 million fine, but none of them has merit. The PSI

contained extensive financial information about PUGH's revenue and profits.  The

district court's fact-findings are supported by the record and undisputed facts in the

PSI, and PUGH has shown no clear error in any of them. PUGH also has shown

no legal error in any of the district court's calculations regarding the advisory

guidelines fine range or in any other matters under the sentencing guidelines.

PUGH's brief as to the fine mainly resorts to claiming PUGH did not have

---

[142]The court found, "[t]he September 1, '99 date signifies the first contract awarded to Pugh by the County after the August 1999 concrete work was done for McNair." The court stated: "I have not attributed any profits made by Pugh in 2003, although the government may well have a good argument that profits in 2003 and revenues in 2003 continued to be effected [sic] because of the bribes paid in '99, 2000, 2001 and 2002." The court added: "Likewise, I have not attributed any pre-September 1999 gain to Pugh Construction based upon the bribe scheme that was in place and paid by other contractors."

adequate notice of certain arguments or adequate opportunity to respond.  The

record refutes those claims too.  The parties submitted numerous sentencing briefs

and offered a substantial amount of evidence as to PUGH's revenue and profits.

PUGH claims it did not know the district court would consider that the bribes were

paid out of fear of losing contracts or future payments thereon.  However, PUGH's

counsel, in arguing that the bribes were unrelated to the PRC, relied on the fact that

the contractors feared what would happen if they did not pay bribes:

> [L]et me explain to [the court] why I think the contractors make such payments to public officials.
>
> . . . .
>
> [T]he best testimony that I heard about that was from Mr. William Dawson.  Mr. Dawson was an engineer, independent, who was doing work for Jefferson County. . . . Mr. McNair invited him to come by the studio.  And when he got there, Mr. McNair said, Mr. Dawson I've never asked you for anything before, but what I would like is for you to buy me an audio-visual equipment, some sort of a projector or something of that nature, and he had a book.  And he said this is the model and this is what I would like to have.  Well, Mr. Dawson didn't want to do that. And he went home and he thought about it and finally he did it.  And he did it because he was afraid of what Chris McNair would do to him if he didn't.
>
> So when these people come and put the touch on a contractor or someone, I think it's the fear of the unknown.

In closing arguments, PUGH's trial counsel maintained that any benefits PUGH

provided to the County employees were given purely out of friendship.  PUGH

cannot now claim it had an inadequate opportunity to explain its motivation in

paying bribes or to prepare for the ultimate approach the district court took in deciding on the amount of the fine. If anything, counsel's argument succeeded in reducing the amount of the fine imposed to well below the advisory guidelines range of $61,580,216 to $87,971,738. PUGH has shown no reversible error in any procedural aspects of the sentencing proceedings before the district court in PUGH's case.

## XV. CONCLUSION

We affirm all of the defendant-appellants' convictions except PUGH's conviction on Count 75, which we reverse. We affirm McNair's sentence. We affirm Swann's sentence except as to the amount of the fine. While there was no legal error in the imposition of some fine for Swann, we vacate and remand as to the amount of the fine. As to PUGH's sentence, we (1) affirm the district court's findings of fact as supported by the record; and (2) conclude there was no error in the district court's calculations under the sentencing guidelines; but (3) in light of the reversal of its Count 75 conviction, we vacate PUGH's sentence and remand for resentencing without Count 75.[143]

**AFFIRMED IN PART, REVERSED IN PART, VACATED AND**

---

[143]PUGH was convicted and sentenced on 24 counts of conviction, and the reversal on Count 75 does not appear to impact its overall sentence. However, in an abundance of caution, we vacate PUGH's sentence and remand for resentencing by the district court because, at a minimum, Count 75 must be removed.

**REMANDED IN PART.**